MENNEMEIER, GLASSMAN & STROUD LLP
ANDREW W. STROUD (SBN 126475)
STEPHEN LAU (SBN 221051)
980 9th Street, Suite 1700
Sacramento, CA  95814
Telephone:     916-553-4000
Facsimile:     916-553-4011
E-mail:        stroud@mgslaw.com

Attorneys for Defendant

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENERAL CHARLES E. "CHUCK" YEAGER (RET.),<br><br>                 Plaintiff,<br><br>v.<br><br>AT&T MOBILITY, LLC; and DOES 1 TO 200, inclusive,<br><br>                 Defendants. | Case No. 2:07-cv-02517 (FCD-GGH)<br><br>**DEFENDANT'S REBUTTAL EXPERT WITNESS DISCLOSURE**<br><br>Complaint Filed:     November 21, 2007<br>Trial Date:          February 23, 2010<br><br>The Honorable Frank C. Damrell, Jr. |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that pursuant to Federal Rule of Civil Procedure 26(a)(2)(A) and 26(a)(2)(C)(ii), Defendant AT&T Mobility LLC hereby identifies **David Drews** as a rebuttal expert witness.  Defendant has retained Mr. Drews as an expert who may present rebuttal testimony at trial under Rules 702, 703, or 705 of the Federal Rules of Evidence.  Please see the accompanying report required by Federal Rule of Civil Procedure 26(a)(2)(B).


Dated:  August 21, 2009                   MENNEMEIER, GLASSMAN & STROUD LLP

By: _____ for
                                              Andrew W. Stroud
                                          Attorneys for Defendant AT&T Mobility,
                                          LLC



# United States District Court
# Eastern District of California

## Case No. 07 cv. 2517

# Gen. Charles E. "Chuck" Yeager (Ret.)
# v.
# AT&T Mobility, LLC, et al.

## Rebuttal Expert Report
## of David Drews
## August 2009

---

# CONSOR®
### Intellectual Asset Management

7342 Girard Avenue, Suite 8
La Jolla, CA  92037-5159
Phone:  (858) 454-9091
Fax:  (858) 454-7819

## HIGHLY CONFIDENTIAL
## PURSUANT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**HIGHLY CONFIDENTIAL**

Page 1



## TABLE OF CONTENTS

I.    **INTRODUCTION** ............................................................. 2

II.   **QUALIFICATIONS** ......................................................... 2

III.  **CASE BACKGROUND** ................................................... 3

IV.  **SUMMARY OF OPINIONS** ............................................ 4

      A.  NEGLIGIBLE BENEFIT ........................................... 4

      B.  REASONABLE FEE .............................................. 5

      C.  NO EXCLUSION ................................................ 5

V.   **THE ALBERT REPORT** ................................................. 5

VI.  **THE PRESS RELEASE** ................................................. 6

      A.  DISSEMINATION OF THE PRESS RELEASE ................. 7

      B.  OTHER DISSEMINATION CHANNELS ....................... 8

      C.  BLOGS AND AGGREGATORS ................................. 9

      D.  SUMMARY ...................................................... 10

VII. **VALUATION PRINCIPLES AND METHODS** .................. 10

VIII. **NEGLIGIBLE BENEFIT TO AT&T MOBILITY** ................. 11

      A.  VALUE OF THE MEDIA COVERAGE ......................... 11

      B.  IMPACT ON PROFITS ......................................... 12

IX.  **REASONABLE FEE** .................................................. 13

      A.  NATURE AND EXTENT OF THE USE ....................... 14

      B.  COMPARABLE VALUATION .................................. 16

X.   **NO EXCLUSION** ...................................................... 19

**EXHIBITS** ..................................................................... 21

**APPENDICES** ................................................................. 26

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**HIGHLY CONFIDENTIAL**

Page 2

CONSOR®
Intellectual Asset Management

## I.   INTRODUCTION

I have been retained by AT&T Mobility, LLC ("AT&T Mobility")[1] to provide my rebuttal opinions regarding intellectual property and rights of publicity customs and practices, valuation, and damages assessment in connection with Civil Action 2:07-CV-02517 filed before the United States District Court, Eastern District of California.   Specifically, I have been asked to offer an expert rebuttal to the opinions expressed in Plaintiff's Expert Witness Disclosure by Jon Albert, filed July 22, 2009 (the "Albert Report") and to quantify the damages, if any, that the Plaintiff General Charles E. "Chuck" Yeager (Ret.) ("Gen. Yeager") incurred as a result of certain actions by AT&T Mobility in the event that AT&T Mobility is deemed liable.

This report contains my rebuttal opinions and the basis and reasons for them, a discussion of the data and other information considered in forming those opinions, and summary and support exhibits.   These rebuttal opinions are based on the documentation made available to me to date.   I reserve the right to amend or modify these rebuttal opinions and analyses should additional documentation be provided or made available.

## II.   QUALIFICATIONS

I am David Drews, Director at CONSOR.   I have over twenty years experience as a financial analyst, primarily concentrated in valuing intellectual property of all types, including trademarks, copyrights, patents, know-how, trade secrets and domain names.   My extensive valuation experience includes projects involving use of the assets as collateral, transaction due diligence, joint venture negotiations, licensing, transfer pricing and bankruptcy liquidation and reorganization.   I have also been called on to calculate damages related to infringement of IP in numerous litigation and/or arbitration proceedings, including claims filed under the Lanham Act.

I have performed valuations on assets as diverse as apparel, financial services, automotive, non-profit organization and consumer brand trademarks; mechanical, chemical and electrical patents, processes and trade secrets; customer lists; non-compete agreements; and entertainment industry personalities, characters, trademarks and copyrights.

I have also testified on numerous occasions in litigation involving the value of trademarks and other forms of intellectual property, and have been accepted by numerous courts as an expert witness.   A more detailed listing of my experience and credentials, as well as cases in which I have testified in the past four years and my publications for the past ten years, is set forth in my curriculum vitae, which is attached hereto as Exhibit A.

---

[1] The company that issued the Press Release at the time of the events referred to in this case was Cingular Wireless, which has since merged into AT&T Mobility, Llc.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**HIGHLY CONFIDENTIAL**

Page 3



I was assisted in the preparation of this report by individuals at CONSOR who performed tasks at my request and under my supervision as is customary for projects of this nature.

In addition to documents and publications specifically cited in the body of the report, I have included the list of documents considered in this matter in Exhibit B. As set forth in Exhibit C, my firm is compensated on a standard hourly basis of $395 per hour for work preparing this report. In the event a deposition or testimony in court are required, additional time for deposition or trial preparation and/or deposition or trial testimony will be billed according to the individual hourly rates disclosed in that exhibit, which in my case is $550 per hour.

## III. CASE BACKGROUND

On May 17, 2006, AT&T Mobility[2] (then doing business as "Cingular Wireless") issued a press release on PRNewswire.com entitled, "Cingular Wireless Announces Enhanced Emergency Preparedness Program for 2006 Hurricane Season" (the "Press Release") announcing its investment of $1.8 billion to enhance and improve its network coverage in the Southeastern U.S., including more than $60 million for hurricane emergency preparedness and two new Mobile Access Command Headquarters (M.A.C.H.) designated MACH 1 and MACH 2, which were designed to support the restoration of wireless communication service in disaster affected areas.[3]

Within the text of the Press Release, the fifth paragraph read as follows:

> *"Nearly 60 years ago, the legendary test pilot Chuck Yeager broke the sound barrier and achieved Mach 1. Today, Cingular is breaking another kind of barrier with our MACH 1 and MACH 2 mobile command centers, which will enable us to respond rapidly to hurricanes and minimize their impact on our customers," de la Vega said.*

In the Complaint, Gen. Yeager[4] alleges that the use of his name and identity in the Press Release, without compensation and permission, infringes on his rights of publicity and that such use constitutes a false endorsement of the Defendant's products and services.[5] Gen. Yeager seeks damages from AT&T Mobility from such alleged unauthorized use.

---

[2] AT&T Mobility, Llc. is a wholly-owned subsidiary of AT&T, Inc. operating wireless communications, and was AT&T's joint venture with BellSouth prior to December 29, 2006 (See: AT&T, Inc., 2008 Annual Report, available at: http://www.att.com/Common/about_us/annual_report/pdfs/2008ATT_FullReport.pdf ).
[3] The text of the press release, along "B-roll" video footage of Cingular personnel reading portions of the text (AT&T00108), was posted on www.PRNewswire.com.
[4] Gen. Yeager is a retired U.S. Air Force General, was a fighter pilot in WWII, and was later a test pilot who was the first to fly faster than the speed of sound (Mach 1). Complaint, filed November, 21 2007, at §5-6.
[5] Complaint, at §1.

**CONSOR®**
Intellectual Asset Management

## IV.  SUMMARY OF OPINIONS

In response to the Albert Report, I have been asked to assume for purposes of this analysis that AT&T Mobility is liable to Gen. Yeager for damages relating to the Press Release, and to attempt to quantify the value of those damages, if any.  It is my understanding that claims of right of publicity infringement are based upon the unauthorized use of a commercial property right of value.[6]  Thus, a first approximation to the measure of damages in this case is to ascertain the monetary value of the use of Gen. Yeager's identity or persona in the manner in which AT&T Mobility is alleged to have used it.[7]  The Albert Report seeks to measure this value and I have also been asked to review and analyze that report.

A summary of my opinions follows.  These opinions are explained in greater detail in the subsequent sections of this report.

### A.  Negligible Benefit

Any benefit to AT&T Mobility from mentioning Gen. Yeager's historic achievement in the Press Release is, at most, negligible.  The benefit to AT&T Mobility, if any, can be quantified in one of two ways.

#### 1.  Publicity Value

One measurement of the value of the use of Gen. Yeager's name in the Press Release is to attribute to it a portion of the equivalent advertising value of the media coverage of the Press Release.

In this case, the news media coverage did not reference Gen. Yeager's name as it only referred to the investment announcement, the preparedness program and the mobile units.  Further, coverage of the Press Release was limited, having been accessed by less than 6,000 users of the PR Newswire online service, including only 32 accesses in the dedicated "PR Newswire for Journalists" website.[8]  Some blogs and news aggregators did post the Press Release directly, but the limited audience of these five sites is under 37,000 users.  I have considered the total of 41,414 potential readers of the Press Release in my valuation.  This number is *de minimis* when compared to size of the population in hurricane-affected areas.

The equivalent publicity value for the Press Release as a whole is no more than **$1,035.**  This amount is the only publicity value one can attribute to the reference to Gen. Yeager's historic flight contained in the Press Release.

---

[6] J.T. McCarthy, The Rights of Publicity and Privacy, 2nd Edition, §11:31.
[7] *Ibid.* §11:32.
[8] Access Report, Bates #AT&T0105-6.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report                              **HIGHLY CONFIDENTIAL**

Page 5

**CONSOR®**
Intellectual Asset Management

## 2.   Incremental Revenue

The second approach to quantify any benefit to AT&T Mobility is to analyze whether AT&T Mobility derived any revenues through increased sales as a direct result of the use of Gen. Yeager's name in the Press Release.

In this case, no products or services were branded with Gen. Yeager's name, and no connection was made between AT&T Mobility's products and services to surpassing the speed of sound. In fact, the sole reference in the Press Release is to AT&T Mobility breaking <u>another kind</u> of barrier, thus explicitly differentiating AT&T Mobility's products, services, and infrastructure from Gen. Yeager's historic feat as a pilot.

Based on my analysis, there is no evidence that AT&T Mobility derived any sales or revenue (and thus any profit) as a direct result of the Press Release. Accordingly, the incremental value in revenue or profit to AT&T Mobility cannot reliably be valued at anything other than **$0**.

## B.   Reasonable Fee

I have also analyzed what a reasonable fee would have been for the use of Gen. Yeager's name in the Press Release.

On the basis of my review, the hypothetical fee that would compensate Gen. Yeager for the monetary value of the use of his name by AT&T Mobility is in the range of **$14,000 to $35,000**.

## C.   No Exclusion

Finally, I have considered Gen. Yeager's allegation, and Mr. Albert's opinion, that AT&T's conduct has impaired Gen. Yeager's ability to negotiate representation agreements with other cellular and wireless service providers.

After considering the actual use of Gen. Yeager's name in the Press Release, as well as the characteristics of a suitable endorser, I have formed the opinion that Gen. Yeager has not been limited by such use in pursuing any form of endorsement role with competing wireless carriers.

# V.   THE ALBERT REPORT

The Albert Report purports to determine the range of a reasonable fee for the use of Gen. Yeager's name in the Press Release.

The Albert report assumes, without specific analysis, that the Press Release was aimed at enhancing the AT&T brand and was, therefore, commercial speech.

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

HIGHLY CONFIDENTIAL

Page 6

CONSOR®
Intellectual Asset Management

Moreover, the contention in the Albert Report is that the reference to Gen. Yeager was part of a strategic marketing/public relations effort.[9]

As to the specifics of the mention of Gen. Yeager's name in the Press Release, the Albert Report asserts that the Press Release implies Gen. Yeager endorses AT&T and that "any consumer would likely infer that relationship,"[10] thus causing confusion among consumers as to the affiliation of Gen. Yeager with AT&T.

The Albert Report further assumes that, by mentioning Gen. Yeager's name in connection with his 1947 record flight in the Press Release, AT&T Mobility was using his "reputation, prestige character and other values."[11]

The Albert Report echoes the claim that the Press Release limits the ability and possibilities for Gen. Yeager to endorse "any other wireless product or telecommunications service for several years."[12]

Finally, the Albert Report concludes with the opinion that the use of Gen. Yeager's "name, accomplishments, and image" is valued at no less than $500,000, and no more than $2,000,000.[13] The Albert Report states these amounts without any concrete support, justification, or methodology. Moreover, this range of fees explicitly refers to a long term endorsement relationship of no less than one year,[14] in stark contrast with the fact that the case refers to a one-time incidental reference to the historical flight that took place 59 years before.

As I demonstrate in the detailed analysis below, the opinions reflected in the Albert Report are not reliable. They are not based on the facts or on any sound application of valuation principles.

## VI.   THE PRESS RELEASE

The Press Release was issued on the PR Newswire online service on May 17, 2006, two weeks before the start of the 2006 hurricane season. The Press Release contains a total of 896 words and is structured in 22 paragraphs. Gen. Yeager's name is not included in the title of the Press Release, and is only mentioned in the fifth paragraph. Thus only 4.6% of the paragraphs contain a mention of the name at issue.

That paragraph, cited in the Case Background Section III above, only establishes a link between Gen Yeager and the common name for the speed of sound, Mach 1, and the notion of a barrier being broken. The association made in the subsequent sentence is with the M.A.C.H. acronym for the mobile command centers and explicitly depicts the breaking of "other barriers." Thus, no Cingular product or

---

[9] Albert Report, at §B.
[10] Ibid.
[11] Ibid.
[12] Ibid.
[13] Ibid.
[14] Ibid.

service is directly associated with Gen. Yeager.  The acronym for Cingular's mobile command centers, the MACH vehicles, is similar to the 'Mach' designation for the speed of sound, but Gen. Yeager does not own that term.

The Press Release was prepared in the wake of the devastating impact on the wireless communications infrastructure of Hurricanes Rita and Katrina in 2005, and was issued prior to the start of the following hurricane season.  Cingular (AT&T Mobility's brand at the time) wanted to improve its ability to quickly restore wireless service after a disaster like a hurricane, for example, and the company decided to improve its capabilities and to publicize them.[15]

The salient point of the Press Release was the amount of the investment that AT&T Mobility had undertaken to prepare for the 2006 hurricane season, and this is the point that the media outlets that accessed the Press Release echoed in their own reports.

## A.   Dissemination of the Press Release

I have reviewed the news articles that reference the information from the Press Release, which are summarized in Exhibit D.  The central point of the Press Release, the investment to enhance preparedness for the upcoming hurricane season, was incorporated into 19 news articles during a period encompassing the eleven weeks after the initial release.  The majority of the stories incorporated similar disaster preparedness information from the competing wireless carriers, and reported on the amount invested for that purpose.  **None of the references in the news media include "Chuck Yeager," "Mach 1," the breaking of a "Sound Barrier" or any other type of barrier.  Furthermore, a majority of the media reports on the subject incorporate information and/or refer to the other wireless service providers, mainly Verizon and Sprint.**  Thus, rather than reporting on the specific attributes of Cingular's preparations, the media focused on the underlying context of how the industry had prepared to maintain communications in the face of the hurricane season following two of the region's most devastating disasters (Hurricanes Katrina and Rita).

From a business perspective, it is my opinion that the only connection that can be inferred from the actual use of Gen. Yeager's name in the Press Release is too indirect to be considered a branding association of the two terms "Chuck Yeager" and "Cingular."  The focus of the Press Release was the significant investment made by Cingular to address hurricane preparedness.  The timing of the Press Release was significant because it was issued at the beginning of the 2006 hurricane season, following the disasters of Hurricanes Katrina and Rita in the previous season.  In my opinion, this is a key reason why the reference to the first transonic flight was completely absent from the news

[15] Deposition of M. Seigel taken May 21, 2009, at page 8:14-21.

CONSOR®
Intellectual Asset Management

media reports based on the Press Release, while the facts and amounts of the investments made were the only items reported on.

In sum, Gen. Yeager's name as mentioned in the Press Release was not reported on by the media and, therefore, consumers were never exposed to any alleged "association" or implied endorsement. In fact, the only way for consumers at large to find the aforementioned fifth paragraph of the Press Release was to perform an Internet search for the conjunction of the two terms "Chuck Yeager" and "Cingular" and then access the Press Release within the PR Newswire website, or to find it in the PR archives of Cingular's website.[16]

The report from PR Newswire indicates less than 6,000 accesses to the Press Release,[17] 32 of which were through the subscription-based "PR Newswire for Journalists" website and 5,113 on the general site.[18]

Thus, from my review of the evidence, the use of Gen. Yeager's name was limited to the initial Press Release and its exposure to less than 6,000 users of the PR Newswire service who reportedly accessed it. To further ascertain myself of this fact, CONSOR performed a search of the news section of the Google search engine and verified that the only reference to the search terms "Cingular" and "Chuck Yeager" was the original Press Release at the PRNewswire.com website, and a pay service that only references that same website, Highbeam.com.[19]

## B.  Other Dissemination Channels

In addition to regular print and online news media, the facts of the Press Release were reported in four TV reports. Again, the references were only to the investments announced by Cingular and the other wireless communications providers in the Southeast in the context of the 2006 hurricane season.

On May 17, 2006 two morning reports on FOX affiliate WTVT (Tampa–St. Petersburg) mentioned an "elaborate Cingular wireless set up" and lead with a reference to the investment stating, "Cingular wireless broke the bank" in emergency preparedness.[20]

Another report, which aired on June 2, 2006 on CBS affiliate WINK (Ft. Myers–Naples) mentioned the "state-of-the-art mobile command centers" as part of "Cingular's emergency preparedness program."[21]

---

[16] Naturally, after the filing of this lawsuit there are new references linking Gen. Yeager's name and either Cingular or AT&T as a result of reports of the lawsuit being made available online.
[17] The exact number is reported as 5,145 in: Bates #AT&T0105-6.
[18] See: Bates #AT&T0105-6.
[19] Search of the news archives between January 2005 and November 2007 performed on August 6, 2009.
[20] Source: AT&T00109-110.
[21] Idem.

HIGHLY CONFIDENTIAL

CONSOR®

Intellectual Asset Management

A June 13, 2006 TV report on CNN mentioned Cingular's mobile stations that would now be able to maintain wireless communications in disaster-hit areas.[22]

None of these TV reports mentioned Gen. Yeager or used any video footage mentioning Gen. Yeager.

## C. Blogs and Aggregators

The Press Release was also reproduced in five outlying websites on the Internet.  Outside of the mainstream media, blogs and news aggregators typically reproduce or paraphrase press releases to capture web search traffic. In this case, CONSOR performed a comprehensive search of such types of references to the terms "Chuck Yeager" and "Cingular Wireless" and found four blogs which have archived the Press Release, as well as one instance previously produced in this case.  These sites receive very little traffic.  The table below reports the maximum Internet traffic of these websites at a top level, as the detailed traffic numbers for the specific page where the Press Release appeared at the time of its release are not available.

**Table 1**
**Blog and News Aggregator Postings of**
**the Press Release**

| Blog | Title | Average Reach* |
|------|-------|---------------|
| Cell-phones-and-plans.com (Bates #Y000011-12) | Cingular Wireless Emergency Preparedness Program – Fighting Disasters | 0.000026% of Global Internet Users (290 users)** |
| Mywire.com | Cingular Wireless Announces Enhanced Emergency Preparedness Program for 2006 Hurricane Season | 0.00215% of Global Internet Users (23,957 users) |
| Lowermyphone.com | Cingular Wireless Announces Enhanced Emergency Preparedness Program for 2006 Hurricane Season | 0.000002% of Global Internet Users (22 users) |
| Digchip.com | Cingular Wireless Announces Enhanced Emergency Preparedness Program for 2006 Hurricane Season | 0.00105% of Global Internet Users (11,700 users) |
| Experiencemobility.blogspot.com | Cingular Enhances Emergency Preparedness for 2006 Hurricane Season | 0.000027% of Global Internet Users (300 users) |
| **TOTAL REACH** | | **36,269 users** |

\* *Three-month average daily reach as reported by Alexa.com, accessed on 8/19/2009.*
\*\* *Global Internet Users are 1,114.3 million users as reported by D. Britton & S. McGonegal, The Digital Economy Fact Book, 9th Edition 2007, p 7.*

These five blogs or aggregators that posted the Press Release do not establish an endorsement relationship or association between Gen. Yeager and Cingular Wireless, and do not have significant Internet traffic and,

---

[22] *Idem.*

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

HIGHLY CONFIDENTIAL

Page 10

CONSOR®
Intellectual Asset Management

therefore, readership.  They play the same role as the Press Release posted, and made available, at the PR Newswire online service.

### D.  Summary

My review of the reports tracking the dissemination of the Press Release confirms that the essential point communicated through it, the investment to enhance preparedness for the upcoming hurricane season, was incorporated into 23 media reports during a period encompassing the eleven weeks after the initial release.  The majority of the stories incorporated similar disaster preparedness information from competing wireless carriers, and reported on the amount invested for that purpose.  None of the references in the news media include "Chuck Yeager," "Mach 1," the breaking of a "Sound Barrier" or any other type of barrier.  From a business perspective, the less than 6,000 readers of the Press Release who reportedly accessed it on the PR Newswire service do not appear to have been confused as to any association between Gen. Yeager and AT&T Mobility, or an implicit endorsement of the wireless company and therefore did not reflect it on any of the reports found.

The five blogs or aggregators that posted the Press Release do not establish an endorsement relationship or association between Gen. Yeager and Cingular Wireless.  They play the same passive role as the Press Release posted at the PR Newswire online service.

## VII.  VALUATION PRINCIPLES AND METHODS

To reliably measure a value of the potential damages, it is necessary to establish a suitable and accepted methodological approach.

The valuation of intellectual property or, more generally, intangible assets, such as trademarks and rights of publicity, follows three generally accepted approaches to the definition and measurement of value.  Many different methods may be used in practice, but they are all forms of these core approaches: [23]

1. The Cost Approach, in which the value of the assets is measured by the amount of money it would cost to replace the same service (or utility) in the current market (i.e., value of the media coverage);

2. The Income Approach, which measures the value of the assets by the net present value of the benefit to be received over the life of the assets (i.e., impact on profits); and,

3. The Market Approach, in which the assets are valued by comparing them to similar assets in similar transactions (i.e., reasonable fee).

---

[23] These approaches are recognized in the literature on the subject of valuation of intangibles.  See, for example: G.V. Smith & R.L. Parr, Intellectual Property: Valuation, Exploitation, and Infringement Damages, J. Wiley & Sons, Inc., Ch. 7, pp 140-155.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report                         Page 11

HIGHLY CONFIDENTIAL

CONSOR®
Intellectual Asset Management

In this engagement, I have analyzed the damages issues using generally accepted methodologies which apply these principles.

## VIII.   NEGLIGIBLE BENEFIT TO AT&T MOBILITY

There are two methods to potentially quantify the value to AT&T Mobility stemming from dissemination of the Press Release.  Falling within the Cost Approach, a first method is to quantify what it would cost to buy an advertising placement of similar impact to the publicity generated from media reports on the Press Release ("Publicity Value").   The second method is to analyze whether AT&T Mobility enjoyed any unexpected rise in revenues as a direct result, or contemporaneously with the reports on the Press Release ("Incremental Sales"), a method classified within the Income Approach.  Under either valuation method, AT&T Mobility's financial benefit was negligible at best, and most reasonably null.  AT&T Mobility would not have compensated Gen. Yeager more than the value of the use of his name, and would likely have limited the compensation to some fraction of that value.

### A.   Value Of The Media Coverage

Items placed in media, be they advertisements or news items, are customarily valued based on the impressions they generate.  Impressions are the number of people who might have had the opportunity to be exposed to the text in question.

While coverage valuations do apply an objective methodology to quantifying value, they nevertheless tend to overstate publicity values.  Among the factors contributing to this inflated value are the following:

- The valuations typically do not distinguish between positive and negative coverage.

- Impressions are all uniformly counted for a given media outlet, thus assuming everyone who is exposed to that particular outlet has actually seen or read the item at issue.

- Impressions generally take no account of the content of the item or its placement in relation to other items.

Nevertheless, the coverage tracking valuation is useful for setting an upper limit for the value of the publicity to AT&T Mobility.  It is important to note, however, that only the direct accesses to the PR Newswire site can be conceivably be related to the mention of Gen. Yeager's name.  All media references are exclusively to AT&T Mobility's emergency preparedness investments.

The conventional method to establish a value on the exposure a press release attains in a campaign is to multiply the number of accesses or "views" times a relevant cost per impression (typically quoted as the cost of one thousand impressions, designated CPM).  Since, other than journalists, the public would

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

HIGHLY CONFIDENTIAL

Page 12

CONSOR®
Intellectual Asset Management

generally only be able to access the Press Release through an Internet search, the appropriate publicity value metric in this case would be the market cost of advertising on search engines at the time. In 2006, the range of costs for Internet based search engine advertising was from $15 to $25 per thousand impressions.[24] Thus, the estimated impact of the direct accesses to the Press Release on the PR Newswire site, a total of 5,145 accesses, plus the maximum traffic attributable to the blogs and aggregators identified, is a total of 41,414 potential impressions. This number represents an insignificant proportion of the population in areas typically affected by hurricanes. By contrast, news websites, like the New York Times, receive an average of 43.6 million unique visitors annually.[25]

The estimated publicity value of those impressions ranges from **$621** and **$1,035**. It is only in this initial direct dissemination of the Press Release among the news media that Gen. Yeager's name appeared.

Indirectly, the reports may have generated a greater number of impressions for the investment Cingular had made in emergency preparedness. This impact cannot be attributed to Gen. Yeager's name.

Based on this analysis, I conclude that the publicity generated by dissemination of stories based on the Press Release was short lived and can be valued at a maximum of **$1,035**.

## B.   Impact on Profits

Another way in which the alleged financial benefit to AT&T Mobility can be calculated is to approach the valuation of the news coverage of the Press Release from the perspective of the potential profit, if any, it generated for AT&T Mobility. This analysis would require that AT&T Mobility experience incremental revenues in the time period immediately following that event and that any such incremental revenues were attributable to dissemination of the Press Release.

I am not aware of any data, testimony or other information indicating that AT&T Mobility experienced any increased revenues as a result of the Press Release, let alone from the specific mention of General Yeager's historical achievement. Given the limited media exposure around the Press Release as discussed above, I would not expect that there would be any impact on AT&T Mobility's sales directly attributable to this event. AT&T Mobility's revenues, instead, can be expected to be attributed to the contractual nature of the wireless service, the public's perception of the quality of the devices and the service provided by the Cingular network and its substantial, directed

---

[24] Source: 2020 Marketing Communications, LLC, The 2006 Thumbnail Media Planner, Vol. 4, No.1. p 37. Available at: <www.ThumbnailMediaPlanner.com>.
[25] D. Britton & S. McGonegal, The Digital Economy Fact Book, 9th Edition 2007., p 9.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

HIGHLY CONFIDENTIAL

Page 13

CONSOR®
Intellectual Asset Management

advertising campaigns, rather than the relatively minor publicity generated around the Press Release.

AT&T Mobility did not brand any products, services, or promotions with Gen. Yeager's name, it never used any images of Gen. Yeager, and no connection was even made between AT&T Mobility's products and services to surpassing the speed of sound.  In fact, the sole reference in the Press Release is to AT&T Mobility breaking another kind of barrier, thus explicitly differentiating AT&T Mobility's products, services, and infrastructure from Gen. Yeager's historic feat as a pilot.

Consequently, there is no basis to conclude that the Press Release caused any measurable increase in AT&T Mobility sales, revenues or, ultimately, profits.

## IX.  REASONABLE FEE

In an additional approach to establishing a potential measure of damages in this case, I considered an analysis of the fair market value of the alleged use of Gen. Yeager's name by AT&T Mobility in the Press Release.  This is a common methodology in valuing intangible assets and corresponds to the principles of the Market Approach.  It is also ostensibly the approach taken by Mr. Albert in his report, although his implementation of it is fundamentally flawed.

This method of valuation determines the value of a hypothetically negotiated price for the use of the intellectual property at issue.  This approach requires identifying the nature and extent of the use at issue and, to the extent available, identifying market transactions that are comparable.

The nature and extent of use involves a number of factors, including the following:

- Properties: The specific intellectual property being licensed, such as: name, image, voice, likeness, personal appearances, sound recordings, live performance rights, video footage, etc.  For example, as a general matter, use of image and likeness is more valuable than use of a name only.

- Use:  how the properties are to be used and how integral they are to what the licensee is doing.  For instance, use of a name as a brand of goods or services generally is far more valuable than use that does not involve branding.    Similarly, use that forms the centerpiece of an advertising campaign generally is more valuable than one that is only a small supporting component.

- Territory: The geographic scope of the use being licensed.  All things being equal, a wider geographic scope will be more valuable than a more limited geographic scope.

- Media: Which communication media are covered by the license: e.g., radio, television, Internet, billboards, direct mail.  It is generally

accepted that, all things being equal, television rights carry the greatest value.

- **License Term:** The duration of the permitted uses. As would be expected, the longer the term of use the more valuable it will be.

- The degree of exclusivity. As a general principle, exclusive rights are more valuable than non-exclusive rights.

After examining the nature and extent of use, one then looks at contracts entered into by the parties and/or others to determine if they provide guidance on the value of the use that is at issue.[26]  Ideally, the analysis would take into account contracts that:

- Involve property similar to the subject under analysis.

- Are part of an active, public market, and for which the price and terms are known.

- Are contemporaneous with the hypothetical negotiation being considered.

- Are between unrelated parties.[27]

It is well known in the field of intellectual property valuation that finding direct comparables involving the same or like specific items of intellectual property is a rare occurrence.[28]  The central difficulty in implementing this approach is comparability. To establish the comparability of actual market transactions or, as here, licensing contracts, one must consider the various factors outlined above with regard to the nature and extent of use. The analysis in the Albert Report fails on this fundamental point as it does not establish a comparability criteria.

In any event, the following analysis determines a reasonable fee for the use at issue here, based on an evaluation of the nature and extent of use and consideration of contracts involving Gen. Yeager to the extent they can be considered comparable.

## A.   Nature and Extent of the Use

In this case, the contemplated use is simple and discrete. Specifically, one must quantify the value of what AT&T Mobility would have expected to pay and what Gen. Yeager would have expected to receive for an agreement to allow AT&T Mobility to publicly disclose the Press Release referencing his 1947 transonic flight.

---

[26] A discussion of this approach is provided in: Smith & Parr, *op cit*, Chapter 9, pp169-184.
[27] This is known as the "arm's length" principle.
[28] See, for example: Smith & Parr, *op cit*, p 173.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

HIGHLY CONFIDENTIAL

Page 15

CONSOR®
Intellectual Asset Management

Unlike typical celebrity endorsement contracts referred to in the Albert Report, the nature and extent of use in this hypothetical transaction are extremely limited:

1.  The Press Release does not explicitly state that Gen. Yeager endorses, recommends, or is associated with AT&T Mobility.

2.  The Press Release does not require Gen. Yeager to make an endorsement, personal appearances or, in fact, to do anything, it only references a historical fact from 1947.

3.  The Press Release does not brand any goods or services with Gen. Yeager's name or trademarks.

4.  No likeness or images of Gen. Yeager were used in the Press Release or provided by AT&T Mobility to the media.

5.  AT&T Mobility only provided the Press Release to the PR Newswire service, leaving it to members of the media to determine whether it was newsworthy and how and if it would be reported. AT&T Mobility did not purchase or contract for advertising using the Press Release. Accordingly, AT&T Mobility had no control over how the Press Release would be made public, or even whether it would be made public at all. Although some media did end up reporting parts of the story, the parties negotiating a hypothetical deal would have to take into account that there was a risk that no story might get published at all.

6.  The use to be made was a single one-time event that did not provide for multiple releases by AT&T Mobility or multiple versions of the Press Release.

7.  The medium of dissemination was primarily the Internet.

8.  Reporting of the Press Release story was short lived, and explicitly linked to the start of the 2006 hurricane season.

9.  The Press Release was not integral to AT&T Mobility's marketing campaign. The Press Release was only an incidental component of a relatively minor public relations support program, while AT&T Mobility's regular advertising campaign and budget were significantly larger.

10. The use was not exclusive – that is, AT&T Mobility did not have the benefit of preventing others from using Gen. Yeager's name. A non-exclusive use is worth substantially less than an exclusive use.

11. This was not the first use of Gen. Yeager's name in a commercial context. To the contrary, Gen. Yeager has at various times permitted

**HIGHLY CONFIDENTIAL**           CONSOR®

use of his name, image, and likeness in commercial endorsements and ventures. Whereas, in some situations, the first time use of a celebrity's name for commercial purposes may increase value of the use that is not the situation here.

In short, the alleged use to be valued consists of the use only of Gen. Yeager's name in the Press Release, to be released once to the press on a non-exclusive basis. Gen. Yeager's required activities are limited to granting permission for such use.

### B.    Comparable Valuation

To establish a reasonable basis for comparison to value the use at issue, I considered 17 instances of endorsements or contracts entered into by Gen. Yeager. Exhibit 2 shows a summary of these instances, and Table 2 summarizes the financial terms of those endorsements.

None of the endorsements that I reviewed involving Gen. Yeager are directly comparable to the claimed use in this case. Many of the contracts involve commitments that are much more extensive than the hypothetical agreement to allow for dissemination of the Press Release, and several determine Gen. Yeager's compensation as royalties on merchandise sales.

### Table 2
### Summary of Gen. Yeager's Endorsement Agreements

| Company Endorsed | Annual Amount | Dates | Observations |
|---|---|---|---|
| AC Delco | $150,000 | 1980-89 | (Approx.) Annual for 8 – 10 years |
| Rolex | $ 70,000 | 2006 | Annual (plus a watch ($20k) on contract signing and then every 2 yrs. |
| Saint Barnibus Healthcare System | $42,500 | 2008 | Fee for one appearance (Plus first-class round trip fare) |
| EADS and Airbus | $ 33,333 | 2008 | Fee for each of 3 appearances (Plus first-class roundtrip fare) |
| Doug Van Howd | $30,000 | 2003-04 | To the foundation, over one year |
| CR Smith Museum at the Dallas Forth Worth Airport | $25,000 | 2009 | Per V. Yeager Deposition, first-class tickets. |
| Born Aviation Products | $ 9,900 | 2004 | Royalties (over one year) |
| Georgia Marketing & Promotions (GMP) | $ 8,500 | 2003 | Royalties (inclusive of 3 model planes worth $600) |
| America Remembers' United States Society of Arms and Armour | $ 359 | 2004 | Royalties |
| SilverGate | $ 100 | 2009 | Royalties |
| John Deere | Non-monetary | n/a | A tractor and lifetime service for it. |
| Disability Resources, Inc. | Non-monetary | 2008 | Reimbursement of Expenses |
| American Fighters Aces Association | Non-monetary | 1963 | Copies of lithographs |

Charles Yeager v. AT&T Mobility                **HIGHLY CONFIDENTIAL**
EDCA 07-CV-2517
Rebuttal Expert Report                         Page 17

# CONSOR®
Intellectual Asset Management

| Company Endorsed | Annual Amount | Dates | Observations |
|---|---|---|---|
| Danbury Mint | N/A | n/a | |
| GMP Diecast | N/A | 2003 | |
| Leiner Vitamins | N/A | 1997 | |
| Electronic Arts | N/A | 1987-91 | 2 Video games. |

*Source: Exhibit 2.*

For example, for his endorsement relationship with AC Delco Gen. Yeager had to be available for the production of five commercials per year for an estimated annual compensation of $150,000.[29]  This use entailed travel, photo-sessions, and the use, not only of Gen. Yeager's name, but also of images and text clearly establishing his association in the endorsement of the products. Therefore, this endorsement use linked the goodwill of his personal reputation with the advertiser's own goodwill and brand equity.  None of these elements are directly applicable for the use in the Press Release, except for the use of his name (See photograph below of a 1988 magazine advertisement from this relationship).  In addition, the AC Delco contract expired approximately 20 years ago and has not been subsequently renewed.[30]  As such, this agreement has limited value as an appropriate comparable for analysis purposes using the Market Approach.





---

[29] Deposition of General Charles E. "Chuck" Yeager (Ret.), taken July 16, 2009, pages 29:13-19 and 36:10-11.
[30] V. Yeager Deposition, p 121:20-24

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility      **HIGHLY CONFIDENTIAL**      CONSOR®
EDCA 07-CV-2517                                                   Intellectual Asset Management
Rebuttal Expert Report                      Page 18

More recently, for $70,000 annually, Gen. Yeager granted Rolex the right to use his name, image and likeness in any medium, for the world-wide advertisement, promotion and sale of Rolex timepieces and in connection with events organized or sponsored by Rolex.[31] In addition, Gen. Yeager is obligated to make every effort to wear a Rolex timepiece when interviewed, photographed or filmed for the purpose of being featured in any medium throughout the world (including Internet) or when appearing at private or public events, including, but not limited to, events organized or sponsored by Rolex (See, above, a 1997 magazine ad from this relationship).[32]

Consequently, the typical fee for Gen. Yeager's participation in a commercial advertising campaign, such as AC Delco, Rolex, must be made commensurate with the use subject of the hypothetical negotiation in this case. Since visual communication is such an important part of advertising, the lack of imagery is an important factor that reduces the commercial value of the limited use of Gen. Yeager's name. Further, the use is limited in scope to a press release which only indirectly may be diffused to the public at large, if the information attracts the attention of journalists. Therefore, a proportion of 20% to 50% of the annual full advertising fee would be a very reasonable compensation apportionment. Thus, the annual fee from the most recent Rolex agreement should be adjusted, at least, to a range of $14,000 to $35,000 to be applicable as a guideline for the use of Gen. Yeager's name as used in the Press Release.

Apportioning the customary, full-service and endorsement fee to the specifics of the intended use is not only logical from the perspective of the company seeking the association, because it has to make a profitable decision, but also from the perspective of the endorser. The endorser stands to gain as it allows for the negotiation of higher fees if additional uses, images, footage, or personal performances are required later. Although the Albert Report does not consider apportionment necessary, assuming that Gen. Yeager would always seek a long term relationship ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This fee adjustment based on the extent of the use is confirmed by Gen. Yeager in his deposition testimony.[35]

In addition, in his deposition, Gen. Yeager gave an estimated range of $30,000 to $50,000 for compensation for making a one-time speech or

---

[31] Rolex Letter of September 22, 2008 and Letter of Agreement, which are Exhibits in the Gen. Yeager Deposition.
[32] *Ibid.*
▮▮▮▮▮▮▮▮▮
[35] Gen. Yeager Deposition, page 72, lines 6 – 12).

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report                                    Page 19

HIGHLY CONFIDENTIAL

CONSOR®
Intellectual Asset Management

presentation, depending on the extent of travel involved.[36]   The low-travel estimate falls within the range calculated above.

Consequently, the hypothetical fee that would compensate Gen. Yeager for the monetary value of the use of his name by AT&T Mobility is in the range of **$14,000 to $35,000**.

## X.   NO EXCLUSION

I have also considered Mr. Albert's contention that AT&T Mobility's Press Release has effectively limited or precluded Gen. Yeager from entering into any endorsement deal in the wireless communications industry.   For a number of reasons, this conclusion is entirely speculative and, in any event, incorrect.

Mr. Albert provides no support for the notion that Gen. Yeager has ever sought or intends to seek an endorsement deal in the wireless communications industry.   To the contrary, the material I have reviewed confirms that Gen. Yeager has not lost any business opportunity at all, let alone one in the wireless communications category, or experienced any diminution in business opportunities or quality of terms offered in any transaction as a result of the Press Release.

Moreover, Gen. Yeager had not actively pursued wireless communications endorsement opportunities before the release of the Press Release, nor has he pursued such opportunities since that time.[37]

Moreover, I have not seen any data in this case showing that any appreciable number of consumers have any lasting impression of Gen. Yeager as being associated with or an endorser of AT&T Mobility.   There simply is no basis to reach the conclusion in the Albert Report that Gen. Yeager has been limited or precluded from endorsements in the wireless communications industry as a result of the Press Release.

In addition, to be attractive as an endorser, a famous person must also provide what is customarily referred to as a "good fit" with the brand and product.   The characteristics of Gen. Yeager's history, as a WWII pilot and as the test pilot who first flew at Mach 1, are not closely aligned with the products and services of wireless communications, namely because:

- The speed of the service is closer to the speed of light than of sound
- The target market is young and technologically savvy
- The attributes of the services are the future, not the past

Thus, there does not appear to be any evidence that Gen. Yeager would be a good fit as an endorser in the wireless communications industry and, therefore, is not likely to have been prevented from being an endorser as a direct result of the

---

[36] Gen. Yeager Deposition, page 94:9-13.
[37] V. Yeager Deposition, p 107:10-25; p 108:13-25; p 109:1-20.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report                    **HIGHLY CONFIDENTIAL**

Page 20

**CONSOR**®
Intellectual Asset Management

reference to his 1947 transonic flight in the Press Release. Gen. Yeager is a good fit with aviation-related brands, products, and services, and he has been a spokesperson and endorser in that segment as detailed in Exhibit 2. The Rolex brand is also a good fit, as the longevity of the brand and the attributes of the product coincide nicely with those of Gen. Yeager. In those favorable circumstances, rational advertisers are reasonably able to pay fees in the range cited in the Albert Report because they expect to make a profitable investment.

Furthermore, the extremely limited dissemination of the Press Release cannot be held as evidence that the public at large has associated Gen. Yeager with AT&T Mobility, limiting any speculative future endorsement relationship with competing wireless providers.

In sum, Mr. Albert's unsupported theory that Gen. Yeager has somehow been precluded from obtaining lucrative endorsement contracts with AT&T Mobility's competitors is speculative and fundamentally unreliable.

The foregoing opinions and conclusions are based on my experience, research, and the documentation, including expert reports, made available to date.   I hereby reserve the right to amend or modify these opinions should additional documentation be provided or made available for consideration.

Sincerely,

David Drews
CONSOR

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**HIGHLY CONFIDENTIAL**

Page 21

**CONSOR**®
Intellectual Asset Management

# EXHIBIT 1
## Diffusion of the Press Release
## Media Mentions of Cingular and Information from
## the May 17, 2006 Press Release
## (As reported by the FACTIVA service)*

| Media Outlet | Date | Title | Wireless Companies | References to: | Words | Source |
|---|---|---|---|---|---|---|
| Reuters | 5/17/06 | Cingular Spends $60 Million On Hurricane Preparation | Cingular | $60M investment part of $1.8B improvement budget, including command centers | 173 | AT&T 0007 |
| TR's State News Wire | 5/18/06 | REGIONAL – Cingular Wireless Earmarks $60M for Hurricane Prep | Cingular | $60M investment part of $1.8B improvement budget, including command centers | 77 | AT&T 0008 |
| Clarion-Ledger | 5/25/06 | Preparing For Hurricane Season | Verizon, Cingular | $60mil. Investment SUV mobile command centers (photo) | 920 | AT&T 0001 – 0004 |
| Satellite News | 5/29/06 | Hurricane Season Begins Thursday: Are Emergency Communications Ready? | Cingular | $60mil. Investment SUV mobile command centers | 654 | AT&T 0005 – 0006 |
| Orlando Sentinel | 5/29/06 | Cell Companies Are Ready For Mother Nature: Verizon, Sprint And Cingular Have Bolstered Their Wireless Networks | Cingular, Verizon, Sprint | $60mil. Investment SUV mobile command centers | 812 | AT&T 0009 – 0011 |
| RCR Priceless News | 5/29/06 | Carriers Prepare For Hurricane Season | Cingular, Verizon, Sprint | SUV mobile command centers | 954 | AT&T 0012 – 0014 |
| Tampa Tribune | 5/30/06 | Cell Phone Companies Prepare For Storms | Cingular, Verizon, Sprint | $60mil. Investment. Portable village | 1,314 | AT&T 0015 – 0019 |
| Augusta Chronicle | 6/4/06 | Officials Get Georgia Set For The Worst | Cingular, Verizon | $60mil. Investment. | 634 | AT&T 0020 – 0022 |
| The Florida Times Union | 6/6/06 | Despite Past Fortune, Georgia Officials Not Taking '06 Hurricane Season Lightly | Cingular, Verizon | $60mil. Investment. Portable village | 1,016 | AT&T 0023 – 0026 |
| Wireless Week | 6/9/06 | Carriers Geared For Hurricane Season | Cingular, Verizon, Sprint, SouthernLinc, Cellular South | $60mil. Investment. Mobile command centers | 599 | AT&T 0027 – 0028 |
| Shreveport Times | 6/13/06 | Ready And Connected | Cingular, Verizon, Sprint | $60M investment part of $1.8B improvement budget, including | 805 | AT&T 0029 – 0031 |

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility          **CONFIDENTIAL**
EDCA 07-CV-2517
Rebuttal Expert Report                         Page 22

**CONSOR®**
Intellectual Asset Management

| Media Outlet | Date | Title | Wireless Companies | References to: | Words | Source |
|---|---|---|---|---|---|---|
| | | | | command centers | | |
| Associated Press Carried by: San Jose Mercury News, The State (SC), Charlotte Observer, The Sun Herald (MS), South Florida Sun-Sentinel, Times Union, and The Augusta Chronicle | 6/1/06 | Cell Companies Beefing Up In Preparation For Hurricane Season | Cingular, Verizon, Sprint | $60M investment part of $1.8B improvement budget, including command centers | 944 | AT&T 0032 – 0035 |
| New Orleans City Business | 7/31/06 | Wireless Firms Spend $2.5B To Fill Communications Void In New Orleans area | Cingular, Verizon, Sprint | 1.8B improvement budget. | 719 | AT&T 0036 – 0038 |

*Dow Jones Factiva provides business news and information from a collection of more than 25,000 authoritative sources includes the exclusive combination of The Wall Street Journal, Dow Jones and Reuters newswires and the Associated Press, as well as Reuters Fundamentals, and D&B company profiles (See: www.factiva.com).*

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**CONFIDENTIAL**

Page 23



## EXHIBIT 2

## Gen. Yeager's Endorsement Relationships

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

**EXHIBIT 2-1**

| Gen. Charles E. "Chuck" Yeager (Ret.) v. AT&T Mobility, LLC, et al. |
| :-: |
| Gen. Yeager and/or the Chuck Yeager Foundation's Agreement Terms |
| As of August 2009 |

| LICENSEE | OBLIGATIONS/SERVICES | SOURCE | COMPENSATION | SOURCE | DATE/TERM |
| --- | --- | --- | --- | --- | --- |
| AC Delco | Gen. Yeager entered into contracts to do five AC Delco commercials every year for 10 years. He endorsed five or their products, such as batteries, air filters, oil filters, spark plugs and shock absorbers | Gen. Yeager Deposition (7/16/09) p 29:13-19 & 36:10-11. | $150,000 per year for the next 8 to 10 years, which translates to roughly $1 million over a 10-year period | Gen. Yeager Deposition (7/16/09) p 36:19-20, p 82:23-24 & p 85:1-6. | 10 Years |
| Electronic Arts | Gen. Yeager was a consultant to Electronic Arts in association with a game that involved putting on video displays and then building into the video displays the aerodynamic effects on an airplane that you're trying to simulate; and Gen. Yeager's name was associated with the game | Gen. Yeager Deposition (7/16/09) p 30:13-24 and p 31:2-6. | Estimate of $100,000 to $150,000 per year; Per the deposition transcript of Gen. Yeager, a question was asked regarding whether or not Gen. Yeager had been paid an annual fee between $100,000 and $150,000 just to endorse a product? Gen. Yeager's response was that of Electronic Arts, which he indicated was another lucrative contract, which required a lot of work (he could not give an exact figure) | Gen. Yeager Deposition (7/16/09) p 123:15-22. | 2 - 3 Years |
| John Deere | Gen. Yeager was asked to talk to some of the company's customers in Kansas City | Gen. Yeager Deposition (7/16/09) p 34:6-10. | A tractor and lifetime service on the tractor | Gen. Yeager Deposition (7/16/09) p 34:6-10, and Victoria Yeager Deposition 7/17/09 p 102:22-25 & p 103:1-3. | One-time Appearance |
| Danbury Mint | Gen. Yeager signed 21,000 models of the X-1 for Danbury Mint and was paid for each signature | Gen. Yeager Deposition (7/16/09) p 35:1-4. | N/A | Gen. Yeager Deposition (7/16/09) p 35:1-4. | N/A |
| GMP Diecast | N/A | Victoria Yeager Deposition 7/1/709 p 101:10-19. | N/A | Victoria Yeager Deposition 7/1/709 p 101:10-19. | N/A |
| Rolex | Gen. Yeager grants the right during the term of the Agreement to use his name, image and likeness in any medium, for the world-wide advertisement, promotion and sale of Rolex timepieces and in connection with events organized or sponsored by Rolex; Gen. Yeager shall make every effort to wear a Rolex timepiece when interviewed, photographed or filmed for the purpose of being featured in any medium throughout the world (including Internet) or when appearing at private or public events, including, but not limited to, events organized or sponsored by Rolex | Gen. Yeager Deposition (7/16/09) Exhibit 11 - Rolex Letter taken September 22, 2008 and Letter of Agreement. | Rolex shall pay to Gen. Yeager an amount of $70,000 per contractual year; Rolex shall provide Gen. Yeager with one Rolex watch or more for a total retail value not exceeding $20,000 at no charge, upon signature of the Agreement; and Per letter dated September 22, 2008, Rolex will provide Gen. Yeager with a timepiece(s) valued at $20,000 every two years commencing on August 1, 2008 | Gen. Yeager Deposition (7/16/09) Exhibit 11 - Rolex Letter taken September 22, 2008 and Letter of Agreement. | As of June 29, 2006, and ongoing. |
| Born Aviation Products | To use a facsimile of Chuck Yeager's signature on the company's Signature Series polo shirts; To use a photograph of himself in the company's catalog, website, flyer, hang tag and/or any other advertisement that is directly related to the sale of the Signature Series polo shirts - Chuck Yeager will either supply the photograph or approve one of the company's choosing; and the company would create a tag line, but ask for Chuck Yeager's review and approval before being included in such advertisements | Gen. Yeager Deposition (7/16/09) Exhibit 9 - Letter of Intent. | Includes a royalty per Signature Series polo shirt sold—10% of the current wholesale cost for each Signature Series polo shirt sold that bears his name; and Per the Deposition Transcript of Victoria Yeager, Volume 1, Mrs. Yeager is fairly certain that what was realized from this agreement was less than $10,000, with a term of only a year | Gen. Yeager Deposition (7/16/09) Exhibit 9 - Letter of Intent, and Victoria Yeager Deposition (7/17/09) p 56:6-14. | As of May 17, 2004 through 2006. |
| SilverGate | Will use of his trademarks Glamorous Glen III and BY 6 on a model replica of the P-51, and the use of his name and image, i.e., SilverGate will have permission to sell model P-51s with Gen. Yeager's trademark(s) on them; and any travel and appearances in connection with this Agreement. | Gen. Yeager Deposition (7/16/09) Exhibit 10 - Agreement between SilverGate and General Chuck Yeager Inc. | SilverGate will pay Gen. Yeager 15% of all gross revenues of this product and of give-aways. Any appearances required shall be paid at the full rate in addition to the trademark use fee $50,000 plus first class travel for two. Per Mrs. Yeager's deposition, a payment was made of $100 for prior sales around June 5, 2009. No other payments have been made. The unit/models were selling in the range of $3.25 to $4.00 | Gen. Yeager Deposition (7/16/09) Exhibit 10 - Agreement between SilverGate and General Chuck Yeager Inc. | As of June 5, 2009 |

**CONFIDENTIAL**

**EXHIBIT 2-2**

**Gen. Charles E. "Chuck" Yeager (Ret.) v. AT&T Mobility, LLC, et al.**
**Gen. Yeager and/or the Chuck Yeager Foundation's Agreement Terms**
**As of August 2009**

| LICENSEE | OBLIGATIONS/SERVICES | SOURCE | COMPENSATION | SOURCE | DATE/TERM |
|---|---|---|---|---|---|
| America Remembers/ United States Society of Arms and Armour | A colt .45 firearm that bears a picture of a 51 and an X-1 on it; and also the production of 12-gauge shotguns with similar inscribing. | Gen. Yeager Deposition (7/16/09) 116:4-23. | royalty from all total sales; Per royalty statement (deposition exhibit), royalty earned for the period January 1, 2004 to March 31, 2004 was $359.00. This consisted of 2 units sold in the month of February 2004 for $1,795.00/unit, which translates to $3,590.00 x 10% = $359.00; and a free shotgun. | Gen. Yeager Deposition (7/16/09) Exhibit 12 - Royalty statement for Chuck Yeager. | As of May 7, 2004 |
| Georgia Marketing & Promotions (GMP) | Grants the right to Georgia Marketing & Promotions to reproduce the likeness of the Licensor and the physical replication related to the sale of a maximum of 5,000 1:35 scale die cast "Glamorous Glenn" P51-D Mustang replicas. | Gen. Yeager Deposition (7/16/09) Exhibit 13 - Non-Exclusive License Agreement. | Georgia Marketing & Promotions shall pay royalties that consist of $8.00 per model plus best wholesale price for additional models; and a maximum of 3 planes will be supplied at no cost to the Licensor and/or his assigns. Per deposition testimony of Mrs. Yeager, she was fairly certain that GMP sold less than 1,000 models, hence less than $8,000 plus three planes, which were worth $200 each for a total value of $600. This translates to total compensation of less than $8,600 | Gen. Yeager Deposition (7/16/09) Exhibit 13 - Non-Exclusive License Agreement, and Victoria Yeager Deposition (7/17/09) p 82:9-14. | February 14, 2003 – December 31, 2004. |
| American Fighters Aces Association | At Gen. Yeager's leisure, the association can market and sell lithographs that he has signed for scholarships for progeny of American Fighter Aces | Victoria Yeager Deposition (7/17/09) p 88:3-8. | No monetary compensation – Gen. Yeager has received some copies of the lithographs | Victoria Yeager Deposition (7/17/09) p 88:9-17. | N/A |
| Doug Van Howd | Doug Van Howd was allowed to make a larger than life-size statue and to try and sell it to get it put in various places. In exchange, the foundation would be able to sell miniature versions of the statue in bronze, and the foundation would just be charged at cost | Victoria Yeager Deposition (7/17/09) p 90:3-8. | All money earned goes into the foundation. There's been a total of $30,000 that the foundation has earned since 2003. Per Mrs. Yeager's deposition, most of that $30,000 was in 2003 and maybe some, very little, in 2004 | Victoria Yeager Deposition (7/17/09) p 90:16-25, p 91:1-2 & p 92:11-13. | 2003 and 2004 |
| Leiner Vitamins | A short run of radio commercials in 1997 (2 months in 1997) | Victoria Yeager Deposition (7/17/09) p 102:2-11. | N/A | Victoria Yeager Deposition (7/17/09) p 102:2-11. | One Year - 1997 |
| EADS and Airbus | Make appearances in Munich, Mannheim and Toulouse and speak to employees of EADS and Airbus | Victoria Yeager Deposition (7/17/09) p 165:1-4. | $100,000 for 3 appearances on behalf of EADS and Airbus, and first-class travel to Europe | Victoria Yeager Deposition (7/17/09) p 164:14-25 & p 165:5-11. | One-time Appearance |
| Saint Barnibus Healthcare System | Make appearance Pittsburgh and speak to residents of the home for a fund-raiser | Victoria Yeager Deposition (7/17/09) p 165:18-25 & p 166:1-3. | $42,500 for an appearance on behalf of Saint Barnibus Healthcare System, and first-class travel to Pittsburgh | Victoria Yeager Deposition (7/17/09) p 165:12-15 & p 166:2-10. | One-time Appearance |
| CR Smith Museum at the Dallas Forth Worth Airport | Two appearances – Gen. Yeager spoke at the CR Smith Museum at the Dallas Forth Worth Airport in February and April of 2009 | Victoria Yeager Deposition (7/17/09) p 166:11-24. | No monetary compensation - Six first class roundtrip tickets anywhere in the world, and paid trip to Dallas. Per Mrs. Yeager's deposition, these tickets were worth about $25,000 | Victoria Yeager Deposition (7/17/09) p 167:3-15. | One-time Appearance in February and April of 2009 |
| Disability Resources, Inc. | Function appearances and solicitation letters where his name and likeness are utilized | Victoria Yeager Deposition (7/17/09) p 86:16-25. | Reimbursement of travel expenses | Victoria Yeager Deposition (7/17/09) p 85:3-14. | Multiple function appearances (ongoing) |

CONFIDENTIAL

Rebuttal Expert Report

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**CONFIDENTIAL**

Page 26



## APPENDIX A

## QUALIFICATIONS, PUBLICATIONS, AND LITIGATION EXPERIENCE

**DAVID DREWS, CLP**
**DIRECTOR**



David Drews has over twenty years experience as a financial analyst, primarily concentrated in valuing intellectual property of all types, including trademarks, copyrights, patents, know-how, trade secrets and domain names. His extensive valuation experience includes projects involving use of the assets as collateral, transaction due diligence, joint venture negotiations, licensing, transfer pricing and bankruptcy liquidation and reorganization. He has also been called on to calculate damages related to infringement of IP in numerous litigation and arbitration proceedings.

This experience includes employment with CONSOR intellectual asset management and IPMetrics LLC, where he was founder and president of the operation. He has performed valuations on assets as diverse as apparel, financial services, automotive, non-profit organization and consumer brand trademarks; mechanical, chemical and electrical patents, processes and trade secrets; customer lists; non-compete agreements; and entertainment industry characters, trademarks and copyrights.

Prior to concentrating on intellectual property, David was responsible for the analysis and valuation of a broad range of credit applicants and investment vehicles for California Commerce Bank. Before joining the bank, he performed research at William O'Neil & Co. His responsibilities at O'Neil included in-depth analyses of companies in many different industries, including pharmaceuticals, retail, apparel, biotechnology, computer software, financial services and scientific instruments, among others. Mr. Drews holds a Bachelor of Science degree in business administration / economics from the University of Nebraska.

David is a Certified Licensing Professional (CLP) and a creator/instructor of the *Intellectual Property: Calculating Damages and Lost Profits* course for the National Association of Certified Valuation Analysts (NACVA).He has also taught the *Valuation of Intellectual Property* course offered by the National Technology Transfer Center in Wheeling, West Virginia and was a guest instructor of this course at the NTTC Classroom of the Future and at the NASA Langley Research Center in Hampton, Virginia.

In addition to regularly publishing articles in various journals and industry publications, he is a frequent lecturer on IP valuation issues and has written several articles for publication on various websites.

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**CONFIDENTIAL**

Page 27



## PROFESSIONAL INSTRUCTION

- National Association of Certified Valuation Analysts (NACVA) – Instructor
  *Course:* Intellectual Property: Calculating Damages and Lost Profits

- NASA Langley Research Center – Guest Instructor
  *Course:* Valuation of Intellectual Property

- National Technology Transfer Center – Past Instructor
  *Course:* Valuation of Intellectual Property

## PRESENTATIONS

- IP Value Presentation: BofA Special Assets Group 2009 – Charlotte, NC
- LES Annual Meeting 2008 – Orlando, FL
- CLE Presentation: Gibson, Dunn & Crutcher 2008 – Irvine, CA
- CLE Presentation: Finnegan Henderson Farabrow Garrett 2008 – Washington, DC
- NACVA IP Damages Class 2007 – Ft. Lauderdale, FL
- IP Portfolio Management Conference 2007 – New York, NY
- NACVA IP Damages Class 2007 – Philadelphia, PA
- Due Diligence Symposium 2007 – Iselin, NJ
- BIO IPCC Spring Meeting 2007 – San Diego, CA
- ACI IP Due Diligence 2007 – San Francisco, CA
- NACVA IP Damages Class 2006 – Coronado, CA
- SRI Monetization of Intellectual Property 2006 – Boston, MA
- IP Licensing Summit 2006 – New York, NY
- AIPLA Spring Meeting 2006 – Chicago, IL
- PhillipsLytle / HSBC IP Securitization Conference 2006 – New York, NY
- Commercial Finance Association Annual Conference 2005 – San Diego, CA
- LINK New York 2005 – New York, NY
- FindLaw IP Strategies in Deals 2004 – Palo Alto, CA
- Sterling Intellectual Property Issues Seminar 2004 – San Diego, CA
- LES Annual Meeting 2000 – Toronto, Canada
- Glasser Legalworks 11th Annual Institute 2000 – San Francisco, CA
- LES Annual Meeting 1999 – San Antonio, TX
- Corporate Reorganizations 1999 – Chicago, IL
- Glasser Legalworks 10th Annual Institute 1999 – Los Angeles, CA
- Pillsbury IP Business Seminar 1998 – San Diego, CA
- Dow Chemical IP Donation Seminar 1998 – Midland, MI

## PROFESSIONAL ASSOCIATIONS

- CFA Institute (CFA)
- CFA Society of San Diego (CFASSD)
- Certified Licensing Professional (CLP)
- Intellectual Property Management Institute (IPMi)

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**CONFIDENTIAL**

Page 28



- Licensing Executives Society (LES)
- San Diego Intellectual Property Law Association (SDIPLA)

## PUBLICATIONS

**Countering the Impact of Private Label on Brand Value**

(*Total Licensing*, Winter 2009)

**Leveraging Software Assets via the Capital Markets**

(Iron Mountain Service Information Library, July 2008)

**The Intangible Assets Handbook – Maximizing Value from Intangible Assets (Co-editor)**

(American Bar Association, March 2007)

**Patent Valuation Techniques**

(*les Nouvelles*, March 2007)

**Intellectual Property Valuation Techniques**

(*The Licensing Journal*, October 2006)

**Calculating Questions: Accepted Approaches to Patent Valuation**

(*Patent World*, September 2006)

**The Secured Lender (Second Installment)**

(www.ipfrontline.com, March 2006)

**The Secured Lender (Parts I & II)**

(www.ipfrontline.com, January 2006)

**The Impact of SFAS 141 & 142 on Intangible Asset Management**

(*The Secured Lender*, November / December 2005)

**Intellectual Property Valuation: Context is Critical**

(*The Secured Lender*, September 2005)

**Intellectual Property: Collateral for Securitization or Lending**

(*The Secured Lender*, July 2005)

**IP Valuation Techniques**

(*IP Strategies in Deals 2004*, October 2004)

**Intellectual Property Valuation** (Updated)

(*Chapter 23 - Drafting License Agreements, Fourth Edition*, 2004 Supplement, September 2004)



## Valuing for Charitable Donation

(*Chapter 19 – Fundamentals of Intellectual Property Valuation Primer*, American Bar Association, July 2004)

## Patent License Evaluation

(*Patent & High Technology Licensing 2004*, May 2004)

## Intangible Asset Valuation Techniques

(*Intellectual Property Issues*, October 2003)

## Leveraging Intellectual Property via the Capital Markets

(*Intellectual Property Issues*, September 2003)

## Intellectual Property Valuation

(*Chapter 23 - Drafting License Agreements, Fourth Edition*, September 2002)

## The Benefits of Patent Donation

(www.corporateintelligence.com, February 2001)

## The Cost Approach to IP Valuation: Its Uses and Limitations

(www.corporateintelligence.com, January 2001)

## Value v. Fair Market Value

(www.corporateintelligence.com, December 2000)

## Situations Where Valuation Comes Into Play

(www.corporateintelligence.com, November 2000)

## A-Bundling We Will Go: When It Comes to Intangible Assets, the Sum is Often Greater Than its Parts

(www.corporateintelligence.com, October 2000)

## Donating Idle Patents

(*Patent Strategy & Management*, August 2000)

## Giving Away Your Patents: How to Squeeze Tax Advantages from Unused IP Rights

(IP*Network.com, September 1999)

## Intellectual Property - The Key to Lower Risk and Higher Margins

(*les Nouvelles*, June 1999)

## An Overlooked Way to Exploit Patents

(*The Intellectual Property Strategist*, April 1999)

HIGHLY CONFIDENTIAL -- Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility      **CONFIDENTIAL**
EDCA 07-CV-2517
Rebuttal Expert Report      Page 30



## Expert Witness and Legal Experience
## Deposition and/or Trial Testimony

### January 1999 through April 2009

1.  Fruit of the Loom Bankruptcy Filing
    United States Bankruptcy Court
    District of Delaware
    Case No. 99-4497 (PJW)
    Expert Report, December 1999
    **Courtroom Testimony 1999**

2.  Purebred Company, Inc. v. Purebred Pet Products, Inc., et al.
    United States District Court
    District of Colorado
    Civil Action No. 98 D 2392
    Expert Report 1999
    Deposition Testimony 2000

3.  Gae Sharp Richardson, et al. v. The Boyds Collection, Ltd.
    United States District Court
    Northern District of Iowa
    Civil Action No. C96-344
    Expert Report 2000
    Deposition Testimony 2000

4.  Warrior and Ultimate Creations v. Titan Sports, Inc. Diamond Company, Inc.
    Superior Court of the State of Arizona
    Maricopa County
    Civil Action No. CV96-15377
    Deposition Testimony 2000

5.  Harry A. Ratner, et al. v. Stanley E. Foster, et al.
    Superior Court of the State of California
    San Diego County
    Case No. 732482
    Expert Report 2000
    Deposition Testimony 2000
    **Trial Testimony 2000**

6.  Funimation Productions, Inc.
    v. ABC International Traders d/b/a MGA Entertainment
    American Arbitration Association
    Case No. 71 133 00559 99
    Expert Report 2000
    Deposition Testimony 2001

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

CONFIDENTIAL

Page 31

CONSOR®
Intellectual Asset Management

7.  Purebred Company, Inc.
    v. Star-Kist Foods, Inc. d/b/a The Nature's Recipe Company
    United States District Court
    District of Colorado
    Civil Action No. 00 D 665
    Expert Report 2001
    Deposition Testimony 2001
    **Trial Testimony 2002**

8.  Lollar Enterprises, et al. v. Medtech Capital Markets, LLC, et al.
    District Court for Arapahoe County
    State of Colorado
    Civil Action No. 00 CV 1875
    Expert Report 2002
    Deposition Testimony 2003
    **Trial Testimony 2004**

9.  World Triathlon Corp. v. Dawn Syndicated Productions, et al.
    United States District Court
    Middle District of Florida – Tampa Division
    Case No. 8:05 CV 983-T27 EAJ
    Expert Report 2006
    Deposition Testimony 2006

10. Adidas America, Inc., et al. v. Payless Shoesource, Inc.
    United States District Court
    District of Oregon
    Case No. CV01-1655 RE
    Expert Report 2007
    Deposition Testimony 2007
    **Trial Testimony 2008**

11. Hambrecht Wine Group, L.P. d/b/a Belvedere Winery, L.P.
    v. Millennium Import LLC
    United States District Court
    Northern District of California – San Jose Division
    Case No. C 05-4625 JW HRL
    Expert Report 2007
    Deposition Testimony 2007

12. ComponentOne, LLC v. ComponentArt, Inc.
    United States District Court
    Western District of Pennsylvania
    Case No. 2:05-cv-01122-TFM
    Expert Report 2008
    Deposition Testimony 2008

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

CONFIDENTIAL

Page 32

CONSOR®
Intellectual Asset Management

13.  Rain Corporation v. JYP Entertainment, et al.
     United States District Court
     District of Nevada – Reno Division
     Case No. 3:07-cv-00081-LRH-RAM
     Expert Report 2008
     Rebuttal Report 2008
     Deposition Testimony 2008

14.  General Mills, Inc. v. Kellogg Co. and Kraft Foods Global, Inc.
     United States District Court
     District of Minnesota
     Case No. 06-cv-03686 (JMR-JSM)
     Expert Report 2008
     Deposition Testimony 2008

15.  Denice Shakarian Halicki, et al. v. Carroll Shelby, et al.
     United States District Court
     Central District of California
     Case No. 07-6859 SJO (PJWx)
     Expert Report 2008 / 2009
     Deposition Testimony 2009

**CONFIDENTIAL**          

## Expert Witness and Legal Experience
## Expert Reports without Deposition or Trial

### January 1999 through August 2009

1.  21st Century Film Corp. et al. v. Carolco Pictures, Inc., et al.
    Superior Court of the State of California
    Los Angeles County
    Case No. BC 079359
    Expert Report 1999

2.  Trovan Ltd., et al. v. Pfizer, Inc.
    United States District Court
    Central District of California
    Civil Action No. 98-0094
    Expert Report 1999

3.  Heidi Ott AG, Heidi Ott v. Target Corporation
    United States District Court
    District of Minnesota
    Docket No. 99-CV-01170
    Expert Report 2000

4.  Kristian Erik Grimland, petitioner v. Debra Grimland, respondent
    District Court for Elbert County
    State of Colorado
    Case No. 02DR4, Division A
    Expert Report 2003

5.  Precision Replacement Parts Corp. v. Auto Glass Components, Inc.
    United States District Court
    Western District of Washington at Seattle
    Case No. 04-CV-566L
    Expert Report 2005

6.  Kevin Trudeau v. Electronic Retailing Association, et al.
    Superior Court of the State of California
    County of Ventura
    Civil Action No. CIV 236364
    Expert Report 2006

7.  Collins & Aikman Corporation, et al.
    United States Bankruptcy Court
    Eastern District of Michigan
    Southern Division
    Case No. 05-55927 SWR
    Expert Report 2006

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**CONFIDENTIAL**

Page 34

CONSOR®
Intellectual Asset Management

8. Digital Envoy, Inc. v. Google, Inc.
   United States District Court
   Northern District of California
   Case No. C-04-01497 RS
   Expert Report 2006

9. Terance Dunn v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone, LLP
   Professional Negligence Arbitration
   Los Angeles, California
   Expert Report 2006

10. Richard Bach and Russell Munson v. Forever Living Products U.S., et al.
    United States District Court
    Western District of Washington at Seattle.
    Case No.C05-0970P
    Expert Report 2006

11. Michael Hanna on behalf of Estate of Ken Hanna v. Ken's Foods, Inc., et al.
    Superior Court for the Commonwealth of Massachusetts
    Middlesex
    Docket No. 03-3815
    Expert Report 2006

12. Louis Vuitton Malletier v. Dooney & Bourke, Inc.
    United States District Court
    Southern District of New York
    Case No. 04 Civ. 2990
    Expert Report 2007

13. Luppen Holdings, Inc. v. Pitney Bowes, Inc.
    United States District Court
    Central District of California
    Case No. 98-5336-RJK (CWx)
    Expert Report 2007

14. HomeLife Communities Group v. HomeLife Realty Services, Inc. et al.
    United States District Court
    Northern District of Georgia, Atlanta Division
    Case No. 1:06-CV-01607CC
    Expert Report 2007

15. Verizon California, Inc., et al. v. Maltuzi LLC, et al.
    United States District Court
    Central District of California, Western Division
    Case No. CV 07-1732 PA (JCx)
    Expert Report 2007

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

CONFIDENTIAL

Page 35

CONSOR®
Intellectual Asset Management

16. Adjustment of Rates and Terms for Pre-existing Subscription Services and Satellite
    Digital Audio Radio Services.
    Copyright Royalty Judges
    Washington, D.C.
    Docket No. 2006-1 CRB DSTRA
    Expert Report 2007

17. Abbywho, Inc., et al. v. Interscope Records, et al.
    United States District Court
    Southern District of California
    Case No. 06cv1686 WHQ(AJB)
    Declaration 2007

18. Pharma Base S.A. v. HVL, LLC
    International Chamber of Commerce
    International Court of Arbitration
    Case No. 14 433/EBS
    Expert Report 2008

19. Big Fish Games, Inc. v. IWin, Inc., et al.
    United States District Court
    Western District of Washington
    Case No. C07-0718 Jcc
    Consulting Expert 2008

20. Constellation Management Group, Inc., et al. v. CVS Pharmacy, Inc.
    American Arbitration Association
    Case No. 13 181 Y 00408 09
    Expert Report 2009

21. Ironwood Capital Ltd. v. Ironwood Capital Management, et al.
    United States District Court
    District of Connecticut
    Civil Action No. 3:07 cv 1624 (CFD)
    Expert Report 2009



# APPENDIX B
## DOCUMENTS CONSIDERED

In addition to publications and websites specifically cited in the body of the report:

1. Documents filed in Case No. 07-CV-2517, US District Court for the Eastern District of California.

   o Complaint, filed November, 21 2007.
   o Plaintiff's Expert Witness Disclosure FRCP Rule 26(2), filed July 22, 2009.
   o Defendant's Answer, filed June, 26 2008.

2. Deposition Transcripts

   o Rule 30(B)(6) Deposition of Mark Siegel, taken May 21, 2009.
   o Deposition of General Charles "Chuck" Yeager (Ret.) taken July 16, 2009.
   o Deposition of Victoria Yeager taken July 17, 2009.
   o Deposition of Jon Albert-Levy, taken August 11, 2009.

3. Bates-stamped documents:

   o AT&T0001 – AT&T0110
   o Y00001 – Y00012

4. Other publicly available sources:

   o AT&T, Inc. <u>2008 Annual Report</u>
   o J.T. McCarthy, <u>The Rights of Publicity and Privacy</u>, 2nd Edition, Thompson West
   o G.V. Smith & R.L. Parr, <u>Intellectual Property: Valuation, Exploitation, and Infringement Damages</u>, J. Wiley & Sons, Inc.
   o D. Britton & S. McGonegal, <u>The Digital Economy Fact Book</u>, 9th Edition 2007.
   o 2020 Marketing Communications, LLC, <u>The 2006 Thumbnail Media Planner</u>, Vol. 4, No.1.

5. Websites accessed for research:

   o www.google.com
   o www.prnewswire.com
   o www.att.com
   o www.alexa.com

HIGHLY CONFIDENTIAL – Dissemination is subject to the applicable protective order and confidentiality agreements.

Charles Yeager v. AT&T Mobility
EDCA 07-CV-2517
Rebuttal Expert Report

**CONFIDENTIAL**

Page 37

CONSOR®
Intellectual Asset Management

## APPENDIX C
## COMPENSATION

CONSOR is being compensated at a flat hourly rate of $395, for the professional time spent for the production of this expert report.  Upon completion of the report, deposition preparation and/or deposition time, any additional time for trial preparation, and/or trial testimony time will be billed at the firm's standard hourly rates as listed below:

| | |
|---|---|
| Chairman, CEO | $695 / hour |
| Officers and Directors | $550 / hour |
| Senior Associates | $425 / hour |
| Associates | $275 / hour |
| Administrative Support | $125 / hour |