1    Steven E. McDonald (SBN 121949)
     Charles J. Murray (SBN 106750)
2    Keith L. Cooper (SBN 175741)
     DE LA PEÑA & MCDONALD LLP
3    785 Market Street. 14th Floor
     San Francisco, CA 94103
4    Telephone: (415) 227-4100
     Facsimile: (415) 227-4116
5    smcdonald@dlpmcd.com
     charlesjarvismurray@gmail.com
6    kcooper@dlpmcd.com

7

8    Attorneys for Plaintiff
     GENERAL CHARLES E. "CHUCK" YEAGER, (RET.)

9

10                        UNITED STATES DISTRICT COURT

11                       EASTERN DISTRICT OF CALIFORNIA

12

13

14   GENERAL CHARLES E. "CHUCK" YEAGER,        CASE NO. CIV 2:07-02517 FCD-GGH
     (RET.),
15                                             **PLAINTIFF'S MEMORANDUM OF**
              Plaintiffs,                      **POINTS AND AUTHORITIES IN**
16                                             **OPPOSITION TO DEFENDANT**
           v.                                  **AT&T MOBILITY INC.'S MOTION**
17                                             **FOR SUMMARY JUDGMENT**
     CINGULAR WIRELESS, LLC; BELLSOUTH; SBC
18   COMMUNICATIONS; AMERICAN TELEPHONE        Date: October 30, 2009
     & TELEGRAPH; and DOES 1-200, inclusive,   Time: 2:00 p.m.
19                                             Courtroom: Honorable Frank C.
              Defendants.                      Damrell, Jr.
20

21
                                               Complaint Filed:  November 21, 2007
22                                             Trial Date:       February 23, 2010

23

24           Plaintiff, General Charles E. "Chuck" Yeager, (Ret.), by and through his

25   undersigned counsel, herewith submits his Memorandum of Points and Authorities In Opposition

26   To Defendant AT&T Mobility Inc.'s ("AT&T") Motion For Summary Judgment, and states, as

27   follows:

28
     20021                              - 1 -                  CIV 2:07-02517 FCD-GGH

*(Left margin, vertical text:)* DE LA PEÑA & MCDONALD LLP — 785 Market Street, 14th Floor — San Francisco, CA 94103 — Tel. (415) 227-4100 Fax. (415) 227-4116

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **I.** | **Introduction**............................................................................ | 2 |
| **II.** | **Argument**............................................................................... | 4 |
|  | A.  The Facts at Issue ....................................................... | 4 |
|  | B.  Plaintiffs Claims are Supported by California 9th Circuit and State Court Case Law ............................................. | 6 |
| **III.** | **Conclusion**........................................................................... | 16 |

DE LA PEÑA & McDONALD LLP
101 Spear Street, Suite 215
San Francisco, CA 94105
Tel. (415) 227-4100 Fax. (415) 227-4116

20072

i

# TABLE OF AUTHORITIES
### Federal Cases

DE LA PEÑA & McDONALD LLP
101 Spear Street, Suite 215
San Francisco, CA 94105
Tel. (415) 227-4100 Fax. (415) 227-4116

Page

*Adbul-Jabbar v. GMC,*
    85 F.3d 407 (9th Cir. 1996)..................................................................11, 12

*Downing v. Abercrombie & Fitch,*
    265 F. 3d. 994 (9th Cir. 2001)..................................................................7

*Hoffman v. Capital Cities,*
    255 F. 3d 1180 (9th Cir. 2001)..................................................................13, 14

*Midler v. Ford Motor Co.,*
    849 F.2d 460, 461 (9th Cir. 1988)..................................................................10

*New Kids on the Block v. News America Publ'g., Inc.,*
    971 F. 2d 302 (9th Cir. 1992)..................................................................11, 12

*Newcombe v. Adolf Coors Co.,*
    157 F. 3d 686 (9th Cir. 1998)..................................................................8

*Ohralik v. Ohio State Bar Ass'n,*
    436 U.S. 447 (1978)..................................................................

*San Francisco Arts & Athletics, Inc. v. United States Onlymic Comm.,*
    483 U.S. 522 (1987)..................................................................8

*Waits v. Frito-Lay, Inc.,*
    978 F.2d 1093, 1097-98 (9th Cir. 1992)..................................................................9, 10

*White v. Samsung Electronic Am., Inc.,*
    971 F.2d 1395, 1396 (9th Cir. 1992)..................................................................9, 10

### STATE CASES

*Eastwood v. Superior Court,*
    149 Cal. App. 3d 409 (1983)..................................................................7, 8

*Gionfriddo v. Major League Baseball,*
    94 Cal. App. 4th 400 (2001)..................................................................8

*Montana v. San Jose Mercury News, Inc.*
    34 Cal. App. 4th 790 (1995) ..................................................................7

*Pooley v. National Hole-in-One Ass'n,*
    89 F. Supp.2d 1108 (D. Az. 2000)..................................................................9

20062

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

# I

## <u>INTRODUCTION</u>

**Nearly 60 years ago, the legendary test pilot Chuck Yeager broke the sound barrier and achieved Mach 1.  Today, Cingular is breaking another kind of barrier with our MACH 1 and MACH 2 mobile command centers, which will enable us to respond rapidly to hurricanes and minimize their impact on our customers," de la Vega said.**

Plaintiff, General Charles E. "Chuck" Yeager (Ret.) ("Plaintiff" or "General Yeager"), has sued Defendant AT&T Mobility, Inc. ("AT&T").  According to AT&T's Introduction in AT&T's supporting Memorandum, the suit was brought because AT&T "mentioned" Plaintiff's historic achievement of being the first man to break the sound barrier in a press release touting AT&T's hurricane preparedness program (the "Press Release").  AT&T argues that Plaintiff's "claims fail as a matter of law" because there can be no misappropriation claims against AT&T based on the "mere mention of his name" in the Press Release; that AT&T's Press Release did not use an "image" of Plaintiff, that Plaintiff's name was 'not mentioned' in any headline or heading, that the Press Release did not say that Plaintiff endorsed AT&T or its products; that the Press Release did not propose any commercial transaction or any other AT&T products for sale; that Plaintiff's name "was only used once", and that his achievement of breaking the sound barrier occurred when he was an officer in the United States Air Force.  Thus, AT&T concludes that "the reference to Plaintiff was incidental" and is not actionable.  Judging by its Memorandum, AT&T remains in a state of denial about what it did.

Perhaps sensing its "incidental  use" and "mere mention" of his name argument is completely specious, AT&T argues in the alternative that "even if AT&T's use of Plaintiff's name were not just incidental, AT&T is still protected by the First Amendment" because  "AT&T's Press

20021

- 2 -

CIV 2:07-02517 FCD-GGH

Release concerned a newsworthy issue – AT&T's hurricane preparedness" and that the purpose of

the Press Release "was to advise the public" of its improved cellular service after a hurricane. Of

course, AT&T, well-knowing that the First Amendment defenses don't apply to commercial

speech, it is forced to advance an intellectually dishonest argument that the Press Release was

"newsworthy" and certainly not "commercial" in any way.

The notion that the Press Release was made in a context of pressing public emergency is

utter nonsense. The jury will find that it was made to keep and acquire cell phone accounts, rather

than that of competitors, because of what is promised for customers in the future. The 'Press

Release' dated May 17, 2006, was directed for a profit commercial enterprise, AT&T, which by

their own statement was seeking the enhancement of its brand, and not solely to convey information

of public interest. *See* Jon Albert-Levy's Expert Witness Report on Exhibit 20, Line 2, *and* Jon

Albert-Levy's 8/11/09 Deposition, Vol.1 at 101:23. The Press Release was clearly designed to

inform consumers that they would be well-advised to purchase the improved services of Cingular –

the very essence of commercial speech. The jury will find that this use of General Yeager's name,

reputation and iconic image was made to advance this commercial effort.

In order to get someone to actually read this promotion, AT&T needed a "hook", i.e.

General Yeager. First, AT&T names its two trucks [mobile command centers"], MACH I and

MACH II; then it refers to the "legendary" [General Yeager is indeed, a legend in his own time and

AT&T wants to capitalize on that], then AT&T compares itself and its improved product to General

Yeager's accomplishments, all without calling him, at least as a courtesy, to find out if it was OK..

There is no evidence of a "subjective intent by AT&T to deceive consumers" argues

AT&T, and that the "mention of Plaintiff's name" constitutes "nominative fair use". AT&T states

"it is admitted" that the Press Release "in no way" states that Plaintiff was endorsing AT&T or its

products, and that the Press Release "did not make an association" between Plaintiff and AT&T, it

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT AT&T MOBILITY INC.'S MOTION FOR SUMMARY JUDGMENT

1  cannot form the basis of a Lanham Act or false endorsement claim by "merely mentioning

2  Plaintiff's name" in a newsworthy Press Release. According to AT&T, although Plaintiff was

3  and "is a legendary test pilot, he cannot monetize his achievements" by requiring parties to pay

4  him money "any time his name is mentioned".

5

6        The fact is, and the jury may well find, that AT&T sought to burnish its own AT&T brand

7  by rubbing up against the icon, the hero, and the right stuff that personifies General's reputation,

8  and yes, his celebrity status.

9

10       As set forth below, AT&T's motion papers reflect its refusal to address actual facts by its

11 designed omission of them. AT&T then completely misinterprets the case law it presents and

12 then carefully avoids mention of controlling Ninth Circuit case law on the very issues it raises.

13                                                 **II**

14                                            **ARGUMENT**

15   **AT&T's MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE OF**

16                      **EXISTING DISPUTED MATERIAL FACTS**

17     **A. The Facts at Issue**

18

19       AT&T insists upon repeating the statement that all the Press Release did was to make a

20 "mere mention" of Plaintiff's name. This is plainly wrong on a number of fronts. To begin with,

21 Plaintiff's name not "Chuck Yeager," it is, "General Charles 'Chuck' E. Yeager (Ret.)." Nowhere

22 in the brief does AT&T mention the fact that when it says "de la Vega said" that itself is a complete

23 lie. Mr. De la Vega did not say these words, and he wasn't involved in the press release. It is

24 AT&T's public relations people to write news releases and craft quotes said by executives. *See*

25 Mark Siegel Deposition, May 21, 2009, at 10:25 to 11:23. The quotation attributed to Mr. de la

26 Vega was never spoken by him, indeed never seen by him prior to its promulgation on the internet

27

28

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

1   through PR services. Nor does AT&T mention that this contrived and false quote exists today, and

2   will continue to exist on the internet should anyone wish to Google "General Chuck Yeager".

3       AT&T's Memorandum does not address the core of Plaintiff's claims regarding AT&T's co-

4   opting and complete misuse of MACH I and MACH II. There is more than one mention of Plaintiff

5   in the "Press Release" in connection with his historic flight in which he broke the sound barrier.

6   The first mention of General Yeager's name is in the first sentence stating, "… the legendary test

7   pilot, Chuck Yeager, broke the sound barrier and achieved Mach 1." *See* Complaint, ¶¶ 14 & 15,

8   Ex. 1. The second mention occurs when the Plaintiff's achievement is compared to the Cingular's

9   MACH 1 and MACH 2 sound barriers. Mark Siegel, who wrote the "New Release," The names for

10  the MACH 1 and MACH 2 concept were supplied to Siegel by someone, and reminded the writer

11  of the sound barrier break by General Yeager. The writer thought that the connection between

12  MACH the acronym, and MACH the sound barrier, would make a good association of between

13  breaking the sound barrier and breaking the news barriers of disaster preparedness, and then wrote,

14  "Today Cingular is breaking another barrier without MACH 1 and MACH 2 mobile command

15  centers which will enable us …" thereby making another connection with Plaintiffs name and

16  achievement. *See* Deposition of Mark Siegel, May 21, 2009, 17:15 to 18:17. MACH 1 and MACH

17  2 were not the names of the AT&T's emergency response program before their new program was

18  announced in 2006. Mark Siegel, who wrote the "Press Release", says that the names of the

19  command centers were non existent and that someone made him aware of these names before he

20  wrote the "Press Release." *See* Siegel Deposition, 35:17 to 36:23.

21      People who know of General Yeager, particularly in the rich military tradition which remains

22  alive in our Nation's southeast, know that he was the first to break the sound barrier [MACH I] and

23  the first to exceed MACH II-twice the speed of sound. Indeed, AT&T has left no fingerprints on

24  that brilliant piece of subliminal character and reputation copying. No one, not even the author,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT AT&T MOBILITY INC.'S MOTION FOR SUMMARY JUDGMENT

DE LA PEÑA & MCDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

knows who came up with the idea to name two trucks after General Yeager's, and only General

Yeager's, accomplishments.

AT&T distributed this Press Release to PR Services such that they no longer had any

control over its dissemination and that yes, indeed, it will exist in perpetuity through websites,

blogs, and blogspots. AT&T complains that it had no "subjective intent" to violate the law and that

there was no evidence to support any such inference. However, Mark Siegel states that it would be

possible to ascertain the number of people who looked at the press release and that a significant

amount of press releases like the one at issue are given every day, month. *See* Siegel Deposition at

14:12 – 14:19 and 15:18 – 15:25.

**B.  Plaintiffs Claims are Supported by California 9th Circuit and State Court Case Law**

While clear and convincing evidence of the subjective intent of a multinational

telecommunications giant such as AT&T may be near impossible, there are enough fact already

adduced during discovery from which a jury could find the level of intent necessary to meet the

requirements in accordance with the statutory and case law of California and the Ninth Circuit as

set forth below.

Plaintiff's Right of Publicity and Lanham Act are completely different claims. Though they

are similar in that they involve the protection of someone's intellectual property (a mark vs. a

name/likeness), they are treated completely differently under the law.  The issue of actual or

likelihood of confusion is completely irrelevant in right of publicity law.  It's a creature of

trademark law.  Also, a plaintiff in a right of publicity action need not show actual injury (i.e., lost

business opportunities) or that the defendant incurred any profits from the use of plaintiff's name or

likeness.  A plaintiff will recover on a right of publicity claim if his name or image has any value

whatsoever, and it's a triable issue before the jury as to the amount of that value.

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

DE LA PEÑA & MCDONALD LLP
785 Market Street, 14ᵗʰ Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax (415) 227-4416

To prevail on a claim for common law misappropriation, the plaintiff must show:

      (1)     Defendant used the plaintiffs' name, image, identity or persona;

      (2)     The appropriation of the name or other publicity right was to the defendant's advantage, either commercially or otherwise;

      (3)     Lack of consent; and

      (4)     Resulting injury.

Downing v. Abercrombie & Fitch, 265 F.3d 994, 1001 (9th Cir. 2001).

To prevail on a claim for statutory misappropriation pursuant to Cal. Civil Code sec. 3344, the plaintiff must show each of the four elements stated above, plus two more:

      (5)     The defendant's "knowing" use of the plaintiff's publicity rights; and

      (6)     A direct connection between the alleged use and the commercial purpose.

Id., 265 F.3d at 1001 (9th Cir. 2001)

AT&T argues that the Press Release doesn't say General Yeager endorsed any AT&T product, but that is necessary, especially when AT&T implies its own relationship by calling the General "Chuck". It is not necessary that the unauthorized use be suggestive of an endorsement by or association with the plaintiff. *Eastwood v. Superior Court*, 149 Cal.App.3d 409, 418 (1983). See also, Abdul-Jabbar v. GMC, 75 F.3d 1391, 1398 (9th Cir. 1996)

AT&T argues that the use of a plaintiff's identity is not actionable where the publication relates to matters of the public interest. However, AT&T is not a newspaper, "which rests on the right of the public to know and the freedom of the press to tell it." Downing v. Abercrombie & Fitch, 265 F.3d 994, 1001 (9ᵗʰ Cir. 2001) (quoting Montana v. San Jose Mercury News, Inc., 34 Cal. App./ 4ᵗʰ 790, 793 (1995)). "The First Amendment defense extends 'to almost all reporting of

1   recent events,' as well as to publications about 'people who, by their accomplishments, mode of

2   living, professional standing, or calling, create a legitimate and widespread attention to their

3   activities.'" Id. (quoting Eastwood v. Superior Court, 149 Cal. App. 3d 409, 422 (1983). "[O]ne of

4   the primary purposes of advertising is to motivate a decision to purchase a particular product or

5   service. The first step toward selling a product or service is to attract the consumers' attention.

6   Because of a celebrity's audience appeal, people respond almost automatically to a celebrity's name

7   or picture." Eastwood v. Superior Court, 149 ,at 420.

8

9          However, under both Ninth Circuit and California law, commercial speech is actionable

10  when a "plaintiff's identity is used, without consent, to promote an *unrelated* product" of a

11  defendant. *Giofriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 413 (2001) (citing *Newcombe*

12  *v. Adolf Coors Co.,* 157 F.3d 686, 691-94 (9th Cir. 1998). In Newcombe, the court ruled that a

13  drawing used in an advertisement that merely resembled the plaintiff in certain respects, and may

14  have been recognized by only a limited number of people, was "certainly" used to defendant's

15  commercial advantage and thus was actionable.1398 (9th Cir. 1996)]   "The prominent use of a

16  person's name or picture in an advertisement for a product is almost always certain to attract

17  attention to the ad and thus to meet the 'direct connection' test." J. Thomas McCarthy, The Rights of

18  Publicity and Privacy (2d Ed.) § 6:30 at 6-57 (citing *Newcombe v. Adolf Coors Co.*, 157 F.3d 686,

19

20  693-94 (9th Cir. 1998))

21         AT&T's claim that the Press Release was "one news release from 2006..." In fact, the

22

23  offending publication has, and to this day remains, as a posting on Defendant's web site and hence

24  published to all the world. Commercial speech – such as AT&T's Press Release – has a

25  significantly diminished level of protection, and receives a limited form of First Amendment

26  Protection. *San Francisco Arts & Athletics, Inc. v. United States Onlymic Comm.*, 483 U.S. 522

27  (1987) Speech proposing or furthering commercial transactions is afforded a limited, lesser amount

28

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

20021                          - 8 -                    CIV 2:07-02517 FCD-GGH

1   of protection than "pure" speech. *See Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447 (1978).

2          In the present situation, there was simply no reason for the use of General Yeager's name

3   and identity other than to capitalize upon its popularity, recognition, and appeal. The use of the

4   name was wholly unrelated to the subject of the advertisement. Had Defendant intended to draw

5   parallels between historical events and its network investments and upgrades, it could have easily

6   done so by omitting General Yeager's name. The only practical effect of such a step would be the

7   loss of the name recognition, appeal, and popularity associated with Plaintiff's name and identity.

8   Court's have held that when the purpose of using a person's identity is to advertise a product or a

9   service, as it is here, the use is *not* protected by the First Amendment. *Pooley v. National Hole-in-*

10  *One Ass'n,* 89 F. Supp.2d 1108 (D. Az. 2000). The purpose of the "Press Release" dated May 17,

11  2006 was two fold. One was to show that AT&T took their obligation to improve their efforts to

12  restore services as quickly as possible seriously, and the second was to create positive associations

13  in people's mind with the AT&T brand so they would think highly of them. *See* Siegel Deposition,

14  16:16 to 16:23.

15         In *Waits v. Frito-Lay, Inc.,* 978 F.2d 1093, 1103 (9th Cir. 1992), the Ninth Circuit upheld a

16  multi-million dollar jury verdict in favor of singer Tom Waits for the unauthorized use of a sound-

17  alike of his distinctive singing voice in a radio ad for Doritos chips. The Ninth Circuit held that the

18  compensatory damages award was properly calculated according to "the fair market value" of Tom

19  Waits' services.

20         The Ninth Circuit has noted that the use of celebrities name, likeness, identity, or image is

21  crucial to advertising campaigns. As the Court noted, "Advertisers use celebrities to promote their

22  products, the greater the number of people who recognize [the celebrity], the greater the visibility

23  for the product." *White v. Samsun Electronics America, Inc.,* 971 F.2d 1395, 1399 (9th Cir. 1992).

24  The goal of publicizing AT&T's ability to movie rapidly after a hurricane such as Katrina and Rita

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

through a 'Press Release' was to have people think more highly of AT&T Cingular as a brand and a

company. *See* Siegel Deposition, 35:6 to 35:19.

///

///

      The *White* Court continues by noting that:

> Considerable energy and ingenuity are expended by those who have achieved celebrity value to exploit it for profit. The law protects the celebrity's sole right to exploit this value whether the celebrity has achieved [their] fame out of rare ability, dumb luck, or a combination thereof.

      See *Midler v. Ford Motor Co.,* 849 F. 2d 460, 461 (9th Cir. 1988)). Where the use of a

plaintiff's identity in an advertisement is merely illustrative of a commercial theme or product and

does not contribute significantly to a matter of public interest, a defendant cannot avail itself of the

First Amendment defense. Again, in <u>Downing</u>, 265 F.3d at 1002-03 (holding that the First

Amendment defense was inapplicable where the use of plaintiff's photograph was used "essentially

as window-dressing to advance the catalog's" theme). Mark Siegel, the director of media relations

for AT&T Mobility, states that as the principal spokesperson with the media for the company, he

prepares press releases and manages different initiatives to get the company favorable press

coverage. *See* Mark Siegel Deposition, May 21, 2009, at 5:9 to 5:18.

      Defendant argues that plaintiff's trademark claims fail as a matter of law because his

achievements in breaking the sound barrier are within the public domain. Plaintiff disagrees and

contends that the claim under the Lanham Act, 15 U.S.C. § 1525 (a), through defendant's

unauthorized use of his name and identity in connection with the promotion.  A false endorsement

claim is actionable under the Lanham Act where a party can show that the use of any false or

misleading representation of fact is "likely to deceive consumers as to the association, sponsorship,

or approval of goods or services by another person." <u>Waits v. Frito-Lay, Inc.</u>, 978 F.2d 1093,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT AT&T MOBILITY INC.'S MOTION FOR SUMMARY JUDGMENT

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

1   1107n.7 (9th Cir. 1992); 15 U.S.C. § 1525 (a). In order to prevail on a false endorsement claim, a

2   plaintiff must demonstrate that the alleged advertisement "created a likelihood of confusion" over

3   whether the plaintiff was endorsing defendant's product. White v. Samsung Electronics Am., Inc.,

4   971 F. 2d 1395, 1399-1400 (9th Cir. 1992) (internal citations omitted).

5

6

7          In this case, the use of plaintiff's name and identity was both unauthorized and likely to

8   cause confusion by consumers as the affiliation, connection, and/or association of plaintiff with

9   defendants. Here, "[AT&T was looking] for a story with a hook. Chuck Yeager provided that

10  hook." *See* Albert-Levy Deposition John Albert at 111:17- 111:19. "Press "[News people] read this

11  release and any other release and then make a decision if they are interested or not. What I'm

12  saying is the use of General Yeager's name is what in PR and in advertising would be called the

13  hook." *See* Deposition of John Albert-Levy (8/1/09), Volume 1, 111:17-19.

14          In Adbul-Jabbar, the defendant auto manufacturer had published a televised commercial for

15  an automobile. Abdul-Jabbar, supra, 85 F.3d at 409. During this advertisement, as described by the

16  Court in its opinion, a disembodies voice first asked "How 'bout some trivia?", to which a slide on

17  the screen was displayed answering "You're Talking to the Champ." Id. The voice then asked

18  "Who holds the record for being voted the most outstanding player of this tournament?" In the

19  screen appear the printed words, "Lew Alcindor, UCLA, '67, '68, '69." Id. Next, the voice asked,

20  "Has any car made the 'Consumer Digest Best Buy' list more than once?", to which it answered its

21  own question, stating "The Oldsmobile Eighty-Eight has." Id. The advertisement then discussed the

22  features of the automobile, a statement that the automobile has made the list three years in a row,

23  and that consumers can purchase the car. Id. It then ended by stating "Definite First Round Pick,"

24  accompanied by the voice saying, "it's your money." A final printed slide appears on the screen

25  saying: "Demand Better, 88 by Oldsmobile." Id.

26

27

28  20021                              - 11 -                    CIV 2:07-02517 FCD-GGH

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

The Court found that the use of the plaintiff's collegiate name and achievements in connection with the sale of the defendant's automobile was sufficient to constitute a false endorsement claim under the Lanham Act. Similarly, in *New Kids on the Block v. News Am. Publ'g, Inc.,* 971 F.2d 302, 308 (9th Cir. 1992), the defendants were conducting surveys asking questions about the plaintiff entertainers, and then publishing the results of these surveys for their readers, and the court found this was well-established practice of defendants.  In Adbul-Jabber, as here, the defendant also claimed a "nominative" or "fair use" defense under New Kids. The Court dismissed this defense, nothing that "That distinction between this case and New Kids is that use of celebrity endorsements in television commercials is so well established by commercial custom that a jury might find an implied endorsement in General Motors' use of the celebrity's name in a commercial…" Abdul-Jabbar, supra, 85 F.3d at 413. The Court further noted that:

> Had GMC limited itself to the "trivia" portion of its ad, GMS could likely defend the reference to Lew Alcindor as a nominative fair use. But by using Alcindor's record to make claim for its car – like the basketball star, the Olds 88 won an "award" three years in a row, and like the star, the car is a "champ" and a "first round pick" – GMC has arguably attempted to "appropriate the cachet of one product for another," if not also to "capitalize on consumer confusion." Id.

The last page of the opinion provides:

> "GMC makes a final argument that its use of the name Lew Alcindor was "incidental" and therefore not actionable . . . . While Lew Alcindor's basketball record may be said to be 'newsworthy,' its use is not automatically privileged. GMC used the information in the context of an automobile advertisement, not in a news or sports account. Hence GMC is not protected by section 3344(d)."

As noted by the White Court, a "celebrity's identity can be valuable in the promotion of products, and the celebrity has an interest that may be protected from the unauthorized commercial exploitation of that identity… If the celebrity's identity is commercially exploited, there has been an invasion of his right whether or not his "name and likeness" is used…Television and other media create marketable celebrity identity value." *White,* supra at 1398-99. The use of a celebrity's

DE LA PEÑA & MCDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax (415) 227-4416

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT AT&T MOBILITY INC.'S MOTION FOR SUMMARY JUDGMENT

name has further been held to enhance the marketability of the services offered. Pooley, supra.
Defendant did not even seek to obtain, license, otherwise obtain permission to utilize the Plaintiff's
name prior to the advertisement, and utilized it in an attempt to bring name recognition and
visibility to an otherwise mundane and routine commercial advertisement.

AT&T posits that "when speech contains commercial aspects intertwined with expressive or
informative aspects, the speech as a whole is protected", citing See *Hoffman*, 255 F.3d at 1195. In
the *Hoffman* case, a magazine published an article about fashion accompanied by a digitally-altered
photograph of Dustin Hoffman in a current designer dress. Id. at 1183. The Ninth Circuit
concluded that the use of Hoffman's image was noncommercial speech entitled to First Amendment
protection, holding, in part, that the magazine "did not use Hoffman's image in a traditional
advertisement printed merely for the purpose of selling a particular product…[n]or did the article
simply advance a commercial message." Id. at 1185 That admission – that the Press Release does
not propose any commercial transaction – makes this case distinguishable from all of the cases
previously cited by Plaintiff in responding to Defendant's First Amendment defense."

Magazine and its publisher were sued by actor, Dustin Hoffman, for using a still photograph
of him from the motion picture "Tootsie" without authorization in their magazine. The photograph
was used to create a computer generated image of the actor in which he was falsely depicted
wearing fashion designer's women's clothes. The standard used that of a public figure suing a
media defendant, whereby Plaintiff had to show actual malice in publishing the photo. In *Capitol
Cities*, the court held that the article in question was not pure commercial speech, and thus was
entitled to full protection under the First Amendment, and that the magazine did not publish the
article with actual malice. First of all, the standard is not the same, as Plaintiff does not claim to be
a public figure. Thus, Plaintiff does not have to show actual malice.

Furthermore, even if Plaintiff were a public figure, the facts are further distinguished

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

because in *Capital Cities*, the images appeared as part of an article in the Magazine and included

clear references in the article that digital techniques were used to substitute current fashions for

clothes worn in original still, and original stills were presented for comparison at the end of the

article. As such, Magazine editors did not intend to suggest that they were seeing the actor's body

in the still photograph. Here, there is no mention made in the advertising/promotional article styled

as a "Press Release" that GENERAL YEAGER does not endorse CINGULAR's cellular

communications network either impliedly or expressly as there was in the *Capitol* case.

AT&T argues that "the Press Release did not exploit Plaintiff's reputation, prestige, or any

values associated with him"-that is a jury issue. AT&T continues "Because the Press Release

sought to make a point about the innovativeness of its preparedness program, it was the event –

and not the man – which was important to the Press Release. The breaking of the sound barrier is

not a personal characteristic, or even a personal achievement, of Plaintiff's. Rather, the breaking

of the sound barrier was the achievement of a team of engineers, scientists, and pilots working for

the United States Air Force." These are all jury issues. "If this was done as Mr. Siegel said as an

historical fact, they could have said 60 years ago man broke the barrier of sound and now we at

AT&T have broken the sound barrier. But to say the legendary Chuck Yeager broke it that creates

interest. That's why -- that's why news you see on Headline News, et cetera, they tie a celebrity

with it. They love to tie a celebrity in. It gets people interested. It gets – whether they're media

people or consumers, it served that purpose here." *See* Albert-Levy Deposition John Albert at

111:22 – 112:6.

By their motion for Summary Judgment AT&T is asking this court to substitute its own

judgment about the facts in place of the jury who will hear the complete facts when the case is tried.

The phrase "legendary test pilot" evokes part of Plaintiff's iconic image with the public as

documented by Tom Wolf in the book "the right stuff" and more properly viewed in the movie

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT AT&T MOBILITY INC.'S MOTION FOR SUMMARY JUDGMENT

DE LA PEÑA & MCDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

adaptation of the book by director Phil Kaufman. Anyone who has seen the movie, or at least seen the first 20 minutes of the movie, will know exactly what was meant by "legendary test pilot". Anyone who has read the book or seen the movie knows exactly the association that Chuck Yeager has with the acronyms MACH 1 and MACH 2. AT&T might as well have named their trucks after glamorous Glennis III. AT&T and its director of media relations knows full well the meaning, and the subliminal meanings of each of the chosen words contained in the offending paragraph above. These words were not chosen by accident or through mere inadvertence, but rather to promote the overall AT&T strategy of enhancing its brand name by reference to real people that real people can identify with.

The suggestion in the memorandum that this "mere mention" of Plaintiff's name itself reveals if not its own corporate hubris, certainly the assumption of naivety on the part of the reader or juror. The suggestion in AT&T's motion papers that the rest of the publication other than the words above was merely the recitation of a newsworthy event is laughable. One can only presume that AT&T (Cingular then) Wireless was unable to respond to its customers in the hurricanes mentioned in the "press release" and that they have improved their product since. In fact, in order to demonstrate how much they have improved their product, they seek to evoke the ultimate celebrity for accomplishments as recognized by the specific part of the country to which their false quotes and insidious use of a celebrity's name was designed to achieve. Regardless of one's position with respect to the overall merits of the claim, AT&T loses all credibility when it fails to mention "test pilot", fails to say why they chose to use "Chuck Yeager" rather than his real name or how it came to be that MACH 1 and MACH 2 – so particularly inseparable from the man himself, General Chuck Yeager.

////

DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT AT&T MOBILITY INC.'S MOTION FOR SUMMARY JUDGMENT

**III**

**CONCLUSION**

Based upon the foregoing, it is clear that there are numerous contested material facts and genuine issues which require that the Defendant's Motion for Summary Judgment be DENIED.

Dated: October 13, 2009                          DE LA PEÑA & MCDONALD LLP


By _____ /s/ *Steven E. McDonald* _____
Steven E. McDonald
Attorneys for PLAINTIFF

DE LA PEÑA & MCDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

20021

- 16 -                          CIV 2:07-02517 FCD-GGH