1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11   GENERAL CHARLES E. "CHUCK"
     YEAGER (RET.),
12
              Plaintiff,
13
         v.                          NO. 2:07-cv-02517 FCD GGH
14
                                     MEMORANDUM AND ORDER
15   CINGULAR WIRELESS LLC;
     BELLSOUTH; SBC COMMUNICATIONS;
16   AMERICAN TELEPHONE & TELEGRAPH;
     and DOES 1 to 200, inclusive,
17
              Defendants.
18

19                        ----oo0oo----

20        This matter comes before the court on defendant AT&T

21   Mobility, LLC's ("AT&T" or "defendant")[1] motion for summary

22   judgment pursuant to Rule 56 of the Federal Rules of Civil

23   Procedure.  Plaintiff General Charles E. "Chuck" Yeager

24   ("Yeager" or "plaintiff") opposes the motion.  For the reasons

25   _____

26        [1]    On March 27, 2008, pursuant to the parties'
     stipulation, the court ordered that AT&T Mobility LLC be
27   substituted as defendant.  All other named defendants were
     dismissed without prejudice.  (Stip. & Order [Docket #12], filed
28   Mar. 27, 2008.)

                                 1

set forth herein,[2] defendant's motion for summary judgment is DENIED.

### BACKGROUND[3]

This case arises out of the use of plaintiff's name in a publication issued by Cingular Wireless entitled "Cingular Wireless Announces Enhanced Emergency Preparedness Program for 2006 Hurricane Season" (the "Publication").[4]  (UMF ¶ 1.) Plaintiff Yeager served in the United States Army Air Corps for many years.  (Dep. of General Charles "Chuck" Yeager ("Yeager Dep."), Ex. B to Decl. of Steven E. McDonald ("McDonald Decl.") [Docket #57], filed Oct. 13, 2009, at 13.)  He was trained to be a combat pilot and a test pilot after enlisting at the age of eighteen.  (Id.)  On October 14, 1947, as part of the mission of the United States Air Force to try to break the sound barrier, Yeager was the first pilot to exceed the speed of sound.  (Id. at 17-18.)

The Publication at issue was released on May 17, 2006 through PR Newswire and posted on Cingular's website.  (UMF ¶ 2.)  The Publication is 755 words long and contains information

_____

[2]    Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs.  See E.D. Cal. L.R. 78-230(h).

[3]    Unless otherwise noted, the facts herein are undisputed.  (See Pl.'s Response to Def.'s Separate Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("UMF") [Docket #56], filed Oct. 13, 2009, at 1-8.)  Where the facts are disputed, the court recounts plaintiff's version of the facts. (See Pl.'s Statement of Disputed Facts ("DF") [Docket #56], filed Oct. 13, 2009, at 8-12.)

[4]    The complaint alleges that defendant Cingular Wireless LLC issued the material, but the Stipulation and Order was based upon express representations that defendant At&T was responsible for the Publication.  (Stip. & Order [Docket #12].)

about Cingular's preparedness for disasters, such as hurricanes, through its emergency preparedness equipment that includes its MACH1 and MACH2 mobile command centers. (UMF ¶¶ 3, 15.) In the fifth paragraph, the Publication also provides:

> Nearly 60 years ago, the legendary test pilot Chuck Yeager broke the sound barrier and achieved Mach 1. Today, Cingular is breaking another kind of barrier with our MACH 1 and MACH 2 mobile command centers, which will enable us to respond rapidly to hurricanes and minimize their impact on our customers," de la Vega said.

(UMF ¶ 4.)

The Publication neither includes a picture of plaintiff nor mentions plaintiff's name in any headline or headings. (UMF ¶¶ 7-8.) It does not propose a commercial transaction, nor does it offer for sale any specific products or services. (UMF ¶ 8.) The Publication also does not state that plaintiff endorses or has enjoyed benefits from Cingular, AT&T, or any of their products or services. (UMF ¶¶ 10-11.)

The executive director of media relations for AT&T Mobility who wrote the Publication, Mark Siegel ("Siegel"), testified that the purpose of the press release was "two-fold. (DF ¶ 5; Dep. of Mark Siegel ("Siegel Dep.") at 16:18.) First, AT&T sought to demonstrate its commitment "to improve our efforts to restore services as quickly as possible after a natural disaster." (Siegel Dep. at 16:18-21.) Second, it sought "to create positive associations in people's mind with the AT&T brand so they would think highly" of the company." (Id. at 16:22-23.) Siegel noted the connection between MACH, the acronym for defendant's technology, and MACH, the sound barrier; he crafted the Publication to make an association between

3

breaking the sound barrier and breaking new barriers of disaster preparedness. (Id. at 18:12-17; DF ¶ 8.)  Plaintiff contends that AT&T used his name within the Publication in order capitalize upon his name, reputation, and iconic image. Plaintiff further asserts that his name was used as a "hook" to entice an audience to read about defendant's improved services. (See DF ¶¶ 6-7, 11; Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Opp'n"), filed Oct. 13, 2009, at 3.)

Plaintiff brings claims for (1) violation of California common law right to privacy/right to control publicity and likeness (also known as a common law claim for commercial misappropriation); (2) violation of California Civil Code § 3344; (3) violation of the Lanham Act, 15 U.S.C. § 1125(a); (4) unjust enrichment; (5) violation of California Business and Professions Code § 17200; and (6) violation of California False Advertising Act. (Compl., filed Nov. 21, 2007.)  Defendant seeks summary judgment against plaintiff on all claims for relief.[5]

### STANDARD

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir.

---

[5]    Plaintiff filed a supplemental opposition to which defendant objects.  The court considers neither plaintiff's supplemental opposition nor defendant's response thereto.

1   1998).  The evidence must be viewed in the light most favorable

2   to the nonmoving party.  <u>See</u> <u>Lopez v. Smith</u>, 203 F.3d 1122, 1131

3   (9th Cir. 2000) (en banc).

4       The moving party bears the initial burden of demonstrating

5   the absence of a genuine issue of fact.  <u>See</u> <u>Celotex Corp. v.</u>

6   <u>Catrett</u>, 477 U.S. 317, 325 (1986).  If the moving party fails to

7   meet this burden, "the nonmoving party has no obligation to

8   produce anything, even if the nonmoving party would have the

9   ultimate burden of persuasion at trial."  <u>Nissan Fire & Marine</u>

10  <u>Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

11  However, if the nonmoving party has the burden of proof at

12  trial, the moving party only needs to show "that there is an

13  absence of evidence to support the nonmoving party's case."

14  <u>Celotex Corp.</u>, 477 U.S. at 325.

15      Once the moving party has met its burden of proof, the

16  nonmoving party must produce evidence on which a reasonable

17  trier of fact could find in its favor viewing the record as a

18  whole in light of the evidentiary burden the law places on that

19  party.  <u>See</u> <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216,

20  1221 (9th Cir. 1995).  The nonmoving party cannot simply rest on

21  its allegations without any significant probative evidence

22  tending to support the complaint.  <u>See</u> <u>Nissan Fire & Marine</u>, 210

23  F.3d at 1107.  Instead, through admissible evidence the

24  nonmoving party "must set forth specific facts showing that

25  there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

26  /////

27  /////

28  /////

ANALYSIS

**A.    Common Law and Statutory Claims for Misappropriation**

Plaintiff claims that defendant violated his rights to control the use of his name and identity because defendant made unauthorized use of plaintiff's name to promote defendant's unrelated products and services. (Pl.'s Opp'n Mot. Summ. J. ("Pl.'s Opp'n"), filed Oct. 13, 2009, at 9.) "California recognizes, in its common law and its statutes, 'the right of a person whose identity has commercial value—most often a celebrity—to control the commercial use of that identity.'" Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180, 1184 (9th Cir. 2001)(quoting Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1098 (9th Cir. 1992)). To state a claim for misappropriation of likeness under common law, a plaintiff must prove: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. Downing v. Abercrombie & Fitch, 265 F.3d 994, 1001 (9th Cir. 2001) (citing Eastwood v. Superior Court, 149 Cal. App. 3d 409, 417 (1983)). Section 3344 of the California Civil Code complements the common law cause of action for commercial misappropriation. See Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 414 (9th Cir. 1996). A plaintiff making a claim under Section 3344 must "allege a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose," in addition to proving the

6

1    elements of the common law cause of action.[6]  <u>Downing</u>, 265 F.3d

2    at 1001.

3        Defendant argues that summary judgment should be granted as

4    to both plaintiff's common law and statutory claims based upon

5    the applicability of two affirmative defenses, arguing that (1)

6    the First Amendment protects the Publication because it contains

7    newsworthy matter and is not commercial speech; and (2) the

8    doctrine of incidental use protects the "fleeting and

9    inconsequential" use of plaintiff's name.  (Def.'s Mem. Mot.

10   Summ. J. ("Def.'s Mem."), filed Oct. 1, 2009.)

11       **1.   The First Amendment Defense**

12       "Under both the common law cause of action and the

13   statutory cause of action, 'no cause of action will lie for the

14   publication of matters in the public interest, which rests on

15   the right of the public to know and the freedom of the press to

16   tell it.'"  <u>Downing</u>, 265 F.3d at 1001 (quoting <u>Montana v. San</u>

17   <u>Jose Mercury News</u>, 34 Cal. App. 4th 790, 793 (1995)).  "The

18   First Amendment requires that the right to be protected from

19   unauthorized publicity 'be balanced against the public interest

20   in the dissemination of news and information consistent with the

21   democratic processes under the constitutional guaranties of

22   freedom of speech and of the press.'"  <u>Gionfriddo v. Major</u>

23   <u>League Baseball</u>, 94 Cal. App. 4th 400, 409 (1st Dist. 2001)

24   (quoting <u>Gill v. Hearst Publ'g Co.</u>, 40 Cal. 2d 224, 228 (1953));

25   _____

26       [6]   California Civil Code § 3344(a) provides in relevant
     part that "[a]ny person who knowingly uses another's name . . .
     in any manner . . . for purposes of advertising or selling, or
27   soliciting purchases of . . . goods or services, without such
     person's prior consent . . . shall be liable for any damages
28   sustained by the person or persons injured as a result thereof."

1  <u>Downing</u>, 265 F.3d at 1001 (noting that the court "must find a

2  proper accommodation between the competing concerns of freedom

3  of speech and the right of publicity).  In order to balance

4  these countervailing interests, a court must consider "the

5  nature of the precise information conveyed and the context of

6  the communication."  <u>Id.</u> at 410.

7      The First Amendment defense extends to publications about

8  people "who, by their accomplishments, . . . create a legitimate

9  and widespread attention to their activities."  <u>Eastwood v.</u>

10 <u>Superior Court</u>, 149 Cal. App. 3d 409, 422 (1983).  Nevertheless,

11 "this defense is not absolute."  <u>Downing</u>, 265 F.3d at 1001.  A

12 tenuous connection between the unauthorized use of a person's

13 name or likeness and the matter of public interest can remove

14 the publication from the First Amendment's protection.  <u>See</u> <u>id.</u>

15 at 1002.  Moreover, if the speech is classified as commercial

16 speech, it is not actionable "when the plaintiff's identity is

17 used, without consent, to promote an unrelated product."

18 <u>Gionfriddo v. Major League Baseball</u>, 94 Cal. App. 4th 400, 413

19 (2001); <u>Hoffman</u>, 255 F.3d at 1185 (noting that when a defendant

20 uses "an aspect of the celebrity's identity entirely and

21 directly for the purpose of selling a product," such use does

22 not "implicate the First Amendment's protection of expressions

23 of editorial opinion").

24          **a.   Commercial Speech**

25      Defendant argues that the Publication is noncommercial

26 speech that deserves the full protection of the First Amendment.

27 (Def.'s Mem. at 10-11.)  Specifically, defendant contends it is

28 undisputed that the Publication does not propose any commercial

8

1  transactions and does not offer any products or services. (_Id._)

2      The "core notion" of commercial speech is that it "does not

3  more than propose a commercial transaction." _Bolger v. Youngs_

4  _Drug Prods. Co._, 463 U.S. 60, 66 (1983) (citations and

5  quotations omitted); _see_ _Hoffman_, 255 F.3d at 1184.  However,

6  the "boundary between commercial and noncommercial speech has

7  yet to be clearly delineated." _Hoffman_, 255 F.3d at 1184.  On

8  one end of the spectrum, an advertisement is "clearly commercial

9  speech." _Id._ at 1185; _see_ _e.g._ _Abdul-Jabbar_, 85 F.3d at 409;

10 _Waits_, 978 F.2d at 1097-98.  On the other end of the spectrum is

11 speech that, when viewed as a whole, expresses editorial comment

12 on matters of interest to the public.  _See_ _Hoffman_, 255 F.3d at

13 1185 (holding that magazine article that used an altered

14 photograph of a male celebrity to showcase a designer gown was

15 noncommercial speech because the article did not have the sole

16 purpose of selling a particular product, complemented the

17 magazine issue's focus on Hollywood part and present, and

18 combined fashion photography, humor, and visual and verbal

19 editorial comment); _Montana_, 34 Cal. App. 4th at 793-95 (holding

20 that relatively contemporaneous reprinting of poster of football

21 player that appeared in newspaper article about Super Bowl

22 victory received full protection under the First Amendment).

23      Informational publications that refer to or promote a

24 specific product, but are not mere proposals to engage in

25 commercial transactions, present a closer question regarding the

26 appropriate classification of the type of speech.  _Bolger v._

27 _Youngs Drug Prods. Corp._, 463 U.S. 60, 66-67 (1983).  In _Bolger_,

28 the court considered whether the plaintiff's informational

pamphlet was commercial or noncommercial speech in order to
determined the extent of First Amendment Protection.  <u>Id.</u>  The
eight page pamphlet, entitled "Plain Talk about Venereal
Disease," provided information regarding the prevention of
venereal diseases and repeatedly discussed the advantages of
using condoms without any specific reference to those
manufactured by the plaintiff.  <u>Id.</u> at 62 n.4, 66 n.13.  The
single reference to the plaintiff's specific product was at the
very bottom of the last page, which stated that the pamphlet was
contributed as a public service by the plaintiff, who
distributed condoms.  <u>Id.</u>  The Court noted that the pamphlet
contained discussions of important public issues.  <u>Id.</u> at 67.
However, the Court also made clear that "advertising which links
a product to a current public debate is not thereby entitled to
the constitutional protection afforded noncommercial speech."
<u>Id.</u> at 68 (quoting <u>Central Hudson Gas & Elec. Corp. v. Pub.</u>
<u>Serv. Comm'n of N.Y.</u>, 447 U.S. 530, 563 n.5).  Based upon the
totality of the characteristics of the pamphlet, namely that the
plaintiff had an economic motive in mailing the pamphlets, it
was conceded to be an advertisement, and it referenced a
specific product, the Court held that the pamphlet was properly
characterized as commercial speech.  <u>Id.</u>

    In this case, looking at all of its characteristics, the
Publication is properly categorized as commercial speech.  The
central theme of the Publication is how defendant's emergency
preparedness program enhances its wireless services.
Defendant's name as a service provider is mentioned multiple
times throughout the Publication.  Further, the Publication did

not seek to inform the reader about emergency preparedness generally, but rather how defendant's wireless service specifically had been improved to handle such emergencies. Indeed, the writer of the Publication testified that the purpose of the Publication was, in part, to create positive associations with the AT&T brand. (See Siegel Deposition 16:18-23.)  As such, it is reasonable to infer that defendant had an economic motivation underlying the Publication's distribution.  Further, defendant's name as a service provider is mentioned multiple times throughout the Publication.  While none of these facts alone is necessarily dispositive, a review of the Publication as a whole supports a finding that it is commercial speech.

The facts of the case are similar to those the Court found dispositive in Bolger.  463 U.S. 60.  In both cases, the speech did not directly propose any commercial transactions or offer any products or services.  See id. at 62 n.4.  Rather, the material emphasized the benefits of defendant's product generally.  See id.  Further, in this case, defendant's service was explicitly referred to throughout the body of the writing, while in Bolger, the distributor's specific product was referenced only once at the end of the pamphlet.  See id. Accordingly, even though both the Publication in this case and the pamphlet in Bolger contained discussions of important public issues, because the Court concluded the content of the pamphlet supported a finding of commercial speech, the content of the Publication similarly supports such a finding.

Defendant argues that, similar to Hoffman, the commercial aspects of the Publication are intertwined with expressive

11

aspects, thus protecting the Publication as a whole as noncommercial speech. (Def.'s Mem. at 11.) However, the facts before the court in <u>Hoffman</u> are distinguishable from the facts before the court in this case. At issue in <u>Hoffman</u> was a feature article in a magazine that complemented the issue's focus on the history of Hollywood. <u>Hoffman</u>, 255 F.3d at 1185. Viewing the article in context, the <u>Hoffman</u> court described it as a combination of fashion photography, humor, and visual and verbal editorial comment, implicating the First Amendment's protection of expressions of editorial opinion. <u>Id.</u> The <u>Hoffman</u> court also noted that the defendant received no consideration from the designers for featuring the clothing in the altered photograph. <u>Id.</u> at 1185. Under these facts, the use of the altered photograph as an illustration in the article constituted protected noncommercial use. <u>Id.</u> at 1186. In this case, however, the Publication's sole purpose was to promote defendant's services. It provided information about defendant's program, but expressed no editorial comment on public safety issues during a natural disaster or any other related issue. Accordingly, the First Amendment's protection of expressions of editorial opinion is not likewise implicated under the facts in this case. <u>See</u> <u>Downing</u>, 265 F.3d at 1003 n.2 (distinguishing from <u>Hoffman</u> because the defendant used plaintiffs' names and photographs to promote its products while the magazine in <u>Hoffman</u> was unconnected to and received no consideration for showcasing the designer dress).

/////

/////

12

1    Therefore, the court concludes that the Publication at

2    issue is commercial speech for purposes of the First Amendment

3    defense.

4              **b.    Newsworthiness**

5        Defendant also argues that the First Amendment protects the

6    Publication's use of plaintiff's name because the Publication

7    reported on matters of public interest.  (Def.'s Mem. at 9.)

8    Specifically, defendant argues that the Publication was issued

9    subsequent to the devastation wrought by Hurricane Katrina,

10   Hurricane Wilma, and Hurricane Rita.[7]  Defendant characterizes

11   the information in the Publication as information addressing

12   public safety concerns and whether its customers can continue to

13   rely on defendant's services during a natural disaster.

14   Plaintiff contends that defendant's Publication was not issued

15   solely to convey information of public interest, but rather,

16   "was directed for a profit commercial enterprise."  (Opp'n at

17   3.)

18       Where a plaintiff's identity is used, without consent, to

19   promote an unrelated product, such speech is actionable.  See

20   Downing, 265 F.3d 994; Newcombe v. Adolf Coors Co., 157 F.3d

21   686, 691-94 (9th Cir. 1998) (use of pitcher's image in beer

22   advertisement); Abdul-Jabbar, 85 F.3d at 409 (use of basketball

23   star's former name in a television car commercial); Waits, 978

24   F.2d at 1097-98 (use of imitation of singer's voice in a radio

25   snack-food commercial); White v. Samsung Electronics Am., Inc.,

26

27       [7]    The court notes, however, that the Publication
     contains no editorial expression related to the specified
28   hurricanes.

971 F.2d 1395, 1396 (9th Cir. 1992) (use of gameshow hostess's likeness in advertisement for electronic products).  In <u>Downing</u>, clothing manufacturer Abercrombie & Fitch ("Abercrombie") used a photograph of plaintiffs competing in a surfing competition. <u>Downing</u>, 265 F.3d at 1000.  The photograph was placed in a clothing catalog that also included news and editorial pieces about the surfing culture.  <u>Id.</u>  While the surfing theme of the catalog was conceded to be a matter of public interest, the <u>Downing</u> court found that the photograph's use did not contribute significantly to the editorial pieces about surfing culture. <u>Id.</u> at 1002 ("The catalog did not explain that [the plaintiffs] were legends of the sport and did not in any way connect [the plaintiffs] with the story preceding it.").  Rather, the court reasoned that the defendant used the plaintiffs' photograph "essentially as window-dressing to advance the catalog's surf-theme."  <u>Id.</u>  Therefore, because the plaintiffs' likeness was used primarily to attract consumers to the unrelated product for sale in the sales catalog, such use was not protected by the First Amendment defense.  <u>Id.</u>

     In this case, the context of the communication and the nature of the information conveyed demonstrate that plaintiff Yeager's name and accomplishments were used to attract attention to defendant's unrelated wireless services.  While emergency preparedness and the availability of wireless services following a natural disaster are matters or public interest and concern, as set forth above, the Publication in this case was not purely informational in nature; rather, it is properly characterized as commercial speech because, *inter alia*, it aimed to positively

14

market defendant's services by linking them to that public

concern.    Further, plaintiff's name and accomplishments in

breaking the sound barrier are wholly unrelated to defendant's

mobile command centers and cellular service in emergency

situations.[8]    Indeed, as reflected by Siegel's testimony, the

use of plaintiff's name was carefully crafted as part of a

strategy to promote defendant's brand.    (See Siegel Deposition,

at 11:9-12, 16:16-23.)    Even if the content of defendant's

Publication could otherwise be considered within the public

interest, the illustrative use of plaintiff's name does not

contribute significantly to that interest; Like the use in

Downing, which the court characterized as "window-dressing," the

connection between public safety issues during hurricane season

and the use of plaintiff's name is tenuous at best.    See

Downing, 265 F.3d at 1002.

    Accordingly, defendant is not entitled to summary judgment

on its asserted First Amendment defense.

    **2.    Incidental Use**

    "The contours of the incidental use doctrine are not

well-defined in California."    Aligo v. Time-Life Books, Inc.,

1994 U.S. Dist. LEXIS 21559, at *6 (N.D. Cal. Dec. 19, 1994).

"However, the general rule is that incidental use of a

plaintiff's name or likeness does not give rise to liability"

under a common law claim of commercial misappropriation or an

_____

        [8]    Furthermore, even though plaintiff's achievement may
be said to be newsworthy, "its use is not automatically
privileged."    See Abdul-Jabbar, 85 F.3d at 456 (holding that the
newsworthiness of a former basketball player's record-breaking
achievement did not entitle the defendant to use the player's
identity in the context of an unrelated car commercial).

action under Section 3344.  *Id.* at *8.  The rationale underlying this doctrine is that an incidental use has no commercial value, and allowing recovery to anyone briefly depicted or referred to would unduly burden expressive activity.  <u>Pooley v. Nat. Hole-In-One Ass'n</u>, 89 F. Supp. 2d 1108, 1112 (D. Ariz. 2000).

Whether the use of a plaintiff's name or likeness falls within the incidental use exception to liability "is determined by the role that the use of the plaintiff's name or likeness plays in the main purpose and subject of the work at issue." <u>Preston v. Martin Bregman Prods., Inc.</u>, 765 F. Supp. 116, 119 (S.D.N.Y. 1991).  Generally, "a plaintiff's name is not appropriated by mere mention of it."  Restatement (Second) of Torts § 652C, comment *d*.  A claim is also not actionable when a plaintiff's likeness is appropriated because "it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him."  <u>Id.</u>

In determining whether the doctrine of incidental use applies, courts have considered "(1) whether the use has a unique quality or value that would result in commercial profit to the defendant, (2) whether the use contributes something of significance, (3) the relationship between the reference to the plaintiff and the purpose and subject of the work, and (4) the duration, prominence or repetition of the likeness relative to the rest of the publication."  <u>Aligo</u>, 1994 U.S. Dist. LEXIS 21559, at *7-8 (internal citations omitted).  Even if the mention of a plaintiff's name or likeness is brief, if the use stands out prominently within the commercial speech or enhances the marketability of the defendant's product or service, the

16

doctrine of incidental use is inapplicable.  See Pooley, 89 F.
Supp. 2d at 1113.  In Pooley, the defendant used, without
consent, the name of likeness of the plaintiff, a professional
golfer who was well-known for making a hole-in-one shot and
winning one million dollars as a result, in a marketing video
for its "Million Dollar Hole-in-One" fundraising service.  Id.
at 1110-11.  The footage of the plaintiff constituted only six
seconds of the entire eight minute video.  Id.  While the court
noted the duration of the use was relatively short in relation
to the rest of the publication, the court found that the use was
"crucial" to the defendant's advertisement because without it,
the video would not have been as attractive to the target
audience and because the plaintiff's hole-in-one was not
fungible to that of any other golfer.  Id. at 1112-13.  The
court also found that the plaintiff "was specifically selected
because of his distinction and his wide market appeal."  Id. at
1113.  Accordingly, the court concluded that the incidental use
doctrine did not apply because the use of the plaintiff's name
and likeness was integral to the defendant's advertisement and
"clearly enhanced the marketability of [the] defendant's
services."  Id.; see also Schifano v. Greene County Greyhound
Park, Inc., 624 So. 2d 178, 181 (Ala. 1993) (distinguishing the
incidental use of a photograph of an unidentified and unknown
person from the use of the recognizable name of a former college
football star and an experienced radio announcer for
solicitation purposes); cf. Aligo, 1994 U.S. Dist. LEXIS 21559,
at *8 (holding that four-second appearance of a magazine cover
featuring photograph of unnamed and unidentified plaintiff in a

17

29-minute "infomercial" promoting a rock music anthology was incidental use because it was one of dozens of magazine covers used in the infomercial and insignificant to the purpose of selling a music anthology); <u>Preston</u>, 765 F. Supp. at 118-19 (holding that four-second facial appearance of unidentified and unnamed plaintiff in a street scene, shot from a moving vehicle in low light, during the opening credits of a movie was incidental use because it contributed nothing to the movie's storyline); <u>Ladany v. William Morrow & Co.</u>, 465 F. Supp. 870, 881 (S.D.N.Y. 1978) (holding that incidental use doctrine applied when plaintiff was one of 101 characters in a book discussing in detail the Olympic massacre in Munich and the book referred to plaintiff only when discussing one out of the many aspects of the tragedy).

In this case, under the circumstances in which defendant's name and identity was used, the court cannot conclude that the incidental use doctrine applies. Plaintiff's name and identity is unique and non-fungible in that he is the person associated with breaking the sound barrier for the first time. The use of his name and identity links defendant's new technology to plaintiff's name and accomplishments. Indeed, as set forth above, the evidence reveals that the Publication was crafted in order to make that very association and to "create positive associations in people's mind with the AT&T brand." (Siegel Dep. at 16, 18.) While the use of plaintiff's name and reference to his accomplishment was a small part of the 755-word Publication, the association of defendant's services with a historical feat is a use that may help to pique the interest of

18

a newsman deciding whether to follow up on a press release.
(See Deposition of Albert Levy at 111:4-19.)  Therefore, like in
Pooley, the use of plaintiff's name and identity uniquely
enhanced the marketability of defendant's service.  See also
Henley v. Dillard Dep't Stores, 46 F. Supp. 2d 587, 592 (N.D.
Tex. 1999) (holding that incidental use defense did not apply
where the defendant used the value associated with a well-known
musician's name in a "wordplay" in order to attract consumers'
attention);  Accordingly, defendant is not entitled to summary
judgment on its asserted incidental use defense.

     Because under the facts before the court the defendant
cannot establish as a matter of law that its use of plaintiff's
name and identity is protected by the First Amendment or by the
incidental use doctrine, defendant's motion for summary judgment
on plaintiff's common law and statutory claims of commercial
misappropriation is DENIED.

**B.   Lanham Act**

     Plaintiff claims that defendant violated the Lanham Act,
specifically 15 U.S.C. § 1125(a), because the appearance of
plaintiff's name in the Publication is likely to cause confusion
about plaintiff's affiliation or connection to defendant.
(Pl.'s Opp'n at 11.)  "Section 43(a) of the Lanham Act, 15
U.S.C. § 1125(a), prohibits, *inter alia*, the use of any symbol
or device which is likely to deceive consumers as to the
association, sponsorship, or approval of goods or services by
another person."  Wendt v. Host Int'l, 125 F.3d 806, 812 (9th
Cir. 1997).  "An express purpose of the Lanham Act is to protect
commercial parties against unfair competition."  Abdul-Jabbar,

19

85 F.3d at 410 (quoting <u>Waits</u>, 978 F.2d at 1108)).  A false endorsement claim is actionable under the Lanham Act if such claim is based on the unauthorized use of a uniquely distinguishing characteristic of a celebrity's identity that is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product.  <u>Wendt</u>, 125 F.3d at 812.  "Because the names and likenesses of celebrities are commonly . . . used in a wide variety of publications, Lanham Act jurisprudence places great importance on the likelihood of consumer confusion as the 'determinative issue' in false endorsement claims.  <u>Kournikova v. General Media Commc'ns., Inc.</u>, 278 F. Supp. 2d 1111, 1120 (C.D. Cal. 2003).  The likelihood that a well-known individual's name or likeness was used to promote a product with which he has no association raises the possibility of commercial injury.  <u>Id.</u>

        Defendant contends that plaintiff's claim fails as a matter of law because (1) plaintiff must and cannot demonstrate triable issues of fact regarding actual confusion because the Publication does not contain any express endorsement; and (2) the nominative fair use doctrine supports summary judgment.[9] (Def.'s Mem. at 13, 15.)

        **1.    Likelihood Of Confusion**

        "In cases involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona."

---

[9]    Defendant also argues that the Lanham Act claim fails because plaintiff, as a public figure featured in a noncommercial speech, bears the burden of proving with clear and convincing evidence that defendant acted with actual malice. However, for reasons mentioned *supra*, the court does not characterize the Publication as noncommercial speech and, accordingly, need not reach the issue of actual malice.

White, 971 F.2d at 1400.  In such cases, the Ninth Circuit has
utilized the eight-factor test set forth in AMF, Inc. v.
Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979), to determine
whether there is a likelihood of confusion regarding endorsement
arising out of a defendant's use of a plaintiff's mark.
Downing, 265 F.3d at 1007; Abdul-Jabbar, 85 F.3d at 413; White,
971 F.2d at 1400.  These factors include:

> (1)  strength of the plaintiff's mark;
> (2)  relatedness of the goods;
> (3)  similarity of the marks;
> (4)  evidence of actual confusion;
> (5)  marketing channels used;
> (6)  likely degree of purchaser care;
> (7)  defendant's intent in selecting the mark; and
> (8)  likelihood of expansion of the product lines.

White, 971 F.2d at 1400.  These factors "are not necessarily of
equal importance, nor do they necessarily apply to every case."
Downing, 265 F.3d at 1008.  Further, because "[t]he Lanham Act's
'likelihood of confusion' standard is predominantly factual in
nature . . . [s]ummary judgment is inappropriate when a jury
could reasonably conclude that most of the factors weigh in a
plaintiff's favor."  Wendt, 125 F.3d at 812.

        In this case, plaintiff has presented sufficient evidence
regarding likelihood of confusion to withstand summary judgment.
Both plaintiff and defendant agree that Yeager is a public
figure publicly associated with his accomplishment in breaking
the sound barrier.  (See Pl.'s Opp'n at 4; Def.'s Mem. at 12.)
As such, his "mark" is strong.  Further, there is no dispute
that defendant used plaintiff's mark in its Publication, which
was directed at creating positive associations with its
services.  A jury could infer that under these facts,

defendant's intent was to capitalize upon the positive
associations with plaintiff's name by implying endorsement in
order to achieve its objectives.  While there is little
relationship between plaintiff's mark and the cellular services
in emergency situations and scant specific evidence regarding
actual confusion, the court cannot find that defendant is
entitled to judgment as a matter of law at this stage in the
litigation.[10]

### 2. Nominative Fair Use

Nominative fair use is a specific defense to claims under
the Lanham Act applied to "a class of cases where the use of the
trademark does not attempt to capitalize on consumer confusion
or to appropriate the cachet of one product for a different
one."  New Kids On The Block v. New Am. Publ'g, Inc., 971 F.2d
302, 308 (9th Cir. 1992); see Abdul-Jabbar v. Gen. Motors Corp.,
85 F.3d 407, 412 (9th Cir. 1996).

To establish a nominative fair use defense, a defendant
must prove three elements:

> (1) the product or service in question must be one not
> readily identifiable without use of the trademark;
>
> (2) only so much of the mark or marks may be used as is
> reasonably necessary to identify the product or
> service; and
>
> (3) the user must do nothing that would, in conjunction
> with the mark, suggest sponsorship or endorsement by

---

[10]   The court notes that neither party fully addresses the
application of the Sleekcraft factors in their briefs.  Rather,
defendant only argues that there has been no evidence of actual
confusion.  While this factor is important, it is not
determinative.  Further, while somewhat vague, Victoria Yeager
testified that she received phone calls regarding confusion as
to whether plaintiff endorsed defendant's services.  (Dep. of
Victoria Yeager, Ex. H to Stroud Decl., at 134:2-13.)

the trademark holder.

_Downing_, 265 F.3d at 994.[11]  The doctrine of nominative fair use applies only when the mark is "the only word reasonably available to describe a particular thing."  _Abdul-Jabbar_, 85 F.3d at 412.  "Because it does not implicate the source-identification function that is the purpose of the trademark . . . such use is fair because it does not imply sponsorship or endorsement by the trademark holder."  _Id._; _see_ _Cairns v. Franklin Mint Co._, 292 F.3d 1139, 155 (9th Cir. 2002) (holding that there was no confusion regarding endorsement where the plaintiff's mark was not so closely associated with the plaintiff that any mention would suggest sponsorship or endorsement).

Where a celebrity's name is used in a commercial, there are triable issues of fact regarding whether such use implies endorsement.  In _Abdul-Jabbar_, the defendant car manufacturer used the plaintiff's name in a commercial, comparing the famous basketball player's college basketball record to the defendant's awards for its car.  85 F.3d at 409.  The court noted that by closely analogizing the plaintiff's record of being voted the best player in three consecutive years to the defendant's product being placed on the "best buy" list three years in a row, the defendant "arguably attempted to appropriate the cachet of one product for another, if not also to capitalize on consumer confusion.  _Id._ at 413 (internal quotations omitted).

---

[11]    The parties do not discuss the first two elements of this defense, but rather focus their arguments on the third element, the likelihood of consumer confusion regarding endorsement because of defendant's conduct.

The court held that because the "use of celebrity endorsements in television commercials is so well established by commercial custom," a jury might find an implied endorsement through the defendant's use of the plaintiff's name.  Id. ("Many people may assume that when a celebrity's name is used in a television commercial, the celebrity endorses the product advertised. Likelihood of confusion is therefore a question for the jury."). Accordingly, the court held that there was a question of fact as whether the defendant was entitled to the nominative fair use defense.  Id.

In this case, defendant has failed to meet its burden in establishing that the nominative fair use defense applies as a matter of law.  Defendant used plaintiff's name and accomplishments to support its own product, specifically comparing plaintiff's feat in breaking the sound barrier to defendant's technological advancements.  While not featured in a television commercial, the deliberate, closely-tied analogy in a press release directed to create positive associations with defendant's product is sufficient to raise a triable issue of fact regarding implied endorsement.[12]  Indeed, Victoria Yeager testified that after the press release, she received a few calls inquiring about whether Yeager endorsed AT&T. (Dep. of Victoria Yeager, Ex. H to Stroud Decl., at 134:2-13.)  Therefore, on the

---

[12]    Furthermore, while defendant argues that its limited reference to plaintiff's name and accomplishment is insufficient to imply endorsement, it fails to proffer any evidence regarding what type of use would imply endorsement for purposes of comparison.  Cf. Cairns, 292 F.3d at 1154-55 (holding that the absence of statements regarding authorization that the defendant used in relation to other products supported applicability of nominative fair use defense).

record before the court, defendant is not entitled to summary
judgment on its asserted nominative fair use defense.

Accordingly, defendant's motion for summary judgment on the
Lanham Act claim is DENIED.

**C.   Plaintiff's Remaining Claims**

Finally, defendant contends that plaintiff's claims for
violation of California Business and Professions Code § 17200,
violation of California False Advertising Act, and unjust
enrichment must be dismissed because they are substantially
congruent to plaintiff's commercial misappropriation and Lanham
Act claims.  Because, as set forth above, the court finds
defendant's prior arguments unpersuasive, defendant's motion for
summary judgment on the remaining state law claims is also
DENIED.

CONCLUSION

For the foregoing reasons, defendants' motion for summary
judgment is DENIED.

IT IS SO ORDERED.

DATED: December 7, 2009

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

25