KOHUT & KOHUT LLP
RONALD J. KOHUT (SBN 66463)
3554 Round Barn Blvd., Suite 204
Costa Mesa, CA 95403
Telephone: 707-573-3100
Facsimile: 707-573-3101
Email: ronald@kohutlaw.com

MENNEMEIER, GLASSMAN & STROUD LLP
ANDREW W. STROUD (SBN 126475)
STEPHEN LAU (SBN 221051)
980 9th Street, Suite 1700
Sacramento, CA 95814
Telephone: 916-553-4000
Facsimile:  916-553-4011
E-mail: stroud@mgslaw.com

Attorneys for Defendant AT&T Mobility, LLC

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENERAL CHARLES E. "CHUCK" YEAGER (RET.),<br><br>             Plaintiff,<br><br>v.<br><br>AT&T MOBILITY, LLC;  and DOES 1 through 200, inclusive,<br><br>          Defendants. | Case No. 2:07-cv-02517 (KJM-GGH)<br><br>**DEFENDANT AT&T MOBILITY, LLC'S MOTION IN LIMINE (NO. 1) TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS JON ALBERT AS DISCLOSED IN HIS INITIAL EXPERT REPORT**<br><br>Hearing Date: April 2, 2012<br>Time:       1:30 p.m.<br>Trial Date:   June 4, 2012<br>Courtroom:  3<br>Judge:     Hon. Kimberly J. Mueller |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE that on April 2, 2012, at 1:30 p.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Eastern District of California, Sacramento Division, Courtroom 3, located at 501 I Street, Sacramento, CA 95814, Defendant AT&T Mobility, LLC ("AT&T") will and hereby does move in limine for an order excluding the opinions and testimony of Jon Albert, designated as an expert witness in this matter by Plaintiff.

Foremost, Mr. Albert has admitted that his expert report of July 22, 2009 was merely a "preliminary" one rather than a final one.  Therefore, his report fails to comply with

1

1  Federal Rule of Civil Procedure 26, or with this Court's scheduling order of April 22, 2009.

2  Further, Mr. Albert's initial report reveals that *all* of the opinions contained therein are

3  inadmissible on one or more grounds.  Specifically, all of Mr. Albert's anticipated testimony falls

4  into one or more of the following categories: (1) valuation opinion that is unanchored to any data

5  or methodology; (2) opinion about matters of law; (3) fact testimony about matters of which he

6  has no personal knowledge; (4) opinion about matters with which the jury requires no assistance;

7  and (5) conjecture about matters of empirical fact.

8          This Motion is based upon this Notice of Motion and Motion, the attached

9  Memorandum of Points and Authorities, the pleadings, records, and papers on file with this

10  Court, all matters upon which this Court may take judicial notice, and such oral arguments as the

11  Court may receive.

12  Dated: March 2, 2012                    KOHUT & KOHUT LLP
                                        MENNEMEIER, GLASSMAN & STROUD LLP

13

14

15                            By:    /s/ Stephen Lau
                                        Stephen Lau
16                                      Attorneys for Defendant AT&T Mobility, LLC

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

By this motion, Defendant AT&T Mobility, LLC ("AT&T") seeks to exclude the testimony of Plaintiff's expert witness, Jon Albert (a/k/a Jon Albert-Levy) as disclosed in his initial expert report of July 22, 2009.

As a threshold matter, Mr. Albert has now admitted that his July 22, 2009 expert report was "preliminary" rather than final. Thus, that report fails to comply with Federal Rule of Civil Procedure 26, or with this Court's scheduling order of April 22, 2009. On that basis alone, Mr. Albert should be precluded from testifying to the opinions contained in his initial report.

Further, Mr. Albert's initial report reveals that *all* of the testimony he intends to offer at trial is inadmissible on one or more grounds. Specifically, all of Mr. Albert's anticipated testimony falls into one or more of the following categories: (1) valuation opinion that is unanchored to any data or methodology; (2) opinion about matters of law; (3) fact testimony about matters of which he has no personal knowledge; (4) opinion about matters with which the jury requires no assistance; and (5) conjecture about matters of empirical fact. All such testimony is inadmissible. Accordingly, AT&T seeks an order of the Court excluding Mr. Albert as an expert witness.

## I. FACTUAL BACKGROUND

Federal Rule of Civil Procedure 26(a)(2)(B)(ii) requires an expert witness to submit a written report containing the opinion he intends to express at trial and "the facts or data considered by the witness in forming them."

This Court issued its Amended Status (Pretrial Scheduling) Order ("Order") (Docket No. 37) on April 22, 2009. *See* Declaration of Andrew W. Stroud in Support of Motion in Limine, Ex. G. Under that Order, "[a]ll counsel are to designate in writing, file with the court, and serve upon all other parties the name, address, and area of expertise of each expert that they propose to tender at trial not later than July 22, 2009." Order at 2:9-11. Further:

> All experts designated are to be fully prepared at the time of designation to render an informed opinion, and give their bases for their opinion, so that they will be able to give full and complete testimony at any deposition taken by the opposing party. **Experts will not be permitted to testify at the trial as to any information gathered or evaluated, or opinion formed, after deposition taken subsequent to designation**.

1  Order at 3:6-11 (emphasis added).

2            On July 22, 2009, Plaintiff disclosed Mr. Albert as his expert and submitted his

3  Rule 26 report.  That report describes "Mr. Albert's Anticipated Expert Witness Opinions" as

4  follows:

5            The "Press Release" dated May 17, 2006, was directed by a for-profit
             commercial enterprise, AT&T, which by their own statement was seeking the
6            enhancement of its brand.  This was commercial speech.  The reference to General
             Yeager was part of a strategic marketing/public relations effort including in the
7            context of its timing, continuing use of the Internet and geographical scope of its
             release and exposure to the general public.
8
             The association of General Yeager's image with AT&T in the Press
9            Release was an effort to enhance the AT&T [then Cingular] brand.  The release
             itself implies that the General endorses AT&T, and certainly any consumer/reader
10           would likely infer that relationship.  The use of General Yeager's name would
             without doubt cause confusion among consumers as to the General's affiliation
11           with AT&T.

12           The use of plaintiff's name took advantage of plaintiff's reputation,
             prestige, character and other values, in order to bring those qualities to mind when
13           thinking of Cingular as [a] major wireless provider.

14           The unauthorized use by AT&T surely limits plaintiffs ability and
             possibilities of endorsing any other wireless product or telecommunications
15           service for several years as it is my experience that advertisers do not wish to
             utilize a celebrity talent to endorse their product or service if that talent is already
16           identified with a competitor.  Also, a talent of the stature of General Yeager
             virtually always seeks to establish a long term relationship with an advertiser,
17           normally not less than one year, and often longer. The amount of money that
             AT&T would reasonably have to expect to pay the plaintiff for the use of his
18           name, accomplishments and image would in my opinion be no less than
             $500,000.00, and not more than $2,000,000.00.
19

20  See Stroud Decl., Ex. A at 2:1-28.  According to Mr. Albert's report, the only documents that he

21  reviewed in forming his opinions were: (1) AT&T's Press Release, and (2) a transcript of the

22  deposition of Mark Siegel, the author of the Press Release.  Id., Ex. A at 2:27-28.

23            AT&T took Mr. Albert's deposition on August 11, 2009.  At deposition, Mr.

24  Albert testified that Plaintiff's wife (Victoria Yeager) first contacted him to serve as an expert

25  witness on the morning of July 22, 2009 (the last day for the parties to serve expert disclosures).

26  See Deposition of Jon Albert ("Albert Depo.") at 72:15-73:1.  According to Mr. Albert's

27  testimony, and as corroborated by e-mail correspondence, the primary drafter of the expert report

28  was Plaintiff's then-attorney, Charles Murray.  Id. at 125-128.  At deposition, Mr. Albert testified

    that he received an initial draft of an "expert report" from Mr. Murray some time "after 5:00" pm

1    on July 22. *Id.* at 126:5-127:16.  Mr. Albert also testified that he only spent "maybe an hour"

2    reviewing and editing that attorney-generated report before signing his name to it.  *Id*. at 127:17-

3    128:10 (testifying that he signed off on report at 6:23 pm).

4            On August 21, 2009, AT&T designated a rebuttal expert and submitted a rebuttal

5    expert report, pursuant to Rule 26(a)(2)(C)(ii).  *See* Stroud Decl., Ex. B.

6            On February 28, 2012, Plaintiff served on AT&T the "Supplemental Expert

7    Report of Jon Albert" ("Supplemental Report").  *See* Stroud Decl., Ex. C.  In that Supplemental

8    Report, Mr. Albert states that "the fair market value for Cingular's use of General Yeager's name

9    and likeness is *at least* $2,000,000."  *Id*., Ex. C at 2 (italics added).

10                        **II. ARGUMENT**

11      A.    **Because Plaintiff's Expert Has Admitted That His Expert Report of July 22,**

12          **2009 Was Merely "Preliminary," It Should Be Excluded As Non-Compliant With This Court's Order and Rule 26(a)(2)(B).**

13            On February 28, 2012, two and a half years after Mr. Albert's deposition, Plaintiff

14    served his Supplemental Report on AT&T.  In that report, Mr. Albert admits for the first time

15    that "[his] initial expert report was based, in part, on a preliminary analysis of the available

16    records."  Stroud Decl., Ex. C at 1.  The Supplemental Report also discloses that Mr. Albert now

17    intends to offer at trial an opinion that is drastically different from the opinion disclosed in his

18    initial expert report.  According to the Supplemental Report, Mr. Albert now values Plaintiff's

19    identity at a *minimum*, rather than a maximum, of $2,000,000.  *See id.*, Ex. C at 4.

20            By those assertions, Mr. Albert admits that his "initial expert report" of July 22,

21    2009 was merely a "preliminary" rather than a final report.  Thus, that report does not comply

22    with this Court's scheduling order or with Rule 26(a)(2)(B).  *See* Order at 3:6-11 ("All experts

23    designated are to be fully prepared at the time of designation to render an informed opinion");

24    Fed. R. Civ. Proc. 26(a)(2)(B) (expert report must contain "a complete statement of all opinions

25    the witness will express and the basis and reasons for them").  Because Mr. Albert admits that he

26    failed to submit a final opinion and report as of the deadline previously set by this Court, and,

27    further, the opinion submitted was wrong, Mr. Albert should be barred from presenting any of the

28    testimony disclosed in that initial report.

1

**B.      Plaintiff's Expert Intends to Offer a Valuation Opinion Without Any
Foundation in Empirical Data or Methodology.**

2

3      Based on his initial report, Mr. Albert apparently intends to offer opinion

4 testimony about the fair market value of a license to use Plaintiff's name and likeness.  AT&T

5 does not dispute that the valuation of intellectual property is an appropriate subject of expert

6 opinion testimony.  However, AT&T disputes that such opinion testimony is admissible when it

7 is unconnected to any real-world data or articulable methodology.

8                **1.      Expert Opinion Testimony Is Admissible Only If Reliable.**

9      The district court has a "gatekeeping role" to assure the reliability of proffered

10 expert testimony before it is received by the jury.  *Daubert v. Merrell Dow Pharm., Inc.*, 509

11 U.S. 579, 589 (1993).  The district court's duty to act as gatekeeper applies to all, and not just

12 scientific, expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  In

13 assessing the reliability of expert opinion testimony, the Court must consider whether "(1) the

14 testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

15 principles and methods, and (3) the witness has applied the principles and methods reliably to the

16 facts of the case."  Fed. R. Evid. 702; *Metabolife Int'l v. Wornick*, 264 F.3d 832, 841 (9th Cir.

17 2001) (in assessing the reliability and admissibility of an expert opinion, "the focus is on

18 principles and methodology, not conclusions.").  In determining whether expert *economic*

19 testimony is reliable and admissible under Rule 702, courts may consider:

20      –      whether other economists accept the methodology;

21      –      whether the data on which the estimates or projections are based is
            reliable;

22

23      –      whether such data is the kind relied on by other economists in making
            similar projections;

24      –      whether the projections reasonably follow from application of the
            methodology to the data; and

25

26      –      where projections are based on assumptions or a choice among
            alternatives, the reasonableness of the assumptions or choice.

27 Jones et al., *Federal Civil Trials & Evidence*, 8:1619.5 at p. 8F-58 (The Rutter Group 2011).

28

1

2

          **2.    Mr. Albert Has Failed to Provide the Data or Methodology
Underlying His Valuation Opinion.**

3            AT&T invites the Court to review Mr. Albert's expert report with that framework

4 in mind.  In his initial report, Mr. Albert opines that "the amount of money that AT&T would

5 reasonably have to expect to pay the plaintiff for the use of his name, accomplishments and

6 image would in my opinion be no less than $500,000, and not more than $2,000,000."  Those are

7 large numbers.  And by all indications, Mr. Albert manufactured them from whole cloth:

8  •    Mr. Albert's expert report does not contain the methodology he used to generate his fair

9       market value figure.  Nor does Mr. Albert's report describe the data he relied upon in

10      applying that methodology.  Nor does the report speak to any factual assumptions he

11      made in generating his figure.  *See* Stroud Decl., Ex. A.

12  •    At deposition, Mr. Albert testified to the factors he considered in forming his opinion:

13      "[w]ho the talent is, their stature, everything about them, information about the company,

14      what the campaign is, who the company is, the breadth of the usage, what comparable

15      talent may look for to be involved in a situation.  Is it a first usage of somebody or a

16      second usage or a 50 or a 60th usage." Albert Depo. at 99:25-100:10.  Yet, Mr. Albert

17      has never presented any of the factual data corresponding to those factors that he

18      supposedly considered.

19  •    Indeed, it appears that Mr. Albert never actually gathered such data.  According to Mr.

20      Albert's report, the <u>only</u> "data and other information" he considered in forming his

21      opinions were: (1) the Press Release, and (2) the transcript of the deposition of AT&T

22      employee Mark Siegel.  *See* Stroud Decl., Ex. A at 2:27-28; Albert Depo. at 121:14

23      (confirming at deposition that "he did not rely on any other specific documents for this

24      [opinion]").  Also, Mr. Albert freely admitted that he arrived at his fair market value

25      opinion without having reviewed any of Plaintiff's other endorsement contracts.  *See,*

26      *e.g.*, Albert Depo. at 145:18-21 (admitting that, for the most part, he has no idea what

27      General Yeager earns from endorsements); *id*. at 145:22-24 (testifying to his (erroneous)

28      belief that Plaintiff does not generally give product endorsements).  Mr. Albert also

1   admitted that he has performed virtually no other research about Plaintiff's current

2   viability as spokesperson.  *Id*. at 132:16-133:8 (admitting that he did not conduct any

3   research about Plaintiff's past endorsement deals other than a conversation with

4   Plaintiff's wife); *id*. at 134:24-135:2 (admitting that he did not do any research about

5   Plaintiff's current level of name recognition); *id*. at 148:10-14 (admitting that he did not

6   do any research about any negative aspects of Plaintiff's reputation).

7   •   Asked about his failure to articulate a methodology in his report, Mr. Albert responded: "I

8       think the fact that I've expressed the opinion, I think the thing speaks for itself, shows

9       that I took all of the factors of my experience and expertise and particularly, you know, 33

10      years of experience into account in coming up with an opinion."  Albert Depo. at 100:17-

11      22.

12  •   Later in his deposition, Mr. Albert claimed that he has developed a "sense for what

13      people ask for" in celebrity endorsement deals: "I tend to start to know how [prospective

14      endorsers] think, how they operate, how they think based upon what they earn, what their

15      potential earnings are, what they think of their own career. . . . I mean, this is a sense

16      that's been gained in probably 12,000 inquiries since I've started."  Albert Depo. at

17      145:11-17.

18  •   Pressed on whether he relied on any other materials, Mr. Albert elaborated: "In a broad

19      sense, I refer mentally to thousands of documents that I've been acquainted with, part of,

20      for the last 33 years regarding celebrity negotiations, contracts, et cetera, which outlines

21      how much people are being paid, being offered, et cetera."  Albert Depo. at 121:18-22.

22  •   In his Supplemental Report, Mr. Albert admitted that "[his] opinion, as expressed [in his

23      July 22, 2009 report], did not include an express comparison of how much an individual

24      of comparable celebrity status to General Yeager would have been paid for a use of that

25      individual's name or likeness similar to that at issue in this lawsuit."  Stroud Decl., Ex. C.

26  That Mr. Albert did not use a rigorous methodology or perform empirical research is not

27  surprising.  The undisputed fact is that Mr. Albert was contacted by Plaintiff for the first time on

28  the date that the expert report was due (July 22, 2009), and that Mr. Albert spent "maybe an

hour" on that report.  Albert Depo. at 127:17-128:10.  Mr. Albert was not even aware of this case until that date.  *Id*. at 99:15-17.

### 3. Mr. Albert's Valuation Opinion Is Not Sufficiently Reliable Under Federal Rule of Evidence 702.

Simply put, Mr. Albert's opinion does not even begin to pass muster under Rule 702.  The Court cannot evaluate Mr. Albert's "data" for sufficiency because he did not identify any.  The Court cannot evaluate Mr. Albert's "principles and methods" for reliability because he could not articulate any.  And although Mr. Albert provides a laundry list of "factors" he supposedly considered, he cannot articulate the *method* by which those various factors translated into the hard numbers that he provided.  Nor does Mr. Albert provide the *data* he had corresponding to those factors.  By shrouding the origin of his valuation figures in vagaries, Mr. Albert has effectively immunized his opinion from Rule 702 scrutiny.  Simultaneously, however, Mr. Albert has stripped his opinion of any real value for the jury.  Jones et al., *Federal Civil Trials & Evidence*, 8:1527.1 at p. 8F-37 (The Rutter Group 2011) ("An expert must substantiate his or her opinion.  An ultimate conclusion with no analysis is meaningless and thus is not helpful to the factfinder.") (internal quotations omitted).

Mr. Albert attempts to legitimize his figures by invoking his "experience," "thousands" of unspecified documents from his past, and his special "sense" of what celebrities tend to seek in endorsement deals.  But such an opinion is indistinguishable from speculation or intuition, which are inadmissible.  *See Daubert*, 509 U.S. at 589 (the term "specialized knowledge" in Federal Rule of Evidence 702 "connotes more than subjective belief or unsupported speculation").  *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416 (7th Cir. 2005) is instructive.  In that case, the plaintiff sought to introduce expert opinion testimony about lost profit damages.  *Id*. at 418.  The trial court excluded the proffered expert testimony under Rule 702, and the appellate court affirmed.  *Id*. at 420.  In particular, the court observed that the expert's testimony was not founded on any tangible methodology:

/ / /

1
2
3

> Asked repeatedly during his deposition what methods he had used to generate projections, [the expert] repeatedly answered "my expertise" or some variant ("my industry expertise", "[my] awareness," and "my curriculum vitae") – which is to say that he either had no method or could not describe one.  He was relying on intuition, which won't do.

4   *Id*. at 418.  The court further explained: "A witness who invokes 'my expertise' rather than

5   analytic strategies widely used by specialists is not an expert as Rule 702 defines that term. . . .

6   As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of

7   value to the judicial process.'"  *Id*. at 419.

8        Nor can Mr. Albert claim that there were no empirical tools at his disposal.

9   Rigorous methodologies and data were available to Mr. Albert to assess the fair market value of

10  Plaintiff's endorsement.  *See* Stroud Decl., Ex. B at 10-22 (explaining methodologies used by

11  AT&T's rebuttal experts).  But Mr. Albert elected not to use those tools, bringing into doubt his

12  fitness as an expert in the first instance.  *See Zenith*, 395 F.3d at 419 ("Indeed, the record does

13  not contain any hint why [the expert] preferred intuition to the empirical tool kit of the social

14  sciences. And if [the expert] did not use these devices because he does not know how: that would

15  just demonstrate that he's not an 'expert' in the first place.").  Hence, Mr. Albert's valuation

16  opinion is nothing more than *ipse dixit* testimony and should be excluded.[1]

17        **C.    Plaintiff's Expert Intends to Offer Legal Opinion**

18        Based on his initial expert report, Mr. Albert apparently intends to testify that the

19  Press Release "was commercial speech" because it was "directed by a for-profit commercial

20  enterprise."  Such opinion testimony is inadmissible, for at least two reasons.

21        First, Mr. Albert is unqualified to opine on the issue of whether the Press Release

22  falls into the constitutional category of "commercial speech."  Federal Rule of Evidence 702

23  requires that expert witnesses bring "scientific, technical, or other specialized knowledge" to the

24  issue on which they seek to opine.  Here, Mr. Albert's curriculum vitae reveals no expertise on

25  First Amendment law, or any training in the law in general.  Second, even if he had such

26
27
28

---

[1]      Not surprisingly, the fair market value figures proffered by Mr. Albert significantly exceed the compensation that Plaintiff has actually received from any of his past endorsement contracts.  *See* Stroud Decl, Ex. B at 18-19.

1   expertise, such testimony remains inadmissible because it is pure legal analysis.  "It is well

2   established that, an expert may not state his or her opinion as to legal standards, nor may he or

3   she state legal conclusions drawn by applying the law to the facts.  Such opinions invade on the

4   province of the judge."  *Gable v. NBC*, 727 F. Supp. 2d 815, 835 (C.D. Cal. 2010) (internal

5   citations and punctuation omitted); *Aguilar v. International Longshoremen's Union Local #10*,

6   966 F.2d 443, 447 (9th Cir. 1992) ("matters of law for the court's determination . . . were

7   inappropriate subjects for expert testimony").  Here, Mr. Albert seeks to inject opinion testimony

8   in an area in which the Court itself is already an expert (constitutional law).

9    **D.    Plaintiff's Expert Intends to Offer Testimony About Factual Matters of
10            Which He Lacks Personal Knowledge.**

11            Based on his initial expert report, Mr. Albert also intends to offer testimony about

12   AT&T's motivations for releasing the Press Release.  Specifically, he asserts that the "[t]he

13   association of General Yeager's image with AT&T in the Press Release was an effort to enhance

14   the AT&T [then Cingular] brand," and that "[t]he reference to General Yeager was part of a

15   strategic marketing/public relations effort" by AT&T.

16            To the extent Plaintiff seeks to present testimony about AT&T's motives for

17   mentioning Plaintiff's name, Mr. Albert is the wrong witness to give that testimony.  The issue of

18   whether AT&T's mention of Plaintiff was a calculated "effort" to enhance the brand is a

19   significant factual issue in this case.  Mr. Albert has no personal knowledge about that factual

20   issue, because he was not privy to the thought processes behind the creation of the Press

21   Release.[2]  If Plaintiff wishes to present testimony about AT&T's decision-making process in

22   connection with the Press Release, he is free to cross-examine the Press Release's author (Mark

23   Siegel) and others involved with publicizing AT&T's emergency preparedness program (Tina

24   Brown).  Plaintiff does not get to leapfrog the cross-examination process and simply have a

25   purported expert ascribe motives to AT&T.  Not only is such testimony outside the realm of Mr.

26

27

28       [2]       The only thing that Mr. Albert knows about those processes is what he learned
        from reading the transcript of Mr. Siegel's deposition.  However, Mr. Siegel himself will be
        available to testify about the creation of the Press Release, and to be cross-examined by Plaintiff.

1    Albert's competency, it is prejudicial and risks misleading the jury.  *See* Fed. R. Evid. 403

2    (evidence is inadmissible where probative value is outweighed by risk of unfair prejudice,

3    confusion of issues, and misleading of jury).

4        **E.**    **Plaintiff's Expert Intends to Offer His Opinion on Matters that the Jury Is Equally Qualified to Assess.**

5

6            Mr. Albert also seeks to offer opinion testimony about inferences that readers

7    might draw from the Press Release.  Specifically, he opines that "[t]he release itself implies that

8    the General endorses AT&T, and certainly any consumer/reader would likely infer that

9    relationship."  He further opines that "[t]he use of plaintiff's name took advantage of plaintiff's

10   reputation, prestige, character and other values, in order to bring those qualities to mind when

11   thinking of Cingular as [a] major wireless provider."

12           The issue of what inferences a reader might draw from the Press Release is not the

13   proper subject of expert opinion testimony.  "Expert opinion testimony is appropriate when the

14   factual issue is one that the trier of fact would not ordinarily be able to resolve without technical

15   or specialized assistance."  Jones et al., *Federal Civil Trials & Evidence*, 8:1526 at p. 8F36 (The

16   Rutter Group 2011) (citing *Daubert*, 509 U.S. at 591).  "In contrast, if a jury is capable of

17   drawing its own inferences from the available evidence, expert opinion testimony may *not* 'assist

18   the trier of fact.'"  *Id*. (italics in original); *see also United States v. Joyce*, 511 F.2d 1127,

19   1130-1131 (9th Cir. 1974) ("[The expert has] a power to draw inferences from the facts which a

20   jury would not be competent to draw.  To warrant the use of expert testimony, . . . the subject of

21   the inference must be so distinctively related to some science, profession, business or occupation

22   as to be beyond the ken of the average layman.").  Consistent with that rule, courts routinely

23   exclude expert testimony regarding the meaning to be drawn from ordinary language. *See United*

24   *States v. Kupau*, 781 F.2d 740, 745 (9th Cir. 1986) (affirming exclusion of expert testimony that

25   was "aimed not at explaining technical terms used in the conversation" but rather "to interpret

26   language in ordinary usage"); *Kournikova v. General Media Communs., Inc.*, 278 F. Supp. 2d

27   1111, 1122 (C.D. Cal. 2003) ("expert testimony is not admissible to determine the plain meaning

28   of a word and its effect upon a reasonable consumer").

1  Here, Mr. Albert seeks to offer testimony about what the Press Release "implies"

2  and what comes "to mind" when one reads the Press Release.  But the jury requires no assistance

3  from an expert in that regard.  The jurors can read the Press Release for themselves and

4  determine what the Press Release says or does not say.  Indeed they are no worse qualified to

5  perform that task than Mr. Albert.  Accordingly, any testimony from Mr. Albert regarding what

6  the Press Release implies, or what readers might infer from the Press Release, should be

7  excluded at trial.

8  **F.    Plaintiff's Expert Intends to Offer Conjecture About Matters of Empirical
         Fact.**

9

10  In his initial report, Mr. Albert offers a number of statements that constitute out-

11  and-out conjecture about factual events.  Such statements are inadmissible.  *Monroe v. Zimmer*

12  *US Inc.*, 766 F. Supp. 2d 1012, 1032 (E.D. Cal. 2011) ("An expert's opinions that are without

13  factual basis and are based on speculation or conjecture are inadmissible at trial") (internal

14  quotations omitted).

15  First, Mr. Albert states that "[t]he use of General Yeager's name would without

16  doubt cause confusion among consumers as to the General's affiliation with AT&T."  Notably,

17  Mr. Albert frames this statement as a prediction ("would without doubt cause confusion") and

18  not as an empirical observation.  But there was no need for him to predict or project.  At the time

19  Mr. Albert submitted his initial report (July 2009), over three years had passed since AT&T

20  issued the Press Release.  By then, the question of whether consumers identified Plaintiff with

21  AT&T was a matter of verifiable, observable fact.  By conducting consumer surveys and field

22  studies, Mr. Albert could have determined whether there was, or ever had been, marketplace

23  confusion attributable to the Press Release.  Yet, Mr. Albert apparently never undertook such a

24  study, which is commonly submitted as evidence in Lanham Act cases.  *See Oregon Arms, Inc. v.*

25  *Oregon Arms, Ltd.*, 2000 U.S. App. LEXIS 30215 (9th Cir. Or. Nov. 27, 2000) ("The lack of

26  survey evidence counts against finding actual confusion.") (quoting *Merriam-Webster, Inc. v.*

27  *Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994)).  Nor does Mr. Albert even present anecdotal

28

1  evidence of confusion.  In short, Mr. Albert's statement regarding confusion is conjecture

2  substituting for actual empirical research.[3]

3         Second, Mr. Albert asserts that "[t]he unauthorized use by AT&T surely limits

4  plaintiff's ability and possibilities of endorsing any other wireless product or telecommunications

5  service for several years as it is my experience that advertisers do not wish to utilize a celebrity

6  talent to endorse their product or service if that talent is already identified with a competitor."

7  That sentence contains conjecture in two respects.

8         The latter part of the sentence – that Plaintiff "is already identified with" AT&T –

9  is, once again, unsupported conjecture.  Mr. Albert has no empirical evidence that a significant

10  number of consumers – or *any* consumers – "already identif[y]" Plaintiff with AT&T.  The first

11  part of the sentence – that AT&T "surely limit[ed]" Plaintiff's ability to act as a spokesman for

12  telecommunications companies – is also conjecture.  Mr. Albert can point to no evidence that any

13  telecommunications company has actively sought out Plaintiff's endorsement.  Nor is there

14  evidence that any telecommunications company ever decided against obtaining Plaintiff's

15  endorsement because of the Press Release.  Simply put, Plaintiff's career as a spokesperson for

16  telecommunications companies is a theoretical one.  Mr. Albert's opinion that AT&T "limited" a

17  career option that does not actually exist is conjecture as well.

18  ### III.  CONCLUSION

19         For the foregoing reasons, AT&T respectfully seeks an order of the Court

20  excluding Mr. Albert as an expert witness.

21  Dated: March 2, 2012         KOHUT & KOHUT LLP
                         MENNEMEIER, GLASSMAN & STROUD LLP

23  By:  /s/ Stephen Lau
24         Stephen Lau
       Attorneys for Defendant AT&T Mobility, LLC

[3]  To the extent that Mr. Albert's testimony goes to the effect that the Press Release might have upon an average reader (as opposed to its actual impact on the marketplace), expert testimony is inadmissible in that regard.  *See Kournikova,* 278 F. Supp. 2d at 1122 (expert testimony is inadmissible to determine effect of words upon a "reasonable consumer").