IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

---oOo---


GENERAL CHARLES E. "CHUCK"
YEAGER (RET.),

       Plaintiff,

                    No. 2:07-cv-02517

vs.

AT&T MOBILITY, LLC; and
DOES 1 TO 200, inclusive,

       Defendants.


_____/




---oOo---

REPORTER'S TRANSCRIPT

TRIAL PROCEEDINGS

MONDAY, JUNE 4, 2012

---oOo---






Reported by: DIANE J. SHEPARD, CSR 6331, RPR

```
 1                         APPEARANCES

 2

 3

 4          For the Plaintiff:

 5
                  PARSONS BEHLE & LATIMER
 6                By:  JOHN N. ZARIAN, Attorney at Law
                       KENNEDY K. LUVAI, PHV
 7                960 Broadway Avenue, Suite 250
                  Boise, Idaho 83706
 8

 9          For the Defendant:

10                KOHUT & KOHUT
                  BY:  RONALD J. KOHUT, Attorney at Law
11                     LAURA K. HOOPIS, Attorney at Law
                  3554 Round Barn Boulevard, Suite 204
12                Santa Rosa, California 95403

13                          and

14                MENNEMEIER, GLASSMAN & STROUD, LLP
                  BY:  STEPHEN LAU, Attorney at Law
15                980 9th Street, Suite 1700
                  Sacramento, California 95814
16

17

18

19

20

21

22

23

24

25
```

1                             I N D E X

2      PLAINTIFF WITNESSES:                                PAGE:

3      **CHARLES E. YEAGER**
       DIRECT EXAMINATION BY MR. ZARIAN                     65
4      CROSS-EXAMINATION BY MR. KOHUT                       99

5

6      **VICTORIA YEAGER**
       DIRECT EXAMINATION BY MR. ZARIAN                    114

7

8
                   PLAINTIFF EXHIBITS RECEIVED IN EVIDENCE
9        No.                  Description                  Page

10       57    General Chuck Yeager Career Highlights       69
         61    "The Right Stuff" demonstrative              82
11       62    "Yeager, an Autobiography" demonstrative     83
         63    General Yeager, 1986-2012 demonstrative      84
12       53    Brand Marketing Contract                    140
         53    Brand Marketing Contract                    143
13       49    Cingular Press Release on Wireless          152
               IQ-Technology Market Research
14

15                 DEFENSE EXHIBITS RECEIVED IN EVIDENCE
         No.                  Description                  Page
16
         L     Letter to Victoria Yeager from Rolex dated  107
17             September 22, 2008

18

19

20

21

22

23

24

25

1                    SACRAMENTO, CALIFORNIA

2                    MONDAY, JUNE 4, 2012

3                         ---oOo---

4          THE COURT:  All right.  Ladies and gentlemen of the

5    jury, now that you have been seated, I'm going to provide you

6    with preliminary instructions to guide your service, and then

7    we'll take a lunch break.  And actually that break will go

8    until 1:30 p.m. because I have a little bit more business to do

9    with the parties.  So we'll have you back at 1:30 p.m.

10         But in the meantime, here are your preliminary

11   instructions.  I'm going to read those.  You do not have them

12   in front of you at this time.  When you come back after lunch,

13   though, you'll have some binders, and a copy of the

14   instructions will be in those binders for your reference.

15         Ladies and gentlemen, you are now the jury in this

16   case.  It is my duty to instruct you on the law.  It is your

17   duty to find the facts from all the evidence in the case.  You,

18   and you alone, are the judges of the facts.  You will hear the

19   evidence, decide what the facts are, and then apply those facts

20   to the law which I will give to you.  This is how you will

21   reach your verdict.

22         You must follow the law as I give it to you whether

23   you agree with it or not, and you must not be influenced by any

24   personal likes or dislikes, opinions, prejudices or sympathy.

25   That means that you must decide the case solely on the evidence

1    before you.  The evidence will consist of the testimony of

2    witnesses, documents, and other things received into evidence

3    as exhibits, and any facts on which the lawyers may agree or

4    which I instruct you to accept.

5            You must not infer from these instructions or from

6    anything I may say or do as indicating that I have an opinion

7    regarding the evidence or what your verdict should be.

8            In following my instructions, you must follow all of

9    them and not single out some and ignore others.  They are all

10   important.

11           During trial you may hear me use a few terms you may

12   not have heard before.  I will briefly explain some of the most

13   common to you.

14           The party who has brought suit is called, as you've

15   heard this morning, the plaintiff.  In this action, the

16   plaintiff is Retired General Charles E. "Chuck" Yeager or

17   General Yeager.

18           The party being sued is called the defendant.  The

19   defendant in this case is AT&T Mobility, LLC, which was

20   previously known as Cingular Wireless.  For purposes of this

21   lawsuit, AT&T Mobility, LLC, is liable for the actions of

22   Cingular Wireless.

23           Plaintiff is represented by John Zarian and Kennedy

24   Luvai.  Defendant is represented by Ronald Kohut, Laura Hoopis

25   and Steven Lau.

1        The attorneys representing the parties in this case

2    are not allowed to speak with you.  When you see the attorneys,

3    if you do, at a recess or pass them in the halls, and they do

4    not speak to you, they are not being rude or unfriendly.  They

5    are following the law.

6        You will sometimes refer to counsel.  Counsel is

7    another way to say lawyer or attorneys.  I will sometimes refer

8    to myself as the Court.

9        To help you follow the evidence, I'll read that brief

10   summary of the positions of the parties once again.  General

11   Yeager claims that Cingular Wireless used his name without

12   consent as part of a press release issued on May 17, 2006.

13   AT&T Mobility, LLC, is liable for the actions of Cingular.

14       General Yeager claims the use of his name by Cingular

15   Wireless violated his right to publicity.  General Yeager seeks

16   monetary damages.

17       AT&T denies that it is liable for violating General

18   Yeager's right to publicity because the use of General Yeager's

19   name by Cingular Wireless was lawful.

20       Plaintiff has the burden of proving his claims.  He

21   must prove his claims by a preponderance of the evidence.  When

22   a party has the burden of proof on any claim by a preponderance

23   of the evidence, it means you must be persuaded by the evidence

24   that the claim is more probably true than not true.  You should

25   base your decision on all the evidence regardless of which

1    party presents it.

2             The evidence you are to consider in deciding what the

3    facts are consists of following:  Number one, the sworn

4    testimony of any witness; number two, the exhibits received

5    into evidence; and number three, any facts to which the parties

6    agree.

7             There are rules of evidence that control what can be

8    received into evidence.  From time to time during trial I may

9    make rulings on objections or motions made by the lawyers.

10   When I sustain an objection, I am excluding that evidence from

11   this trial.  If I sustain or uphold an objection to a question

12   that goes unanswered by the witness, you should not draw any

13   inferences or conclusions from the question.  You must ignore

14   the question and must not guess what the answer might have

15   been.  When I overrule an objection, I am permitting that

16   evidence to be admitted.

17            Sometimes I may order evidence to be stricken from

18   the record and that you disregard or ignore the evidence.  That

19   means that when you are deciding the case, you must not

20   consider the evidence I told you to disregard.  It is counsel's

21   duty to object when the other side offers testimony or other

22   evidence that they believe is not admissible.  You should not

23   be unfair or prejudiced against either party because they made

24   objections.  You should not infer or conclude from any ruling

25   or other comment I may make that I have any opinion on the

1    merits of the case favoring one side or the other.  I do not

2    favor one side or the other.

3          In reaching your verdict, you may consider only the

4    testimony and exhibits received into evidence.  Certain things

5    are not evidence, and you may not consider them in deciding

6    what the facts are.  I will list them for you:

7          Number one, arguments and non-testimonial statements

8    by counsel for either party are not evidence.  Counsel for the

9    parties are not witnesses.  What they say in their opening

10   statements, will say in their closing arguments, and at other

11   times is intended to help you interpret the evidence, but it is

12   not evidence.  If the facts as you remember them differ from

13   the way the attorneys state them, your memory of the facts

14   controls.

15         Secondly, questions and objections by counsel for

16   either party are not evidence.

17         Third, testimony that has been excluded, or stricken,

18   or that you have been instructed to disregard is not evidence

19   and must not be considered.  In addition, sometimes testimony

20   and exhibits are received only for a limited purpose.  If and

21   when I instruct you that an item of evidence will be or has

22   been admitted for a limited purpose, you must consider it only

23   for that limited purpose and for no other.

24         Fourth, anything you may see or hear when court is

25   not in session is not evidence.  You are to decide the case

1       solely on the evidence received here at trial.

2                Now, evidence may be direct or circumstantial.

3       Direct evidence is direct proof of a fact such as testimony by

4       a witness about what that witness personally saw, or heard, or

5       did.  Circumstantial evidence is proof of one or more facts

6       from which you could find another fact.  You should consider

7       both kinds of evidence.  The law makes no distinction between

8       the weight to be given to either direct or circumstantial

9       evidence.  It is for you to decide how much weight to give to

10      any evidence.

11               By way of example, if you wake up in the morning and

12      you see that the sidewalk is wet, you may find from that fact

13      that it rained during the night.  However, other evidence such

14      as a turned on garden hose may provide a different explanation

15      for the presence of water on the sidewalk.  Therefore, before

16      you decide that a fact has been proved by circumstantial

17      evidence, you must consider all the evidence in the light of

18      reason, experience, and common sense.

19               In deciding the facts in this case, you may have to

20      decide which testimony to believe and which testimony not to

21      believe.  You may believe everything a witness says, or part of

22      it, or none of it.  Proof of a fact does not necessarily depend

23      on the number of witnesses who testify about it.

24               In considering the testimony of any witness, you may

25      take into account the following:  One, the opportunity and

1    ability of the witness to see, or hear, or know the things

2    testified to; number two, the witness' memory; number three,

3    the witness' manner while testifying; number four, the witness'

4    interest in the outcome of the case and any bias or prejudice;

5    number five, whether other evidence contradicted the witness'

6    testimony; number six, the reasonableness of the witness'

7    testimony in light of all the evidence; and, number seven, any

8    other factors that bear on believability.

9          The weight of the evidence as to a fact does not

10   necessarily depend on the number of witnesses who testify about

11   it.  The test is not which side brings the greater number of

12   witnesses or takes the most time to present its evidence but

13   which witnesses and which evidence appealed to your minds as

14   being most accurate and otherwise trustworthy.

15         A witness may be discredited or impeached by evidence

16   that is contradictory or shows that at some other time the

17   witness has said or done something or has failed to say or do

18   something which is inconsistent with the witness' present

19   testimony.

20         As I have already instructed you, it is up to you to

21   decide which testimony to believe and which testimony not to

22   believe.  You may believe everything a witness says, or part of

23   it, or none of it.

24         From time to time during trial it may become

25   necessary for me to talk with the attorneys out of the hearing

1      of the jury either by having a conference at the bench, as you

2      saw this morning, when you are present in the courtroom, or by

3      calling a recess.

4           Please understand that while you are waiting at any

5      time, we are working.  The purpose of any conference is not to

6      keep relevant information from you but to decide how certain

7      evidence is to be treated under the Rules of Evidence, and to

8      avoid confusion and error.

9           Of course, we will do what we can to keep the number

10     and length of conferences to a minimum.  I may not always grant

11     a request for a conference.  Do not consider my granting or

12     denying a request for a conference as any indication of my

13     opinion of the case or what your verdict should be.

14          At the end of the trial you will have to make your

15     decision based on what you recall of the evidence.  You will

16     not have a transcript of the trial.  Therefore, I urge you to

17     pay close attention to the testimony as it is given.

18          If at any time you cannot hear the testimony, see the

19     evidence, hear questions or arguments, or see the witnesses or

20     any relevant document, let me know so I can correct the

21     problem.  You can do that by speaking out, holding up your

22     hand, whatever it takes.

23          If you wish, you may take notes to help you remember

24     the evidence.  When you come back there will be notebooks

25     available to you.  If you do take notes, please keep them to

1    yourself until you and your fellow jurors go to the jury room

2    to decide the case.  Do not let note taking distract you.  When

3    you leave, you should leave your notes on your chair here in

4    the courtroom.  No one will read your notes.  They will be

5    destroyed at the conclusion of the case.

6              Whether or not you take notes, you should rely on

7    your own memory of the evidence.  Notes are only to assist your

8    memory.  You should not be overly influenced by your notes or

9    those of your fellow jurors.

10             Now just a couple of words about your conduct as

11   jurors.  First, keep an open mind throughout the trial and do

12   not decide what the verdict should be until you and your fellow

13   jurors have completed your deliberations at the end of the

14   case.

15             Second, because you must decide this case based only

16   on the evidence received in the case and on my instructions as

17   to the law that applies, you must not be exposed to any other

18   information about the case or to the issues it involves during

19   the course of your jury duty.

20             Thus, until the end of case or unless I tell you

21   otherwise, these are the ground rules.  They repeat and build

22   on what I said to you before our first break.  Do not

23   communicate with anyone in any way and do not let anyone else

24   communicate with you in any way about the merits of the case

25   and anything to do with it.  This includes discussing the case

1       in person, in writing, by phone or electronic means, via

2       e-mail, text messaging, or any internet chat room, blog,

3       website, or other feature.  This applies to communicating with

4       fellow jurors until I give you the case for deliberation, and

5       it also applies to communicating with everyone else including

6       your family members, any employer, the media or press, and the

7       people involved in the trial.

8               You may, however, notify your family and any employer

9       that you have been seated as a juror in the case.  But if you

10      are asked or approached in any way about your jury service or

11      anything about this case, you must respond that you have been

12      ordered not to discuss the matter and then to report that

13      contact to the Court.

14              Because you will receive all the evidence and legal

15      instruction you properly may consider to return a verdict,

16      again do not read, watch, or listen to any news or media

17      accounts or commentary about the case or anything to do with

18      it.  Do not do any research such as consulting dictionaries,

19      searching the internet, or using other reference materials, and

20      do not make any investigation or in any other way try to learn

21      about the case on your own.

22              Third, just as a reminder, if you do need to

23      communicate with me at any time, simply give a signed note to

24      the clerk, and she will give it to me.

25              Fourth, do not make up your mind about what the

1    verdict should be until after you have gone to the jury room to

2    decide the case and you and your fellow jurors have discussed

3    the evidence.  Keep an open mind until then.

4            Just so it's clear, the law requires these

5    restrictions to ensure that the parties have a fair trial based

6    on the same evidence that each party has an opportunity to

7    address.  A juror who violates these restrictions jeopardizes

8    the fairness of these proceedings, and that could result in a

9    mistrial meaning there would have to be a whole new trial.  If

10   you learn that any juror is exposed to any outside information,

11   please let me know immediately.

12           After lunch, the next phase of trial will begin.

13   First each side may make an opening statement.  An opening

14   statement is not evidence.  It is simply an outline to help you

15   understand what that party expects the evidence will show.  A

16   party is not required to make an opening statement.

17           Plaintiff's counsel will then present evidence, and

18   counsel for the defendants may cross-examine.  Then defendant's

19   counsel may present evidence, and counsel for the plaintiff may

20   cross-examine.  After the evidence has been presented, I will

21   instruct you on the law that applies to the case, and the

22   attorneys will make closing arguments.  After that, you will go

23   to the jury room to deliberate on your verdict.

24           Ladies and gentlemen of the jury, those are your

25   preliminary instructions.  So with that I am going to excuse

1        you for a relatively generous lunch break.  It's about quarter

2        of 12:00.  Again, you are excused until 1:30.  Please be ready

3        to go then, and we will proceed with opening statements.

4        During that break please remember my admonitions that I've just

5        given to you.  Have a good break.  See you at 1:30.  Thank you.

6                    (Jury out.)

7                    THE COURT:  You may be seated.  All right.  Just

8        before we break, so I'm clear on the objections related to

9        exhibits, is that Exhibits T, U and X, are those the

10       demonstratives that you need to know about with respect to

11       opening?

12                   MR. LUVAI:  Yes, Your Honor.  Kennedy Luvai for

13       plaintiff, General Yeager.

14                   Yes.  We did object to demonstrative Exhibits T, U, V

15       and X.  And the reason for that is we took the deposition of

16       Tina Brown, and we have some concerns about the lack of

17       authentication of those documents and the lack of foundation as

18       well.

19                   THE COURT:  All right.  And do you agree, Mr. Kohut,

20       that those are the exhibits with respect to which I need to

21       rule on the objections prior to opening?

22                   MR. KOHUT:  Your Honor, I'm going to turn that over

23       to my colleague, Mr. Lau.  Although, I understand that there

24       are a great many more objections by both sides to the proposed

25       demonstratives than the particular exhibits that have just been

1      identified by the Court.

2                 Having said that, let me turn it over to Mr. Lau.

3                 THE COURT:  My question is, which exhibits do I need

4      to rule on prior to opening statements?

5                 MR. LAU:  Well, as to AT&T's exhibits, I understand

6      that plaintiff has objected to T, U, V and X.  As to Exhibit U

7      and V, we do not plan to present those at trial, and so those

8      can be taken off the list.

9                 THE COURT:  So no presentation at all during trial,

10     not just opening statement?

11                MR. LAU:  That's correct.

12                THE COURT:  All right.  So it's narrowed down to T

13     and X.

14                MR. LAU:  Well, there are others.  But as to those

15     four.  As to Exhibit T, T consists of a --

16                THE COURT:  I don't want to hear extended argument

17     now.  I just want to be clear on which exhibits are potentially

18     at issue, and then I can look at those over the lunch break.

19     And then I'm directing you to meet and confer over the lunch

20     break in case you have not exhausted meet and confer as to any

21     objections to exhibits.

22                MR. LAU:  As to Exhibit T there is only one picture

23     that remains at issue.

24                THE COURT:  Is that identified by a page number?

25                MR. LAU:  I believe that is -- pardon me, Your Honor

1          -- yes.  That is Exhibit T, page four, that remains at issue.

2                    THE COURT:  All right.

3                    MR. LAU:  And as for Exhibit X, page eight remains at

4          issue.

5                    THE COURT:  All right.  Are there any others that

6          might be used during opening statements?  Mr. Lau?

7                    MR. LAU:  I'm sorry, Your Honor?

8                    THE COURT:  Any other exhibits that the defense may

9          wish to use during opening that I need to consider?

10                   MR. LAU:  If those are the extent of the objections

11         that are at issue, then no.

12                   THE COURT:  All right.  Well, I'm going to look at T,

13         page four and X, as exhibits the parties need to know about

14         before opening statements.

15                   And then what are the documents identified in the

16         Saturday night e-mail?  Are those identified by exhibit numbers

17         at this point?  Whoever knows the answer to that question?  The

18         plaintiff said earlier -- plaintiff's counsel said they had not

19         seen those documents.

20                   MS. HOOPIS:  Your Honor, at the deposition of Tina

21         Brown, which occurred on Wednesday -- about midnight on

22         Wednesday morning we were served with an extensive document

23         request.  And so at the deposition we were asked whether we

24         brought the documents, and we had not had an opportunity to

25         search or produce anything because we had been traveling to

1      Salt Lake for the deposition.

2              And so in the intervening two days we were able to

3      download certain documents that plaintiff had requested and a

4      video.  And so I left those for plaintiff to pick up on

5      Saturday or Sunday.  I don't know whether plaintiff picked

6      those up or not, but those may or may not be exhibits that we

7      use at trial.

8              I mean, the only reason we would use them would be

9      impeachment.  But they were just produced because they were

10     requested, and they will not be used in the openings statement.

11             THE COURT:  Mr. Zarian, with that clarification do

12     you understand now which documents that e-mail referred to?

13             MR. ZARIAN:  I do not, Your Honor.  And I would ask

14     that they be identified.  Because we think they should be

15     excluded even from impeachment purposes.  These are documents

16     that were requested literally years ago in this case.  And the

17     prejudice is bad enough that we had to be taking a new

18     deposition of a new witness, new documents were introduced.

19             THE COURT:  Well, do you acknowledge that you were

20     told that there was a packet someplace to pick up?

21             MR. ZARIAN:  There was an e-mail late Saturday night

22     saying they would be made available yesterday.  And apparently

23     they were -- now why they were not simply e-mailed to me is

24     beyond me.  I just don't know why they couldn't have just

25     e-mailed.

1          THE COURT:  Where are they right now?

2          MS. HOOPIS:  Your Honor, I sent a second e-mail

3     yesterday when we were able to leave them at the front desk of

4     a hotel.  And if Mr. Zarian chose to pick them up, I don't know

5     that.

6          THE COURT:  Do you have an extra set here today?

7          MS. HOOPIS:  I don't know that either.  We couldn't

8     e-mail it because it consisted also of a video that was too

9     large to e-mail.  We do have an extra set with us.

10         THE COURT:  Well, you will provide a copy immediately

11    upon the Court's recessing before noon to plaintiff's counsel.

12         MS. HOOPIS:  Certainly, Your Honor.

13         MR. LAU:  Your Honor, I would like to make clear that

14    defendant AT&T does have a series of objections to plaintiff's

15    demonstrative exhibits.  Those are set out -- those were set

16    out in a filing entitled Defendant AT&T's Objections to

17    Demonstratives.

18         THE COURT:  All right.  So all of those remain?

19         MR. LAU:  That's correct, Your Honor.

20         THE COURT:  All right.  And are those proposed for

21    use during opening statement?  Are any of those proposed for

22    use opening statement?  Your demonstratives that are objected

23    to by the defense.

24         MR. LUVAI:  Yes, we do.

25         THE COURT:  So which exhibits are those that would be

1          -- that would you be using in opening if you could.

2              MR. ZARIAN:  We intend to use substantially all of

3      our demonstrative, Exhibits 57 through 70, inclusive, Your

4      Honor.

5              THE COURT:  57 through 70.  All right.

6              MR. LUVAI:  Your Honor, we also have further

7      outstanding objections to defendant AT&T's proposed

8      demonstratives.  We have an Exhibit O.  And there is a

9      demonstrative that appears to have been derived from AT&T,

10     either Exhibit BB or CC, which is plaintiff's responses to

11     AT&T's requests for admission.

12             THE COURT:  Is the defense proposing to use any of

13     those in opening, Mr. Kohut?

14             MR. KOHUT:  Yes, Your Honor.  We're intending to use

15     all of those.

16             THE COURT:  Is it BB or CC or both?

17             MR. KOHUT:  Actually, Your Honor, BB and CC are

18     responses to requests for admissions, and there is a slide that

19     we've proposed which takes three of the responses to those

20     requests for admissions and places them on the slide.

21             THE COURT:  So it's both?

22             MR. KOHUT:  I'm sorry, Your Honor.  Yes, it is.

23             THE COURT:  All right.  Mr. Luvai, any others?

24             MR. LUVAI:  We do also have some outstanding

25     objections to work through on demonstratives that are derived

1     from AT&T's Exhibits B and D.

2                THE COURT:  Do you plan to use those, Mr. Kohut, in

3     opening?

4                MR. KOHUT:  Just a moment, Your Honor.  I'm sorry,

5     Your Honor, the two that are at issue right now we do not

6     intend to use D.  What was the other one?  I'm sorry.

7                THE COURT:  Derived from B, as in boy.

8                MR. KOHUT:  Yes, Your Honor.  We do intend to use a

9     demonstrative derived from B.  And essentially that's a slide

10    that's been prepared and shared with the other side.

11               THE COURT:  All right.  Mr. Luvai any others?

12               MR. LUVAI:  And to the extent that the Court hasn't

13    resolved this issue, there's also outstanding objections to a

14    demonstrative that's derived from AT&T's Exhibit W.

15               THE COURT:  Can I get the whole list?  How long is

16    the list here?

17               This is the kind of thing that really should

18    addressed through meet and confer so you can give me the list

19    of only what I need to resolve.  And right now I'm only

20    focusing on what's going to be covered in opening.  Do you have

21    a short list of what you want to use in opening, Mr. Kohut?

22               MR. KOHUT:  We do have a list of what we intend to

23    use in opening, and we'll certainly make that available to the

24    Court.

25               With respect to W, which is the one that was just

1    mentioned by my colleague, we have no intention of using W in

2    our opening.

3            THE COURT:  All right.  Can you show that list to the

4    plaintiff now?

5            MR. KOHUT:  Yes, of course, Your Honor.  That list

6    has been made available to the plaintiff, and the plaintiff has

7    filed objections to those documents, and those objections have

8    been filed with the Court.

9            THE COURT:  The list that clarifies what would be

10   used in opening only?  That's what I'm trying to understand,

11   because that's what's coming next, what exhibits that a party

12   wishes to use in opening are there still objections to?

13           MR. KOHUT:  Right.  We provided our list, and I

14   believe that they objected to every single document and video

15   that we intended to use.

16           MR. ZARIAN:  I think Mr. Kohut's mistaken.  There has

17   been no list.  Specifically those which are going to be used at

18   opening, I think he is referring to the original exchange of

19   demonstratives weeks ago.

20           MR. KOHUT:  I'm sorry, Your Honor.  Perhaps it was

21   not clear.  We intend to use all of our demonstratives in our

22   opening.

23           THE COURT:  All right.  Except not D?

24           MR. KOHUT:  Except for not D and not W.

25           THE COURT:  So you've objected to every other

1    demonstrative, Mr. Luvai?

2              MR. LUVAI:  Yes, Your Honor.

3              THE COURT:  All right.  I'll check those over the

4    break.  If you have not met and conferred, I would ask that you

5    meet and confer and let me know at 1:00 if the list is

6    narrowed.  Otherwise, I will tell you at 1:00 which

7    demonstratives you may or may not use in opening.  And after I

8    do that, I'll give the defense 15 minutes to make their

9    proffer, and we should be ready to go with the jury at

10   1:30 p.m. at which point I'll recognize plaintiff for opening.

11             MR. KOHUT:  Your Honor, may I make a suggestion?

12             THE COURT:  You may.

13             MR. KOHUT:  That the proffer be heard before the

14   Court rules on the demonstratives because it could affect the

15   rulings on the demonstratives.

16             THE COURT:  Is there anything really new and

17   different from what's in the trial briefing?

18             MR. KOHUT:  With respect to the offer of proof,

19   substantially, Your Honor.

20             THE COURT:  Well, I'll consider that.  I'll let you

21   know at 1:00.

22             MR. KOHUT:  Your Honor, to be absolutely fair with

23   respect to the opening, we also would like to use clips from

24   the deposition of General Yeager, and the citations that we

25   would use, in the order that we would use, them are page 7,

1    lines 11 through 15 --

2            THE COURT:  Why do you need to load up the openings

3    with so much material?  Why can't the openings be the evidence

4    will show with summary statements?  Given the large number of

5    objections that remain.

6            MR. KOHUT:  Is this specifically with respect to the

7    video clips, Your Honor?

8            THE COURT:  At this point, it's the entire list.

9            MR. KOHUT:  All right.

10           THE COURT:  I mean, closing is when you interpret the

11   evidence.

12           MR. KOHUT:  We actually don't have that many opening

13   slides, Your Honor.  I would say there are less than ten.  And

14   the video clips go directly to the credibility of General

15   Yeager.

16           And I think it's important that the jury have an

17   opportunity to determine that credibility at the earliest

18   possible moment.  If the Court would prefer that we not do that

19   in our opening, certainly I can state in my opening what I

20   believe the evidence will show as to what General Yeager will

21   testify to at trial.

22           THE COURT:  Why isn't that sufficient here for both

23   sides?  I mean, opening is opening.

24           MR. ZARIAN:  Our concern, Your Honor, is that it just

25   has to stop at some point.  We continue to get a dribble of new

1      documents, new witnesses, new demonstratives.  There are rules

2      in place, and they have just been disregard.

3              In one case there was an exhibit identified, there

4      were nine others slipped underneath it.  That's the subject of

5      objections.  There was an exchange of demonstratives --

6              THE COURT:  My question is, can you live with the

7      rule of no exhibits during opening?

8              MR. ZARIAN:  I'd be willing to limit my exhibits,

9      Your Honor, but ours have been the same.  They haven't changed.

10     We've had our exhibits out there.  It's 57 through 70,

11     unchanged since the exchange date.

12             Most of our concerns were theirs.  It's the

13     untimeliness of them.  We get documents yesterday.  Apparently

14     now there's new exhibits being proffered.  I just think the

15     rules need to be followed.

16             MR. KOHUT:  Your Honor, there are no new exhibits

17     being proffered.  We can argue all day as to which party has or

18     has not followed the rules.  That's not going to get us very

19     far.

20             THE COURT:  All right.  I'm going to look at the

21     record myself.  I'll let you know at 1:00 what order we're

22     taking things in.  And if there is any update at 1:00, you can

23     let me know.

24             MR. KOHUT:  Your Honor, thank you very much.

25             MR. ZARIAN:  Your Honor, is there a guideline on --

1      forgive me -- on opening statements?

2                THE COURT:  Well, how much time do you believe you

3      need?

4                MR. ZARIAN:  20 to 30 minutes tops.

5                MR. KOHUT:  I was thinking 45, Your Honor, but I'll

6      try to do it shorter.

7                THE COURT:  All right.

8                MR. ZARIAN:  If it's 45, then it's 45.  I just

9      thought we should know in advance, Your Honor.  That's all.

10               THE COURT:  Does that depend on how many exhibits you

11     get to use?

12               MR. KOHUT:  Well, certainly, Your Honor, if I use my

13     exhibits, it will be shorter.

14               THE COURT:  Let's plan right now for 30-minute

15     opening statements.  That's my current thinking.

16               (Lunch break taken.)

17               THE COURT:  You may be seated.  We're back on the

18     record with all counsel, with the defense representatives.

19               Do you wish to proceed without General Yeager at this

20     time, Mr. Zarian, Mr. Luvai?

21               MR. ZARIAN:  Yes, we may, Your Honor.  Thank you.

22               THE COURT:  First, with respect to the openings, I've

23     looked at these exhibits and supposed demonstratives.  It would

24     appear to the Court that the parties are trying to try the

25     entire case in the opening, and I'm assuming you all know how

1      to do it the old-fashioned way without Power Points?

2           What's the prejudice to you if the Court says no

3      exhibits during opening, Mr. Zarian?

4           MR. ZARIAN:  I can't say that there is any permanent

5      prejudice, Your Honor.  We'd certainly do it either way.  In

6      all candor, I would prefer to do it with the demonstratives,

7      but I think the Court has some discretion in this matter.

8           THE COURT:  Mr. Kohut.

9           MR. KOHUT:  Well, Your Honor, as the Court can note

10     from visual observation, I've been doing this a long time.  I

11     can certainly do it the old-fashioned way.

12          THE COURT:  All right.  That's the Court's ruling.  I

13     mean plaintiff's is closer to a demonstrative, but even then it

14     incorporates exhibits, and the Court hasn't made a final ruling

15     on some of the exhibits that are referenced there.  So I'm

16     going to say openings without any exhibits for both sides.

17          MR. ZARIAN:  Thank you, Your Honor.  I do intend our

18     first witness is General Chuck Yeager, and I had hoped to use

19     some of these demonstratives with General Yeager as well.

20          THE COURT:  Well, that you may attempt to --

21          MR. ZARIAN:  Thank you.

22          The Court:  -- to the extent you're using them.  Are

23     you saying you would use the demonstratives prior to eliciting

24     the information?

25          MR. ZARIAN:  I don't believe there are objections to

1    them.  For example, there is a biography.

2         THE COURT:  I'm not preventing you from trying to

3    offer any of the evidence including any of the exhibits that

4    were proposed.  I'm not sustaining any objections for the

5    purposes of admissibility at trial.

6         MR. ZARIAN:  Thank you.

7         THE COURT:  I'm trying to keep opening statements as

8    opening statements.

9         All right.  The defense proffer, Mr. Kohut or

10   Ms. Hoopis?

11        MS. HOOPIS:  Your Honor, I did prepare some visuals

12   that I would like to use.  I think it's just for the

13   convenience of the Court and to expedite this presentation, if

14   you wouldn't mind.

15        THE COURT:  Actually, just tell me what you have to

16   say.  A proffer is a proffer.

17        MS. HOOPIS:  All right, Your Honor.

18        This is pursuant to the Court's order in allowing us

19   an opportunity to say what additional evidence we might have on

20   the commercial speech issue.

21        Briefly as possible, I will explain that the new

22   evidence will not burden the Court because it's the same

23   evidence that would be used on other matters.  The prior

24   rulings were based on a very scant evidentiary record, and the

25   new facts would give context to the press release.

1              THE COURT:  Would they come in under 3344(d)?

2              MS. HOOPIS:  Yes.  They come in on several fronts.

3    They come in on whether the press release consisted of

4    advertising or promotional material, whether the press release

5    was distributed for purposes of enhancing AT&T's brand as

6    opposed to conveying information regarding the public interest.

7    The 3344(d), whether defendant used plaintiff's name in

8    connection with news or public affairs, whether defendant

9    knowingly used plaintiff's name to advertise or sell cell

10   phones or cell phone subscription services -- I apologize.  I'm

11   reading the pretrial order, the statement of disputed facts --

12   whether defendant's use of plaintiff's name was directly

13   connected to defendant's commercial purpose i.e., was a

14   non-incidental use, and whether defendant gained a commercial

15   benefit or some other advantage.

16             So all of this evidence will come in any way.  There

17   isn't any additional evidence that would be required for the

18   determination, and so no efficiency would be achieved by

19   excluding it.

20             The prior rulings I would just like to note they were

21   based on a fairly scant evidentiary record.  If you look at the

22   summary judgment motion --

23             THE COURT:  When you say prior rulings, you're

24   including the summary judgment motion?

25             MS. HOOPIS:  Yes.

1          THE COURT:  So you're in effect asking me to revisit

2     that again today.

3          MS. HOOPIS:  In effect, I'm asking you to allow us to

4     introduce more evidence than was before the Court at that time.

5          THE COURT:  At the time of summary judgment.

6          MS. HOOPIS:  Yes.  And the reason is, is the -- the

7     determination of commercial speech is based on context, it's

8     based on the nature of the publication, how it was distributed,

9     how it was used.

10          And at that time, the information that was introduced

11     on summary judgment was very limited.  The Court actually

12     relied on two statements from the deposition of Mr. Siegel to

13     arrive at its conclusion.  One statement was that the purpose

14     of the press release is two-fold.  One was to show that we took

15     seriously our obligation to improve our effort to restore

16     services as quickly as possible after a natural disaster like a

17     hurricane.  And then through that effort to create positive

18     associations in people's mind of the AT&T brand so they would

19     think highly of us.  The second statement was that it is our

20     standard practice that public relations people, media relations

21     people write news releases, craft quotes for executives.

22          Based solely on those statements, the Court concluded

23     that the use of plaintiff's name was carefully crafted as part

24     of a strategy to promote defendant's brand.

25          Now, that leap, unfortunately, I think resulted from

1    a lack of context.  It resulted from lack of context regarding

2    the events that gave rise to the press release, and it also

3    lacked context regarding the way that the press release was

4    distributed and disseminated.

5         The new information that we would like to present,

6    and is relevant, as I said, also to the newsworthiness and news

7    and public affairs exception to 3344(d), is, first, that

8    Cingular's national emergency recovery program was not an

9    advertising stunt.  Instead it was a dedicated response to the

10   largest U.S. disaster in over a century.

11        THE COURT:  Can you identify with specificity the

12   exhibits that constitute the new information?

13        MS. HOOPIS:  Your Honor, primarily we will be relying

14   on testimony with respect to the hurricane and the testimony of

15   Tina Brown.  And then we do have a few exhibits, but I don't

16   have them in front of me.  But it's primarily testimonial.  And

17   she will explain that --

18        THE COURT:  So assuming that you're right, that the

19   evidence also is relevant under 3344(d), isn't the -- and

20   assume the Court will allow that evidence, then isn't this

21   really about you're creating whatever record you can during

22   trial and then having the right to make post-trial motions?

23        MS. HOOPIS:  Certainly, the decision as a practical

24   matter the evidence is coming in for other purposes, and so

25   this Court could defer this determination until the end of

 1      trial.  Certainly.

 2              THE COURT:  Because, in effect, you really want me to

 3      revisit the summary judgment decision.

 4              MS. HOOPIS:  I think it needs to be revisited because

 5      I think the context of this will show so clearly that this was

 6      -- this was developed in the context of news.  That the press

 7      release was disseminated solely as news.  Not through any

 8      marketing.

 9              The three channels that it went through, it went

10      through a newspaper website, PRNews.com, where we posted it.

11      And then PRN distributes the press release to its newspaper

12      members, who then take information from the press release and

13      put it into articles.  It was posted on our news section of our

14      website, which is done for news people not for consumers.  And

15      it's done by our PR department not the marketing department.

16      And then it made its way onto a few blogs, which are all news

17      and opinion speech.

18              THE COURT:  All right.  I understand the argument.

19              So let me ask Mr. Zarian to respond briefly.

20      Assuming the evidence that Ms. Hoopis is referring to is

21      relevant to the 3344(d) factor, is there any set of evidence

22      you believe would not come in under 3344(d) that your motion

23      number six would be narrowed to?  I'm not going to revisit

24      summary judgment before trial.

25              MR. ZARIAN:  If I understand the Court's question, I

1    do agree with the notion that much of the evidence in question

2    probably comes in on other issues, and other elements at issue

3    in this case.  If that is responsive to the Court's inquiry.

4         However, I do want to make it clear we don't believe

5    it's appropriate to revisit the findings that were previously

6    made on summary judgment, and there's already been a motion for

7    reconsideration, repeated findings by this court.  Moreover --

8         THE COURT:  I'm not signalling an interest or

9    willingness in doing that, but the defense would have the right

10   to make pretrial motions if it wishes to.  And it appears to me

11   that would be the additional opportunity for it to raise this

12   issue.

13        MR. ZARIAN:  And I do think, you know, to the extent

14   they want to preserve a record, that's been done at this point,

15   and the summary judgment record is clear.

16        My greatest concern perhaps, at this point, Your

17   Honor, is the reference to new evidence and an unspecific

18   reference to a few exhibits.  We were just handed five minutes

19   ago, just before the Court took the bench, this stack of

20   documents.  They are all new.

21        THE COURT:  Was that what was at the hotel?

22        MR. ZARIAN:  Yes.  And a CD that is new.  There

23   simply has to be an end to this, Your Honor.  These issues are

24   not new.  These issues were all framed literally years ago.

25        THE COURT:  I understand that issue.  Did you know

1       those were at the hotel, just while we're on that?

2               MR. ZARIAN:  I saw an e-mail yesterday morning as I

3       was preparing for trial saying that a document's been left at

4       somebody else's hotel and I should go pick them up.  Frankly, I

5       couldn't understand why they wouldn't be e-mailed to me.  The

6       video perhaps was large.  The others were not.

7               THE COURT:  Well, we'll get into that as we deal with

8       exhibits as they come in.  You can sit down.

9               I understand your point.  I am continuing to deny

10      plaintiff's motion in limine number six, but I'm going to deal

11      with testimony and exhibits on a case-by-case basis as we

12      proceed, considering any objections the party may have.  But

13      I'm not going to sustain any objection based on this was

14      already decided by summary judgment.

15              So I'm not -- to the extent you're saying a final

16      decision has been made about commercial speech, the defense

17      will be allowed to make a record under 3344(d) that may have

18      broader implications.  But, again, I'm not signalling a desire

19      or an interest in revisiting the question.  But I think the

20      defense has indicated it's clear on how the evidence comes in.

21      This is an issue for the Court ultimately to decide, if it

22      does, not something the jury needs to hear about.

23              MS. HOOPIS:  Correct, Your Honor.

24              THE COURT:  The jury is not going to hear the words

25      "commercial speech," agreed?

```
1              MS. HOOPIS:  Agreed.  They will hear "commercial"
2       probably.
3              THE COURT:  Right.  But commercial speech in the
4       legal sense is not an issue we need to take their time with.
5       Agreed?
6              MR. ZARIAN:  I understand the Court's ruling.  I do.
7              THE COURT:  If I were saying -- do you want to use
8       those words in front of the jury?
9              MR. ZARIAN:  No.
10             THE COURT:  That's really the point.  That's a
11      discussion we can continue to have if it makes any sense.
12             MR. ZARIAN:  Thank you, Your Honor.
13             MS. HOOPIS:  Thank you, Your Honor.
14             THE COURT:  All right.  Is there anything else we
15      need to discuss before we call the jury in at 1:30?
16             Just so I understand, are those documents identified
17      by exhibit numbers so I can have a heads up?  Are these the
18      documents you're saying are potential impeachment documents?
19             MS. HOOPIS:  Your Honor, the history of these
20      documents is, again, they wanted to depose Tina Brown on
21      Wednesday, served us with the document request at midnight
22      before the deposition.  We didn't have time to get any
23      documents.  Just to try to be responsive to their discovery, in
24      the intervening couple days we searched for documents
25      responsive to their last-minute document request and gave them
```

1          what we could come up with.

2                     And we didn't e-mail them because they were too

3          voluminous, and the video wouldn't go through, and I asked them

4          where they wanted them delivered on Saturday.  I did not

5          receive an answer.  And so I left them with the hotel concierge

6          downtown because I wasn't quite sure what else to do with them.

7                     We were trying to cooperate in discovery.  This isn't

8          about marking exhibits.  This is about their argument to

9          preclude the deposition -- or the testimony of Tina brown based

10         on non-compliance with discovery.

11                    THE COURT:  So you are not contemplating trying to

12         produce any of those documents as exhibits?

13                    MS. HOOPIS:  Not at this time, Your Honor.

14                    MR. ZARIAN:  Your Honor --

15                    THE COURT:  Just so I understand, how did you

16         identify the hotel to deliver the documents to?

17                    MS. HOOPIS:  That happened to be the hotel we were

18         staying in, the Hyatt downtown, and I knew Mr. Zarian -- he had

19         asked our witness on Wednesday where we were staying, so I knew

20         he was aware where we were.  And that's when I said we could

21         leave them at the Hyatt, I can deliver them to your hotel, tell

22         me what to do with these.  It was all to comply with our

23         discovery obligations.

24                    THE COURT:  All right.  Mr. Zarian, have you had a

25         chance to review those documents over the lunch hour?

1            MR. ZARIAN:  Your Honor, they were handed to me ten

2     minutes ago.  They waited -- I saw Ms. Hoopis, and apparently

3     she waited until just before the Court took the bench to hand

4     these to me.

5            THE COURT:  They would be relevant to

6     cross-examination of Ms. Brown?

7            MR. ZARIAN:  I hope not, Your Honor.  Let me explain,

8     when I took Ms. Brown's deposition -- it was only arranged

9     because the Court ordered that it happen.  There was no

10    progress being made.

11           It became clear that the two exhibits that they had

12    produced, and only in the fall, not three years ago when they

13    were requested in this case, were part of the presentation --

14    well, one was a part of the presentation that she admitted that

15    half of it was missing, half of it was missing.  I still don't

16    see the other half.  She also said there is a second part of

17    that presentation that was all financial information.  That was

18    never produced at all.  And now apparently is the third

19    document that was also never produced.  Not three years ago.

20    Not last fall.  Not at the deposition.  And indeed not even

21    Saturday because what they said was -- I got an e-mail at

22    9:00 p.m.  I saw it the next morning.  It said tomorrow,

23    meaning Sunday, there will be some documents.  Come pick them

24    up.

25           THE COURT:  Rather than getting into the minorest of

1      details, help me understand the order of witnesses this

2      afternoon after opening statements starting around 2:30.

3                  MR. ZARIAN:  Thank you, Your Honor.  Plaintiff will

4      be calling General Chuck Yeager as our first witness.

5                  THE COURT:  How long do you expect he will take on

6      direct?

7                  MR. ZARIAN:  Forty-five minutes to an hour.

8                  THE COURT:  And then?

9                  MR. ZARIAN:  And then Victoria Yeager.

10                 THE COURT:  And how long would she take on the

11     direct?

12                 MR. ZARIAN:  About the same.

13                 THE COURT:  All right.  So that should take us to the

14     end of today.  So you can review those documents this evening,

15     and tomorrow morning you can let me know if you have motions

16     based on those documents.  All right?

17                 MR. ZARIAN:  Okay.

18                 THE COURT:  You said you have not had a chance to

19     review them, so I'm deferring any decision about whatever those

20     documents mean and waiting to see if you have a motion based on

21     everything you've said.

22                 Is there anything more we need to discuss before the

23     jury comes back in at 1:30?

24                 MR. KOHUT:  Just one additional, Your Honor, if we

25     could get the order of the witnesses tomorrow.  I believe that

1      some of those witnesses are our clients that will be called by

2      General Yeager, and we'd like to make sure that we tee them up

3      on time for them.

4                  THE COURT:  Are you prepared to share that now?

5                  MR. ZARIAN:  Yes, and they will be at the order that

6      I set them out for the jury, Your Honor.  The third witness

7      will be Tina Brown and after that will be Mr. Mark Siegel.

8                  THE COURT:  All right.  And how long do you expect

9      Ms. Brown to take on direct?

10                 MR. ZARIAN:  Forty minutes.

11                 THE COURT:  All right.  And Mr. Siegel?

12                 MR. ZARIAN:  Perhaps 30 to 35 minutes.

13                 THE COURT:  All right.  And then you might have one

14     additional witness?

15                 MR. ZARIAN:  Our damages expert, Your Honor.

16                 THE COURT:  And how long do you expect he will take

17     on direct?

18                 MR. ZARIAN:  Forty-five minutes.  Depending on --

19     well, there may be some issues that may take longer than might

20     otherwise be the case.  Thirty to forty-five minutes, Your

21     Honor.

22                 THE COURT:  Mr. Kohut, anything further?

23                 MR. KOHUT:  No.  Thank you very much, Your Honor.

24                 THE COURT:  All right.  We will take a five-minute

25     recess and then call the jury in right at 1:30.

1                    (Break taken.)

2                    THE COURT:  All right.  Let's bring the jury in.

3                    (Jury in.)

4                    THE COURT:  You may be seated.

5            Welcome back, ladies and gentlemen of the jury, hope

6     you had a good lunch break.  We are ready to proceed now with

7     opening statements.  You do see the binders on your chair.

8     Those have the preliminary instructions if you wish to refer to

9     them during your deliberations.  Also in the binder there is a

10    notebook in case you want to take notes.  It's entirely up to

11    you.

12           I'm now going to recognize Mr. Zarian for the opening

13    statement of plaintiff and each side will take up to

14    30 minutes.  Mr. Zarian.

15           MR. ZARIAN:  Thank you, Your Honor.

16           May it please the Court, Ladies and Gentlemen of the

17    jury, it's a pleasure to be with you and to address you all for

18    the opening statement, giving a bit of a roadmap through the

19    evidence that we expect will come out over the course of this

20    week.

21           The plaintiff in this case is General Chuck Yeager.

22    General Chuck Yeager is famous for a number of accomplishments

23    in his life, the most notable of which is that he is the man

24    who broke the sound barrier.  He broke Mach 1.  He did that in

25    1947 and in a small, probably seemingly tin aircraft that was

1    dropped from a B-29, and for the first time created a sonic

2    boom that was heard many years and for many years thereafter

3    and really ushered in the space era and the modern era of

4    flight.

5            His name, as we will show, is something that has

6    value.  It is something that has value, and for that reason it

7    is used for endorsements, for charitable purposes, for

8    educational purposes, and at times by corporations who will pay

9    a fee for that privilege.

10           In this case, the evidence will show that AT&T,

11   through its predecessor Cingular, used his name, used General

12   Yeager's name knowingly, in a very determined fashion, and did

13   so in a promotional release to get attention for a particular

14   services and goods that it was offering.

15           The evidence will show that that took place.  And the

16   case, we submit, will be a simple one.  It will be a simple

17   case which does not involve a number of things.  This is not a

18   case about copyrights, or trademarks, or the use of an image.

19   There is no request for damages for emotional distress or for

20   other types of harm.

21           This is a case that involves two very similar claims

22   for common law and statutory right of publicity, and a claim

23   for damages for the value for that use of the name.  It's a

24   simple case.  And after all the evidence is in, we will ask you

25   on behalf of General Yeager to return a verdict on his behalf

 1          based on the evidence.

 2                  The threshold question in this case will be the

 3          value.  In fact, the usefulness of the name that was, we

 4          submit, misappropriated in this case and used.  And the value

 5          of that name derives from a life that General Yeager will have

 6          a chance to review with you.  He will have a chance to explain

 7          to you his career, how he fought in four wars for his country.

 8          How it is that he went from becoming a private in the service

 9          at the age of 18 ultimately to the rank of Brigadier General, a

10          rare, very rare feat.

11                  And how it was he was selected for a very new, very

12          modern test program that resulted in his being in the cockpit

13          of that X-1 when that sonic boom was heard for the first time.

14                  He commanded the Air Force Aerospace Research Pilot

15          School, and he trained pilots.  He trained men who went on to

16          become astronauts.  Men whose name you will recognize.

17                  And because of his accomplishments, because of his

18          exploits, eventually there was an autobiography that was

19          published, millions of copies were sold.  There was a book

20          written by Tom Wolf that was later made into a movie, The Right

21          Stuff.  And General Yeager, played by an actor, although he

22          will tell you he had a cameo, featured prominently in that

23          movie.

24                  Since that time, he has been elected to a number of

25          awards.  He has received the Special Congressional Silver

1          Medal, the Presidential Medal of Freedom from President Reagan.

2          On the 50th anniversary of his history-making flight he

3          actually flew again and still flies to this day.

4                The honors and awards have continued to come, and

5          they've continued to recognize his accomplishments and the

6          value of his name.  And he has put that name to use.  He has

7          put that name to use in a way that shows the value and what he

8          has accomplished.

9                He was recently the Grand Marshal at the National

10         Memorial Day Parade in Washington D.C.  He was also the Grand

11         Marshal at the Veteran's Day Parade in Sacramento, and will be

12         in San Diego at the same similar event.

13               He visited the troops in Afghanistan last month.  He

14         has given time and lent his name to charitable causes, to Down

15         Syndrome causes.  He helped raise $3.1 million to the Dallas

16         Safari Club, to kids education, to FAA safety talks, to

17         educational efforts like the Marshall University Yeager

18         Scholars, The Young Eagles, to the Civil Air Patrol, and to

19         other causes.  Many of them that he will have a chance, and his

20         wife, who works with him on many of these projects, will have a

21         chance to review and discuss with you.

22               But from time to time he also licenses his name to

23         for-profit corporations.  For-profit corporations like AT&T.

24         And in those instances, there is a fee customarily paid.  And

25         it's paid in one of two ways - either as lump sum or as a

1      royalty.  You will have an opportunity to hear about some of

2      those agreements and some of the understandings that he has

3      reached over the years with companies like AC Delco and Rolex,

4      Electronic Arts and UBS.  And some other smaller companies -

5      America Remembers, Georgia Marketing and Promotion, Silvergate,

6      Born Aviation.

7              As to each of those, his royalties have commanded a

8      high -- relatively high royalty rate of 10 to 15 percent.  And

9      you'll hear some testimony about that through the course of

10     this trial.

11             In this case, AT&T enters the scene in 2006.  And in

12     2006, really stretching back to 2005, the company is dealing

13     with a problem.  There's been a couple of hurricanes.  One in

14     particular was devastating, Hurricane Katrina.  And there is

15     Hurricane Rita as well.  And the company is looking, AT&T is,

16     the evidence will show, at ways to cope with the next disaster.

17     Now this isn't the first disaster that they've dealt with.  The

18     testimony will show that they've dealt with disasters in each

19     and every year since the company and its predecessors were

20     founded.

21             But Katrina was extraordinary.  And one of the

22     purposes of this enhanced emergency program, they will tell

23     you, was to find ways to save money.  The fact is that dealing

24     on-the-fly with a need for lodging, and meals, and other needs

25     for technicians and the like is expensive.  And by planning

1      ahead, they believed they could save money.  They also believed

2      that they could, frankly, promote reliability as something that

3      was marketable, as something that would sell additional

4      services.

5              And the timing that resulted in the announcement of

6      this enhanced or allegedly enhanced program is also

7      significant.  This press release that we'll talk about, that

8      will be the focus of quite a bit of testimony at trial, was

9      issued on May 16th.  Hurricane season started June 1.  And so

10     there was a desire by AT&T to issue that press release before

11     the hurricane season and to communicate to those who would read

12     it, or read about it, that there was something going on of

13     value, something significant with this enhanced emergency

14     program.

15             But there was a problem.  There was a problem that

16     the evidence will point to, and that the evidence will show

17     existed.  And that is that at the end of the day, this program,

18     this enhanced program that had been developed, really offered

19     nothing new.  The program consisted of things like RVs, which

20     the company had been using, things like emergency

21     communications vehicles, which were not new.  It included

22     things like hazmat teams.  But not really teams, they had a

23     team in place.  They just bought some new equipment.  There

24     were two new tents purchased, two large tents for the entire

25     country.  And there were two trailers which were called command

1      centers at the time.  And there were two of them that were

2      used, we'll talk more about those, for the entire country.

3      Just two.

4              We'll talk more about those because they ended up

5      becoming the focus, the very focus of a press release that

6      announced this program.  The testimony of Tina Brown will tell

7      you that there had been an emergency preparedness program in

8      place at AT&T for many, many years.  In fact, it was certified.

9      The program was compliant with the requirements of the industry

10     and had been for years.

11             It included a number of things including, for

12     example, mobile sales offices.  They would deploy new sales

13     offices to emergency areas to sell more batteries and sell more

14     phones.  But it included other things as well, elements that

15     were part of this enhanced program.  Elements that were not

16     new.  Not new to AT&T and not new to the industry.

17             And so eventually the problem ends up on the desk of

18     a gentleman who you will also hear from, Mark Siegel.  Who is

19     charged, he will tell you, with the specific job at then

20     Cingular, now AT&T.  His job is to get favorable coverage.  To

21     get favorable coverage.  And that's through public relations as

22     opposed to advertising.  It is less expensive you will hear.

23     And by the issuance of promotional releases, the hope is that

24     if they are caught up, if they are picked up by editors around

25     the country and the targeted areas, stories will run.  And

1    favorable stories will run.  That was the purpose.  That was

2    the objective.  And that was his mindset as he went to prepare

3    and to finalize this press release that you'll hear testimony

4    about during the course of this trial.

5            But faced with the difficulty that there really was

6    nothing particularly novel about this program, there was some

7    changes that had to be made.  And there was some drafting that

8    had to be done in the hopes that this promotional release would

9    get attention.

10           The focus went to some language, and this will all be

11   reviewed during the course of this trial.  But you'll hear that

12   there was an effort by Cingular, the press release started out,

13   to invest 1.8 billion -- now quoting -- this year to enhance

14   and improve its network coverage in the southeast.

15           The testimony of Tina Brown will be that the spending

16   on the entire program that she worked on, the program that was

17   supposedly announced here, was really 17 million.  But it was

18   promoted as 1.8 billion.  And then it went on to say that the

19   investment included more than 60 million for hurricane

20   preparedness to harden the network.  Now she will tell you she

21   doesn't know where that number came from.

22           The press release went on to talk about some of these

23   elements - the mobile sales offices, the sales on wheels, which

24   already existed, the sales on light trucks, which had already

25   existed, hazardous materials capability, which already existed,

1    and other elements which were nothing new.

2         And what we'll find is that part of this program

3    involved, as I mentioned, two trailers.  Those two trailers

4    became the focus of the headline.  In fact, just under the

5    headline, the subtitle read "Company rolls out mobile command

6    centers."  MCC.

7         During the course of the development of this enhanced

8    program, Tina Brown will tell you these things were referred to

9    as the Mobile Command Centers or MCC.  They even had an

10   acronym.  But at some time just prior or shortly prior to the

11   roll out of this press release, that was changed, and the name

12   was changed.  And now the name became MACH, as in MACH 1 and

13   MACH 2.  Those were the new names for the two trailers which

14   now billed as the very heart -- that's a quote -- of this

15   multi-faceted program.

16        What the testimony will show, what the evidence will

17   tell you, is at the heart of the program were two trailers that

18   in fact had no satellite communications ability.  The only way

19   they could communicate at all was to have these other vehicles

20   pull up that had antennas to provide that capability.  These

21   were trailers that were glorified work stations.  They had

22   perhaps some meals and a place or two to sleep, and indeed a

23   place which could be useful, they will tell you, the evidence

24   will show, in times of disaster.  Helpful to AT&T's own

25   employees.

1          In fact, the purpose was simply to provide a place

2     for AT&T's own employees to work.  And the radius through which

3     communication could be established, once properly hooked up to

4     these vehicles, was a mile.  One-mile radius for two trailers

5     for the entire country.  And those two trailers were billed at

6     the very head of this as mobile command centers that were being

7     rolled out by the company, rolled out by the company, and were

8     at the heart of this new multi-faceted program.

9          Well, this didn't quite solve the problem, but the

10     MACH 1 and the MACH 2 actually provided inspiration to the

11     author of the press release.  Because MACH 1 and MACH 2, Mach

12     indeed refers to the speed of sound, is forever connected to

13     the name of General Yeager.  And the goal of a good drafter of

14     a press release to use a name that will get a hook and get the

15     attention of editors.

16          It was then decided that General Yeager's name should

17     be inserted into the press release.  And at that point the

18     following statement was made -- the statement that was made in

19     the press release was as follows:  Nearly 60 years ago, the

20     legendary test pilot, Chuck Yeager, broke the sound barrier and

21     achieved Mach 1.  Today, Cingular's breaking another kind of

22     barrier with our MACH 1 and MACH 2 mobile command centers.

23          That is how it was billed.  That statement, by the

24     way, was attributed to Ralph DeLaVega, the Chief Operating

25     Officer of Cingular.  Although it wasn't spoken with him, he

1    did review it and approve it, and it was attributed to one of

2    the highest officers in the company.  And thus it was that

3    Chuck Yeager's accomplishment was injected into the press

4    release.

5            And the connection to Cingular was that breaking

6    another kind of barrier is what MACH 1 and MACH 2 were doing.

7    But Tina Brown will tell you there was nothing groundbreaking

8    or revolutionary about this program.  And in particular not

9    about the mobile command center.  What we had and what the

10   evidence will show AT&T had was two trailers whose names had

11   been changed to MACH 1 and MACH 2 and tied to General Yeager's

12   name in a promotional release.

13           At the end of this case, General Yeager will ask you

14   to find that that was indeed a use, indeed a use of his name.

15   And that that use was, according to the instructions that the

16   Court will provide, something that should be compensated and

17   something for which AT&T should have paid.

18           And there will be some experts that will help to

19   guide you, should you get to that point, in finding a

20   reasonable value for that use.  There will be experts for each

21   side who will speak to that issue.  You will have some evidence

22   about other agreements.  And ultimately, you will be asked, if

23   you get to that point, to find a reasonable value.

24           But the experts will explain that there are some

25   factors.  There are some factors that go into deciding how --

1    where a particular value ends up for a particular use.  One of

2    them is the industry in which it's used.  The other is the use

3    itself.  And another is how well or how uniquely suited a

4    particular name is to a particular use.

5           Here, the evidence will show that when the decision

6    was made and after the decision was made to use MACH 1 and MACH

7    2 as the names of these two trailers, and to promote them as

8    the heart of this program that was similar to the programs of

9    the past, there was only one name, only one name that was

10   uniquely suited, that was uniquely tied to MACH 1, and that is

11   General Yeager's name.  And it's for that reason and with the

12   intent of making association that in fact General Yeager's name

13   was used.  That's what the evidence will show throughout this

14   case.

15          There was no historical reporting here of anything

16   that was uniquely or directly tied to this event.  There was in

17   fact simply a tie-in to General Yeager's name.  It wasn't that

18   the decision was made to say that speed of sound had been

19   broken, or that the X-1 plane had broken the sound.  There was

20   the name of a man that was used.  And that man, General Yeager,

21   is here as the plaintiff on that claim that in fact his name

22   was used and misappropriated in a way that was uniquely suited.

23   And for that reason AT&T should be, should be held accountable.

24          Ladies and gentlemen, at the end of the close of the

25   evidence we will ask you to find that based on the instructions

1    that are given to you and the evidence that's presented and

2    adduced, there was in fact a misuse of a name, a use of the

3    name for which compensation is warranted and ask only that you,

4    as the jury, Ladies and Gentlemen, find based on the evidence,

5    and the evidence alone, that that use took place, and that

6    reasonable compensation should be made.  We thank you for your

7    time in advance for that.  Thank you.

8            THE COURT:  All right.  There were some people

9    waiting to come in.  Mr. Kohut, you may proceed.

10           MR. KOHUT:  Thank you very much, Your Honor.

11           Good afternoon.  Once again, my name is Ron Kohut.  I

12   represent AT&T Mobility, LLC.  I think I began the voir dire

13   this morning by telling you that I represented a very large

14   company.  I do.  But very large companies are made up of

15   individuals, much like all of us here in the courtroom today.

16           What's at issue today is a press release, and in

17   particular, one single sentence in a press release that was

18   written by Mark Siegel.  Mark Siegel is here today, so I would

19   like him to stand up.  And in fact, this is the gentleman

20   that's responsible for the one sentence that we're going to be

21   talking about for the next few days.  I thought you should meet

22   him.

23           Mr. Siegel's -- he may have looked bewildered and

24   frustrated to you that all of this attention and effort is

25   because six years ago, in May of 2006, he wrote the following

1   language:  Nearly 60 years ago the legendary test pilot Chuck

2   Yeager broke the sound barrier and achieved Mach 1.

3        Now there is no dispute but that that sentence is

4   true.  That's an accomplishment of General Yeager's.  Indeed,

5   it's complimentary to General Yeager.  It's also a commonly

6   known historical fact.

7        As you may recall, when we were doing the voir dire

8   you were asked who essentially realized that General Yeager had

9   broken the sound barrier, and there was almost unanimous hands

10  up.  This is not a mystery to anyone.

11       This particular sentence was buried in a press

12  release five paragraphs down.  It's a long press release.

13  You'll see it later on.  It's about 755 pages -- or 755 words.

14       The sentence, as I indicated before, was written by

15  Mr. Siegel of an accomplishment of a man he admires, in a press

16  release that he prepared by himself.  There will be absolutely

17  no evidence that there was any input by any advertising

18  department, that there was any input by any marketing

19  department.  Mr. Siegel is not in the advertising or the

20  marketing department of AT&T.  In fact, he is in public

21  relations.

22       Basically he wrote this sentence in his office while

23  he was doing the press release.  The press release took about

24  two hours to write.  The press release was subsequently

25  reviewed by a company lawyer and approved and then published.

1    It was one of hundreds of press releases that Mr. Siegel writes

2    every day.

3              Now it wasn't published directly to consumers.  In

4    fact, it was published to something called PR Newswire.  And PR

5    Newswire is essentially a service that promotes press releases

6    to news reporters.  News reporters can then take out of those

7    press releases what they want to use in their own news reports.

8              One fact that my colleague is not going to be able to

9    prove is that there isn't a single press report, not a single

10   newspaper that picked up this press release, and in repeating

11   or re-publishing parts of the press release there is not a

12   single one that used General Yeager's name.  There's also not a

13   single one that used the references to MACH 1 or MACH 2.

14             Mr. Zarian, my colleague, indicated that Mach was

15   associated with General Yeager.  Mach, as a point of historical

16   fact, comes from Ernst Mach, who is an Austrian scientist who

17   died in 1916.  And while General Yeager does in fact, and I

18   think justfully so, hold the distinction of having gone through

19   Mach 1, he is not the gentleman who went through Mach 2.  That

20   distinction belonged to another pilot, a gentleman by the name

21   of Scott Crossfield.

22             So that's how the press release was put together.

23   Mark Siegel, in his office, writes a single sentence about a

24   man he admires.  That's about as complicated as this case gets

25   as to that particular sentence.

1           Now there is another side of it, though, which is

2      what is the evidence going to show as to General Yeager's

3      involvement in all of this.  And let me give you some dates.

4      And I know you have notebooks, you can decide to write these

5      down if you wish or not.

6           The press release was issued on May 17, 2006.  The

7      complaint, which is the formal document that starts this

8      lawsuit, wasn't filed until almost a year-and-a-half later,

9      which is November 21, 2007.  Now, approximately a

10      year-and-a-half after that, and more than three years after the

11      press release was issued, a deposition was taken of General

12      Yeager.

13           Now, a deposition is essentially where you call a

14      witness in, they are sworn under oath, the same oath you would

15      be given in this court, and they are asked questions by the

16      attorney for the other side.  And during that deposition,

17      General Yeager was asked about the press release that's at

18      issue in this case.  And what he said was that he did not

19      recall when or how he found out about the press release.  He

20      did not remember when he had read the press release.  And he

21      did not know if he had even reviewed the press release before

22      this lawsuit was filed.

23           So then he was asked, having exhausted the questions

24      on his knowledge of the press release, what did he know about

25      the lawsuit that was filed in his name.  And here's what he

1      said.  He said, I'm not familiar with the lawsuit.  Remember,

2      this is a year-and-a-half after the lawsuit has been filed.  He

3      then said he had no understanding of the lawsuit.  He had not

4      reviewed the complaint that initiated the lawsuit or had it

5      explained to him by his attorneys before the lawsuit was filed.

6            All right.  Now after the press release was issued,

7      which about a week later, actually, Cingular, and Mr. Siegel,

8      and Mr. Stan Sigman, who at the time was the president of

9      Cingular, received a later from a law firm called Quinn and

10     Emanuel.  They were attorneys for something called The General

11     Yeager Foundation.

12           MR. ZARIAN:  Objection, Your Honor.  Sorry.  I have

13     to object.  I think this was subject of some --

14           THE COURT:  Is this relevant to this case?

15           MR. KOHUT:  It most certainly is, Your Honor, and

16     there is no ruling on this.

17           THE COURT:  The objection is overruled.

18           MR. KOHUT:  Thank you.

19           So the attorneys for The General Yeager Foundation

20     they write a letter to Mr. Siegel, who had written this press

21     release, and to his boss, essentially.  And they said we own

22     the rights to General Yeager's name, and we don't believe that

23     you should have used his name in a press release, and we want

24     your written assurance that you will not do it again.

25           Mr. Siegel will testify that he subsequently called

1      that lawyer and subsequently wrote a letter to that lawyer

2      saying, okay, we will not do it again.  We thought we had a

3      right to do it.  We thought it was a fleeting use of a

4      historical reference which was permitted, but if it bothers

5      you, we're not going to do it again.

6            Now at that point absolutely nothing happens for

7      about a month-and-a-half.  And then Mr. Siegel receives a

8      telephone call from Victoria Yeager.  That's Mrs. Chuck Yeager.

9      And she is in the courtroom as well.  I don't have the right to

10     ask her to stand, but she's just behind there in the red coat.

11           Now, I think to be fair I can tell you that neither

12     one of the parties remembers exactly what happened in this

13     telephone conversation.  At her deposition, Mrs. Yeager said

14     that she had in mind that she wanted Cingular to fund two

15     scholarships at a price of 500,000 to 1.2 million dollars

16     apiece -- that's a million to 2.4 million dollars -- because

17     Mr. Siegel had written this sentence, this sentence that was

18     buried five paragraphs down in this press release.  Cingular

19     declined.  And we're here now today.

20           Now, there is an issue which you're going to have to

21     deal with as to the context in which this press release was

22     issued.  Essentially, is it an advertisement or is it not.  And

23     I'm not going to go into that a great deal because you will

24     have instructions from the Court on that, and I don't, at this

25     point, want to step on those instructions and be reminded that

1      I have.

2              Let me bring you back to 2005.  And what you may

3      recall is that 2005 was one of the worst hurricane seasons we

4      had in this country.  There was Hurricane Katrina, Wilma and

5      Rita.  During that period of time, Cingular lost 85 percent of

6      its wireless phone network in the hardest hit areas.  That

7      resulted in dropped calls.  Not the kind of dropped calls we're

8      used to as regular customers, but dropped calls and no calls

9      where calls could not go into those areas or come out for weeks

10     and months, and in some instances more than a year.

11             And what that meant was that the people within those

12     areas had no ability to reach out for help.  There was no

13     ability of family members to reach their members in the hardest

14     hit areas to determine whether they were all right or not.

15     There were -- in just Katrina, itself, there were 1.3 million

16     people who were left without service.

17             Now, Tina Brown, and my colleague mentioned her name

18     several times, she was in charge of the emergency response to

19     Hurricane Katrina.  And she sent in 800 technicians, 500 mobile

20     generators, 800,000 gallons of fuel, 30 portable cell sites,

21     and it was not enough.  They simply could not bring the system

22     up quickly enough to alleviate the damage to property and

23     people as a result of the system going down.

24             So after Katrina, after Wilma, after Rita, after

25     these series of hurricanes, the company developed or had a post

1     mortem, essentially.  And they said, you know, we can do a

2     better job in the future.  We need to better support our

3     employees so our employees can in fact get in these affected

4     areas and restore service.  And what that meant was we need a

5     place for our employees to sleep because not surprisingly,

6     Hurricane Katrina, there weren't any hotels available.  The

7     reason was FEMA took them all.  So we were sending people out

8     there to repair the infrastructure.  They were sleeping in

9     trucks.  We had to supply food, laundry, medical, and various

10    communications.

11          And that's essentially what gave rise to the

12    emergency preparedness program, and the emergency preparedness

13    program wasn't just a Cingular program, okay, because it wasn't

14    just Cingular that experienced these problems.  Verizon

15    experienced these problems.  Sprint experienced these problems.

16    And all of these companies had to find a way to address the

17    hurricane issues that came up in this disastrous 2005-year.

18          So they came up with disaster preparedness programs.

19    And then they started publicizing those programs.  And this

20    press release that this one sentence that we're talking about

21    here was part of publicizing the emergency preparedness program

22    for Cingular.

23          Now, my colleague has suggested that this was done in

24    some sort of an effort to burnish our reputation with our

25    customers.  In fact, it was not.  You could argue, I guess --

1    and the evidence will show that it doesn't work -- you could

2    argue that Cingular was essentially doing some comparative

3    advertising to say our system is better than Verizon and

4    Sprint.

5            There are a couple problems with that, however.

6    First, and what the witnesses will tell you, is that Cingular

7    does not market on the back of a disaster.  It has sensitivity

8    to lost lives and to lost property, all of which were

9    experienced during Katrina.  This was a significant issue for

10   the president of the company, Mr. Stan Sigman.  Other

11   telecommunication companies were making the same efforts.

12           Now, this particular press release -- and our

13   position is that it is a press release, it's a public

14   announcement, it is not an advertisement or a marketing

15   device -- was never reviewed or approved by the marketing or

16   advertising departments of Cingular, which are different than

17   the public relations department that Mr. Siegel is a part of.

18           In that press release, and you'll see it later on in

19   this trial, there is not a single product of Cingular

20   mentioned.  There is not a single service of Cingular

21   mentioned.

22           So one thing that Mr. Zarian, my colleague on behalf

23   of General Yeager, indicated was that General Yeager's name has

24   value.  We don't dispute that.  We have no intention of

25   attempting to dispute the accomplishments General Yeager has

1    made for this country.  But the issue is if in fact this is an

2    advertisement, which we contend it is not, what is the value of

3    General Yeager's name as used in this press release, a single

4    sentence, buried in the fifth paragraph.

5            Now there are a couple of experts you're going to

6    hear from.  The expert that Cingular, which is now AT&T, is

7    going to bring to you is Mr. David Drews.  Mr. Drews has an

8    economics degree from the University of Nebraska.  He's a

9    certified licensing professional.  He has taught and written on

10   the subject of intellectual property valuation.  In fact, he is

11   the president of a company dealing with intellectual property.

12           He has worked in valuations involving well-known

13   celebrities such as Marlon Brando, Albert Einstein, Woody Allen

14   and 50cent.  He performed a detailed analysis using three

15   different valuation methods to come up with an amount which he

16   says in the best of all worlds, even if it was advertising,

17   which we contend it is not, the General might be entitled to.

18   And without getting into the specific amount, I will tell you

19   it is not significant.

20           Now, you're also going to hear from John Albert, who

21   is an expert, I assume, based upon the report he submitted in

22   this case.  I don't know what to make of Mr. Albert.  And

23   fortunately you folks will make that decision.  He submitted a

24   report.  His name was John Albert.  We got him to his

25   deposition.  His name was now John Albert Levy.  And my guess

1        is his real name is Mr. Levy.

2                He doesn't have a college degree.  In fairness, he

3        says that he has the credits for a college degree, but he

4        declined his degree as a protest against the Vietnam War.  He

5        was actually hired by Victoria Yeager on the date that his

6        report was due.  He spent a few hours on the project and

7        ultimately signed a declaration that had been prepared by the

8        attorney for Victoria Yeager.

9                Prior to issuing his report, he had absolutely no

10       contact with General Yeager, and at least as of the date of his

11       deposition, which was in 2009, had had absolutely no contact

12       with General Yeager other than some pleasantries.

13               He is going to give an opinion which is substantially

14       higher than the opinion that Mr. Drews will give.  He will also

15       be forced to say, however, by reason of his deposition

16       testimony, that he put a span, which is a range, if you will,

17       on the figure because he did not have a lot of experience with

18       individuals like Chuck Yeager.  He struggled with the

19       valuation.  And he did not consider prior endorsement deals by

20       General Yeager.

21               Now, if we look to 2006 -- and General Yeager had a

22       number of endorsement deals, and, quite frankly, most of them

23       haven't returned him very much money, most of them returned

24       less than 10,000.  There was an AC Delco one that my colleague

25       mentioned.  It's uncertain how much that returned, but there's

1      been some testimony that perhaps over a ten-year period of time

2      it may have brought up to a million dollars.  But, again, that

3      was a long time ago.

4              In 2006, General Yeager had an endorsement with

5      Rolex, the people who make watches.  I haven't checked General

6      Yeager's wristwatch wrist today, but he normally wears it.  And

7      under the Rolex endorsement, Rolex has the right to use his

8      name.  They have the right to use his picture.  They have the

9      right to use his endorsement in all media, all around the

10     world, exclusive to timepieces.

11             And what it looks as though they've used it for is,

12     perhaps for those of you that have been to the Air and Space

13     Museum, there's an Air and Space Museum magazine, on the back

14     of that.  There is a magazine called Explorer, on the back of

15     that.  But more importantly it's been used as an entire web

16     page on the Rolex internet website.

17             For all of that, in addition to which he has an

18     obligation to wear the watch when he is being photographed in

19     public events, and we'll see even in his deposition he showed

20     up in a Rolex shirt.  So essentially for being Mr. Rolex, he

21     gets paid the equivalent of about $80,000 a year.

22             Now, remember in this case we don't think it's an

23     advertisement.  You're going to make that decision.  But we're

24     talking about one sentence that is both true, complimentary,

25     and a historical achievement.  That's all we're talking about.

1    We're not talking about worldwide rights.  We're not talking

2    about all media.

3            THE COURT:  This is opening statement, Mr. Kohut.

4            MR. KOHUT:  Thank you, Your Honor.

5            Let me conclude.  So in this case we have a single

6    true and complimentary sentence relating to a historical

7    achievement in a press release to other news organizations, not

8    to consumers, without the mention of a product or service.  A

9    press release that General Yeager cannot tell when he read to

10   support to this lawsuit.  A lawsuit that he admits he knew

11   nothing about as late as two years after it was filed.

12           Ladies and gentlemen, thank you very much for your

13   time.

14           THE COURT:  All right.  That concludes the parties'

15   opening statements.  Now I'm going to acknowledge plaintiff's

16   counsel to begin its presentation of evidence.

17           The Court's plan is to go until 3:00, take a short

18   break, and then come back and go until 4:30 p.m. today.  Does

19   that schedule work for you if we wait until 3:00 now for a

20   break?  If you need a break earlier, let me know.  But that's

21   the Court's plan.

22           Mr. Zarian, are you prepared to call your first

23   witness?

24           MR. ZARIAN:  Thank you, Your Honor, yes.  I would

25   like to call General Chuck Yeager to the stand.

1          THE CLERK:  Mr. Yeager, please come forward.

2          THE COURT:  Also there is been no motion to exclude

3     witnesses, so I assume the parties have not made any agreement

4     in that regard?

5          MR. ZARIAN:  There's been no motion, that is correct,

6     Your Honor.

7          MR. KOHUT:  That's correct, Your Honor.

8          THE COURT:  All right.

9          (The witness was sworn by the Clerk.)

10          THE WITNESS:  I do.

11          THE CLERK:  Please state your full name and spell

12     your last name for the record.

13          THE WITNESS:  Charles E. Yeager, C-h-a-r-l-e-s, E,

14     Yeager, Y-e-a-g-e-r.

15                    CHARLES E. YEAGER,

16     a witness called by the Plaintiff, having been first duly sworn

17     by the Clerk to tell the truth, the whole truth, and nothing

18     but the truth, testified as follows:

19                    DIRECT EXAMINATION

20     BY MR. ZARIAN:

21     Q.          Thank you, Your Honor.  Good afternoon, General

22     Yeager.

23     A.          Afternoon.

24     Q.          Would you please, sir, briefly introduce yourself --

25          THE COURT:  I hear static.  Can you hear?

1                    THE WITNESS:  Yes, ma'am.

2                    THE COURT:  I'm hearing a little bit of static.

3                    THE WITNESS:  Yeah, I got a lot of static on it.  I

4     don't know why.

5                    THE COURT:  Could you assist him?

6                    (Interruption in proceedings.)

7                    THE WITNESS:  How is that?

8                    MR. ZARIAN:  Thank you, General.

9                    THE COURT:  Can you still hear us as well?

10                   THE WITNESS:  Yes.

11                   THE COURT:  Sorry for the interruption.  You may now

12    proceed.

13    Q.        BY MR. ZARIAN:  Thank you, Your Honor.

14              General Yeager, would you please just briefly

15    introduce yourself to the judge and to the jury.

16    A.        Would you repeat that?

17    Q.        Would you please introduce yourself just briefly to

18    the jury and to the judge.

19    A.        My name is Charles E. Yeager.  I was born

20    February 13th, 1923.  I have spent 71 years in cockpits flying

21    as an Air Force pilot, and I still fly airplanes, and I'm still

22    used by the Air Force.  I was in Afghanistan, Pakistan and

23    Kuwait two months ago visiting all the troops.

24    Q.        Thank you, sir.  If I may, General Yeager, do you

25    wear a hearing aid?

1    A.        Yes, I do.  It's result of hearing loss being exposed

2    to too much noise in P51s and other aircraft for long periods

3    of time.

4    Q.        Were you wearing a hearing aid at this deposition

5    that Mr. Kohut was talking about?

6    A.        I don't recall a lot of the stuff he related on his

7    testimony.

8    Q.        All right.  Were you wearing a hearing aid at that

9    time?

10   A.        Yes.

11   Q.        And you have a special hearing device now over your

12   hearing aid?

13   A.        No, we didn't have these.

14   Q.        All right.  Thank you.  If at any time, sir, you

15   can't hear me or anyone else, please, just let us know.

16   A.        Okay.

17   Q.        I appreciate that.  General Yeager, where do you

18   currently live?

19   A.        What?

20   Q.        Where do you currently live?

21   A.        I live in Penn Valley, California.  It's about

22   20 miles from -- up north in Grass Valley.

23   Q.        How long have you lived there?

24   A.        I moved up there about 20 years.

25   Q.        Are you currently married, sir?

1    A.        What?

2    Q.        Married?

3    A.        Yes.  I was married in 1945 at the end of the war to

4    Glennis Yeager.  We had four children.  She died in 1990.  And

5    I got married again 10 years ago to Victoria Yeager.

6    Q.        Thank you.  Are you currently employed anywhere?  Are

7    you retired?

8    A.        I retired in 1975 from active duty because the law

9    only allows you to spend 35 years on active duty.  And the day

10   I retired, Edwards came to me -- Edwards Air Force Base.  The

11   Flight Center for the Air Force came to me and asked me to

12   serve as a consultant test pilot for a dollar a year.  I

13   accepted.  And I still fly at Edwards.  And I was out there

14   last -- couple months ago flying F16s.

15   Q.        Are you still paid a dollar a year?

16   A.        Yes.

17             THE COURT:  Mr. Zarian and General Yeager, I'm still

18   hearing feedback.  Is that bothering you?

19             THE WITNESS:  No.  I can feed through it.

20             THE COURT:  All right.  It's fairly minor.  I can

21   tell that it's there.  Is it getting in the way of the jury

22   hearing the testimony?

23             All right.  As long as you're okay with it and it's

24   not distracting you, then the Court will allow you to proceed.

25   Just checking.  Then we're fine.

1   Q.          BY MR. ZARIAN:  Are you still paid that dollar a

2   year?

3   A.          I think they owe me about $18.

4   Q.          General, I would like to walk through a demonstrative

5   that is taken from your biography.  It's Exhibit 57.  If we

6   could pull up page one.

7               THE COURT:  Could you pull that up without displaying

8   it to the jury yet?

9               MR. ZARIAN:  I don't know that there is any

10  objection.

11              THE COURT:  Is there any objection?

12              MR. KOHUT:  We have no objection to this document,

13  Your Honor.

14              THE COURT:  All right.  The exhibit number again?

15              MR. ZARIAN:  57.

16              THE COURT:  So Exhibit 57 is admitted without

17  objection.

18              (Plaintiff's Exhibit 57, General Chuck Yeager Career

19  Highlights, admitted into evidence.)

20  Q.          BY MR. ZARIAN:  General Yeager, I would like to ask

21  you, you were born, I guess, in West Virginia, is that correct.

22  A.          I was born in a small town, on a river in West

23  Virginia on February 13th, 1923.  I spent roughly three years

24  in that house in the mountains, and then we moved to another

25  smaller town for a couple years, and then we moved to Hamlin

1    when I was six years old, and I entered grade school, and went

2    through grade school and high school in Hamlin.  And in 1941

3    when the war started, I enlisted in the Army Air Corp and spent

4    the rest of my life in the service.

5    Q.        Tell the jury, please, about how it is that you came

6    to enlist in the Army in 1941?

7    A.        Well, basically, in 1941, as you recall, even 1940,

8    there was a very active war going on in Europe.  The Japanese

9    were arming, and the United States was mobilizing.  And they

10   were building up their combat forces.  And the recruiters came

11   around to our town, which was a very small town of about 400

12   people.  And we had 12 boys in senior class that graduated in

13   '41 in July, and all of us enlisted in the military.  Some of

14   us went in the Air Force, the Navy, and the Army, and it really

15   depended on how good the recruiter was as to where you went.  I

16   enlisted in the Army Air Corp because I had never been

17   associated with an airplane.  That looked like a pretty good,

18   interesting program to get involved in.

19   Q.        Tell us, please, General, how did you come to be

20   accepted for pilot training?

21   A.        Basically, when we were mobilizing in 1941, in order

22   to become a pilot you had to have two years of college, and you

23   would enlist in the Army Air Corp.  If you were 20 years old

24   and had two years of college, then you would go into training

25   as a pilot.

1          Now, they were not getting enough applicants for the

2     senior -- for the pilot training that was in being at the time,

3     so they lowered the requirements to a high school graduate and

4     18 years of age.

5          Now, I had enlisted in September 1941 and was serving

6     as a mechanic in the Air Force because I was a natural

7     mechanic.  My father trained me in maintenance and the like.

8          And I looked at the pilots, you know, they all had

9     clean fingernails, and most of them had a good lookin' blonde

10    on their arm.  I said that looked like a pretty good deal to

11    me, and I applied for pilot training, and was accepted about

12    four months later, and entered pilot training in

13    September 1941, went through the phases of primary training,

14    basic training, advanced training, then got my wings, was

15    assigned to a fighter outfit flying P39s.

16         And from then on I was trained in the western part of

17    the United States for about four months, and then they shipped

18    us to England, gave us P51s, the first Mustangs used in combat,

19    and I flew combat, of course, and shot down a couple airplanes.

20         And --

21    Q.        Tell us about --

22    A.        -- sent us on a mission to Southern France and

23    tangled with a bunch of 190s and got hit, and my airplane

24    caught on fire, and I bailed out and hit the ground in

25    German-occupied France.  And since there is not a German in the

1    world that can catch the West Virginian in the woods, I

2    escaped.

3    Q.        How did you make it out from behind enemy lines when

4    you were shot down, sir?

5    A.        What?

6    Q.        How did you get back from behind enemy lines?

7    A.        I ran around with the resistance fighters in the

8    southern part of occupied France for about three months, and

9    then they turned us loose to go through the Pyrenees Mountains

10   and go into Spain.

11            There were three neutral countries in Europe during

12   the war - Sweden, Switzerland, and Spain.  And if these neutral

13   countries were not involved in the war, if you could get into

14   them, you would be interned, and you didn't have to fight

15   anymore.

16            And I spent a little over a month with the resistance

17   fighters and finally went through the Pyrenees into Spain, was

18   interned.  The American Consulate give us money, put us up in a

19   hotel.  And it was a good way to fight a war laying on the

20   swimming pool looking at gals in bikinis, tremendous way to

21   fight.

22            And after about four months, Spain was having trouble

23   getting gasoline, and the United States was running a little

24   low on fighter pilots, so they negotiated gasoline in exchange

25   for pilots.  And they were successful, and they took us to

1          Gibraltar, and the British flew us back.

2               And when I got back to England, about a month before

3          the invasion started, the rules did not allow me to go back on

4          combat because if I got shot down, and the Germans captured

5          you, then they would sweat the underground system out of you,

6          and a lot of innocent people would be killed.  And so the rule

7          said no more combat.

8               Well, I didn't buy that, and I worked my way up

9          through different chain of command, and fighting all the way,

10         and finally ended up the General -- at the end the Supreme

11         Allied Commander was General Eisenhower.  I went through the

12         chain of these generals.  And I don't know why he would talk to

13         us, but, he said, you know, I usually don't see guys like you,

14         but I've got guys shooting themselves in the foot to go home.

15         Why don't you want to go home?  I said, I haven't done my job.

16         I'm a trained fighter pilot with nine missions, short that one

17         airplane, why send me home?  And he said, I can't give you

18         permission.  I'll go back to the war department.  What he

19         knew -- That was on the 8th.  That was eight days before the

20         invasion.

21              He knew that when the invasion came, the underground

22         and the French resistance fighters would surface as an army,

23         and the reason for not letting me go back on combat no longer

24         existed.  So I was sent back to my squadron, and the D-Day

25         started eight days later, and I was turned loose.

1    Q.        How many combat missions did you fly altogether in

2    World War II?

3              MR. KOHUT:  Your Honor, objection --

4              THE WITNESS:  70 some.

5              MR. KOHUT:  -- 403 as to the entire line of

6    examination.  May we approach?

7              THE COURT:  Sustained.

8              MR. KOHUT:  Thank you.

9              THE COURT:  I'm not going to entertain a sidebar.

10   Q.        BY MR. ZARIAN:  Thank you.  General Yeager, how did

11   you become a test pilot?

12   A.        I returned from the war, and in order to reward all

13   of those pilots who had been -- spent time in the prison of war

14   camps or were evadees, which covered me, were given the

15   opportunity to select any post or field in the United States,

16   and the Air Force would assign them there.

17             I looked, and the closest air base to my home in West

18   Virginia was Wright Field, and I asked for Wright Field.  That

19   was the only reason.

20             When I reported in, the personnel types looked at my

21   record and saw that I had served as a crew chief and as a

22   maintenance officer in my squadron in combat, and there was an

23   opening for the maintenance officer in the flight test

24   division, and I was assigned there.  And my job was to maintain

25   all the airplanes in the flight test division.

1      Q.         And how were you selected for the X-1 program?

2                 MR. KOHUT:  Objection.  Evidence Rule 403.

3                 THE COURT:  General, there is an objection.  Hold on

4      one second.

5                 THE WITNESS:  Okay.

6                 THE COURT:  I'm going to overrule that as long as you

7      make certain that you're moving this along.

8                 And so when you hear a question, General Yeager,

9      could you answer the question only and then wait for the next

10     question.

11                THE WITNESS:  Yes, ma'am.

12                The system in the Air Force that's -- the question

13     was:  Why were you selected for the X-1?  I can't say that in

14     one sentence.

15                THE COURT:  But make it a brief response.

16                THE WITNESS:  I try to.

17                THE COURT:  Your attorney will ask the next question

18     to elicit what he needs for this case.  All right?

19                THE WITNESS:  Yes, ma'am.

20                THE COURT:  Mr. Zarian.

21     Q.         BY MR. ZARIAN:  Thank you, Your Honor.  Thank you

22     General.

23                Tell the Court and the jury how you were selected for

24     the X-1 program, General Yeager?

25     A.         Here again, the X-1 program -- the Air Force had

1    never been allowed to do research flying.  The X-1 was the

2    first airplane that was built to exceed the speed of sound.

3    And since the military had never been involved in its research

4    flying, it was civilian pilot's job to do the work.

5            And the civilian pilot who had flown the airplane out

6    to 80 percent of the speed of sound, which we'd already flown

7    Mustangs that fast, and he went and had his lawyer work up a

8    contract with the Air Force that would pay him $150,000 to

9    exceed the speed of sound.

10           Air Force bowed its back, said we haven't got that

11   kind of money in the program, and they took the airplane away

12   from NASA, gave it to the flight test division at Wright Field

13   where I was the maintenance officer.

14           And that, of course, at the time I had not gone

15   through the test pilot.  They sent me to test pilot school.

16   Then when the Air Force took over the X-1, I was assigned.  The

17   reason I was picked to fly X-1, I understood systems.  My dad

18   was a natural gas driller.  He taught me all the words about --

19   or all the systems in dome regulators.  I was familiar with

20   this.  And that was the reason.  And, obviously, I could fly an

21   airplane.

22   Q.      How many times did you fly the X-1?

23   A.      Forty-some flights, but on the seventh flight was

24   when I exceeded Mach 1, first airplane ever to exceed the speed

25   of sound.

1    Q.        Is the X-1 the plane in which you exceeded and broke

2    the sound barrier?

3    A.        Yes.

4    Q.        Tell the jury about that flight on which you broke

5    the sound barrier, broke Mach 1?

6              MR. KOHUT:  Objection, Your Honor, Rule 403.

7              THE COURT:  Overruled.  Briefly.  You may respond.

8              THE WITNESS:  There had never been an airplane above

9    about 90 percent of the speed of sound, and the X-1 was a

10   rocket.  And the first thing we -- the biggest problem we ran

11   into was controlling the airplane to about 94 percent of the

12   speed of sound.  And the reason was, was the shock wave on the

13   tail that sort of -- it made the tail plane totally

14   ineffective, and we had to go back and modify the airplane with

15   a flying tail.

16             And that was the biggest thing that came out of the

17   old X-1, and it gave us the capability of going supersonic was

18   knowing that we needed a flying tail.  It took the British, and

19   the French, and the Soviet Union five years to find that trick

20   out.  And it gave us a quantum jump on the rest of the world.

21   Q.        How fast did you fly in the X-1?  What was the

22   fastest?

23   A.        Mach speed about 1.45 Mach.

24   Q.        What was the highest altitude you flew?

25   A.        Over 100,000 feet.

1      Q.          Did you ever make a rocket power take off from

2      ground?

3      A.          Yeah.  I made the only one that was ever made, and

4      took off from the lake bed and rolled out at 23,000 feet in 100

5      seconds.

6      Q.          At the beginning, how was the take off arranged, how

7      did you take off in the X-1?

8      A.          In the beginning, it was always launched a B29

9      mothership to save fuel, and also it was to give us a head

10     start on the fuel, and so it was launched from B29 at 21,

11     22,000 feet.

12     Q.          Now years later, General, you also flew the X -- the

13     Bell X-1A, is that correct?

14     A.          X-1A was a later model that came out with more fuel,

15     and with that airplane I got up to 2.4 Mach.  2.4 Mach was

16     around 1600 miles an hour.

17     Q.          How were you chosen to fly that plane, sir?

18                 MR. KOHUT:  Objection.  Rule 403.

19                 THE WITNESS:  I flew eight flights.

20                 THE COURT:  Overruled.

21     Q.          BY MR. ZARIAN:  Go ahead.

22     A.          I flew eight flights, and then we turned over to

23     NASA, and the pilot assigned to it screwed it up and had to

24     bail out of it.  Pardon the expression.

25     Q.          Thank you, General.

1          Let's turn to the next page.  Sir, were you at some

2     point assigned to the pilot school for the space program?

3     A.          Basically, in 1961 the Air Force was totally

4     responsible for space, and I was assigned -- I came back from

5     Europe I was assigned as a commandant at the astronaut school,

6     and the mission of the school was to train the future

7     astronauts for NASA.

8          And in '61 we started training ten pilots a year that

9     went into the NASA clan and were assigned as NASA astronauts.

10    Then in 1965, the President and the Congress decided if we can

11    keep the military out of space, then the Russians won't develop

12    space systems.  It's kind of stupid analogy, but that's the way

13    the law was passed.  And so that wiped the Air Force out of

14    space and turned space responsibility over to NASA, which was a

15    civilian organization, and it's been a bureaucratic mess ever

16    since.

17          THE COURT:  Mr. Zarian, at this point can you

18    highlight certain relevant aspects for the remainder of the

19    bio?

20    Q.          BY MR. ZARIAN:  Yes.  Did you fly in the Vietnam War,

21    sir?

22    A.          Did I fly what?

23    Q.          Did you fly in the Vietnam war?

24    A.          I flew 127 missions in Vietnam for two years.  I had

25    five squadrons in my wing, B57s, F100s.  I had F100s at Tai Nan

1    with nuke weapons on them, targeted in China to keep China out

2    of Vietnam.

3    Q.        When did you retire from active duty in the U.S. Air

4    Force?

5    A.        The law only allows you to spend 35 years on active

6    duty.  I finished mine somewhere's around '74 or thereabouts.

7    And the day I retired, the Air Force came to me and said would

8    you serve as a consultant test pilot for a dollar a year.

9          And my question was, do I have to buy the fuel?  And

10   they said, no.  So I was flying an F16 a couple months ago.  I

11   still work at Edwards as a consultant test pilot for a dollar a

12   year.

13   Q.        Tell us about receiving the Presidential Medal of

14   Freedom?

15   A.        Well, I received a lot of decorations.  Basically

16   like the Collier Trophy, the Harmon Trophy.  Usually those

17   trophies are given to one individual who does something that

18   year that's, you know, outstanding.  And I did -- I received

19   the Harmon, the Collier Trophy, the Presidential Medal of

20   Freedom, and the first peace time Medal of Honor that they

21   handed out.

22   Q.        Thank you, General.

23          Let's de-publish.  I would like to show for the

24   witness only, if we may, Exhibit 61.

25          Can you tell us about the book that Tom Wolfe wrote

1     that included part of the account of your life?

2     A.          Well, Tom Wolfe did a lot of research on the space

3     program, and he wrote a book called The Right Stuff.  And that

4     book showed that Air Force test pilots were doing test work for

5     NASA, and a lot of the guys were getting killed, and they

6     didn't mention it that the Air Force was involved very much in

7     preparing astronauts for the space program.

8               I was the commandant for the astronaut school for six

9     years, as I mentioned earlier, and, consequently, 26 of the

10    guys that came out of the school went into space in the Shuttle

11    and other space vehicles.

12    Q.          Was that book later turned into a movie?

13    A.          It was turned into a movie.  Sam Shepard played me.

14    I was portrayed in the movie.  And it showed, as I mentioned,

15    that the Air Force was doing research for NASA, and killing

16    guys, and it was unfortunate.  It was shot there with Sam

17    Shepard by the X-1 and myself.

18    Q.          Is that you and Sam Shepard in this photograph?

19    A.          Yeah, Sam Shepard is on the left of the photograph.

20    I'm on the right.

21    Q.          Is that a movie poster from The Right Stuff in

22    Exhibit 61?

23    A.          No.  That's the X-1.

24    Q.          Right.  On the left is that a poster for the movie?

25    A.          One of the posters.

```
 1                    MR. ZARIAN:  Your Honor, I'd move 61 in evidence.

 2                    MR. KOHUT:  None, Your Honor.

 3                    THE COURT:  Exhibit 61 is admitted and may be

 4          published to the jury.

 5                    (Plaintiff's Exhibit 61, "The Right Stuff"

 6          demonstrative, admitted into evidence.)

 7          Q.        BY MR. ZARIAN:  Did you play a part in the movie?

 8          A.        I did all the flying in it.

 9          Q.        In The Right Stuff?

10          A.        In The Right Stuff.  That's right.  The T33s, F104s,

11          B29s.

12          Q.        Did you also play a cameo of a small part?

13          A.        Yeah.  One in the bar.  I had a speaking part.

14          Q.        Okay.  You were the bartender, I think?

15          A.        That's what I portrayed.

16          Q.        Let me ask your about your autobiography.  Did you

17          publish an autobiography?

18          A.        Yes.  In 1984 I wrote it.  Called Yeager.  And highly

19          successful.  It sold more than 2 million copies.  And it pretty

20          well told the story of my life, and it was a very well received

21          autobiography.

22                    MR. ZARIAN:  If there is no objection, I would move

23          62 into evidence, Your Honor.

24                    THE COURT:  Any objection?

25                    MR. KOHUT:  Just a moment, Your Honor.
```

```
 1                    THE COURT:  That's a single page.

 2                    MR. ZARIAN:  Yes, Your Honor.

 3                    MR. KOHUT:  No objection.

 4                    THE COURT:  All right.  62 is admitted.

 5                    (Plaintiff's Exhibit 62, "Yeager, an Autobiography"

 6        demonstrative, admitted into evidence.)

 7        Q.          BY MR. ZARIAN:  Is this the cover of that book, sir?

 8        A.          Yes.

 9        Q.          All right.

10        A.          That's the soft back.  The first year I think

11        1.9 million hard backs came out, and then they dropped to paper

12        back.

13        Q.          Let's de-publish that, and I would like you to turn,

14        General Yeager, to Exhibit 63.

15                    THE COURT:  The witness only?

16                    MR. ZARIAN:  Witness only.  Thank you, Your Honor.

17        Q.          BY MR. ZARIAN:  And 63 should be in front of you,

18        General Yeager, can you tell us what the picture dated 1986

19        shows?

20        A.          Yeah.  I got to drive the pace car in the Indy 500.

21        A Corvette in '86 and then in '88 I drove an Oldsmobile.

22                    Next one over, 1988 I'm talking to Vice-President

23        Bush.  He visited at Edwards, and I got to tour around and show

24        him the base.

25                    Then in '96 that's an F15.  On the 50th anniversary
```

1    of breaking Mach 1, I flew the airplane and made a sonic boom.

2    It was just commemorative.

3            And on the right it's just me with a flag, actually,

4    in Afghanistan three weeks ago.  I was over there talking to

5    all the guys in Afghanistan, Pakistan, Kuwait.  And the reason

6    I was over there, I was -- I was assigned to fly with the

7    Pakistan Air Force for two years in the war with India in 1971,

8    -2 and -3.  And I went back and saw a lot of old friends I flew

9    with in Pakistan as well as visiting our troops in Afghanistan

10   and Kuwait.

11           MR. ZARIAN:  I would move 63 into evidence, Your

12   Honor.

13           THE COURT:  Any objection?

14           MR. KOHUT:  No objection, Your Honor.

15           THE COURT:  63 is admitted and may be published.

16           (Plaintiff's Exhibit 63, General Yeager, 1986-2012

17   demonstrative, admitted into evidence.)

18   Q.      BY MR. ZARIAN:  General Yeager, could you tell us

19   what the Free Spirit Award is?

20   A.      Yes.  The founder of USA Today was a rather -- he

21   appreciated free spirit.  And what he did, one year he took a

22   million dollars, and he picked four people that in his opinion

23   had free spirit.

24           And what he saw was on my first flight in the X-1

25   when I dropped out of the B29, I did a roll.  And he said, man,

1    that's free spirit.  And he picked a blind guy who had climbed

2    Mt. Everest and the lady who wrote Gone With the Wind from the

3    black perspective.

4            And he split this million dollars four ways,

5    $250,000.  And I got it, and Victoria and I started The Yeager

6    Foundation, and that sponsored twelve Yeager scholars at

7    Marshall University, and that it started back in '91 or '92 and

8    is still going on.

9    Q.       Is that a charitable foundation?

10   A.       Yes.

11   Q.       We can de-publish that.  General, from time to time

12   do you license others to use your name or a picture of you for

13   promotion or publicity purposes?

14   A.       Yeah, if it's interesting.  The day I broke Mach 1 I

15   was wearing a Rolex watch because I bought it for $53 in London

16   in 1955.  And Rolex found out about it, and they said we've got

17   to have that watch for our museum in Geneva, Switzerland.  And

18   I said you can have it if you give me another one.  So I gave

19   them that watch.  They put it in their museum and gave me a

20   watch of comparable cost, $53 or the like.

21           And then they were interested in a promotional

22   function.  And what Rolex did, we entered into a contract.

23   They paid me a certain amount of watch -- or money -- and give

24   me a watch every two or three years when they -- and also

25   maintain them.  And that contract and situation still is in

1    effect today.

2    Q.        Sir, do you currently own all of the rights to your

3    own name?

4    A.        Yes.

5    Q.        Are you familiar with the legal claims in this

6    lawsuit?

7    A.        Well, I'm not a lawyer.  And if I'm looking at a

8    contract or something, certain things I don't understand

9    because that's not my business.  My business is airplanes.

10            And, consequently, I turn usually everything over to

11   Victoria.  She is sharp as a tack.  And tomorrow is her

12   birthday, so I'll congratulate her now.  And she handles all of

13   our legal problems and the like.

14   Q.        All right.  Now can you tell us why you sued AT&T in

15   this case?

16   A.        Why?  Obviously they used my name without my

17   permission.  Simple.

18   Q.        Did you personally authorize the filing of a

19   complaint?

20   A.        I turned it over to Victoria.  If she wanted to hire

21   lawyers, which she did, she handled it.

22   Q.        And you let her know she could do that?

23   A.        Yes.

24   Q.        Does she handle most of your business and legal and

25   financial affairs?

```
 1     A.          Well, yes.  Because I saturate my brain with the

 2     aeronautical stuff.

 3     Q.          Does she let's you have a checkbook?

 4     A.          You're getting into a joke.

 5     Q.          I am.  Sorry.

 6     A.          I don't need a checkbook.

 7     Q.          I don't have one either.

 8     A.          She gives me cash.

 9     Q.          Before Victoria, who, sir, handled your financial

10     affairs?

11     A.          Glennis until she died in 1990, my first wife.  And

12     then my youngest daughter handled that after Glennis died until

13     I married Victoria.

14     Q.          All right.  You mentioned Rolex.  Can you think of

15     any other companies to which you've licensed your name or

16     picture of yourself?

17     A.          Yes.  Because of my reputation as a mechanic, General

18     Motors came to me and asked me would I do AC Delco commercials,

19     making five commercials every year for batteries, filters, and

20     spark plugs.  And I did that for ten years, making five

21     promotional films every year for ten straight years.

22     Q.          Do you deal with the contractual details or the

23     monies from these contracts?

24     A.          Basically, it's pretty cut and dried.  I receive so

25     much a year to make five commercials.
```

1    Q.        And who handles the money?

2    A.        Glennis, my first wife.  And now all of the contracts

3    or the information I turned over to Victoria because she's

4    sharp, and I don't -- I have a limited mental capacity, and I

5    don't saturate it with anything that doesn't have to do with my

6    longevity.

7    Q.        Let me ask you, are you aware, sir, that there is a

8    press release, a promotional release that is a part of this

9    lawsuit?

10             MR. KOHUT:  Object, Your Honor.  Argumentative with

11   respect to the use of the term "promotional."

12             THE COURT:  Sustained.

13             MR. ZARIAN:  I think the evidence will show that,

14   Your Honor.

15             THE COURT:  Well, if you can rephrase.

16   Q.        BY MR. ZARIAN:  Are you familiar with the press

17   release that is a part of this lawsuit?

18   A.        You mean AC Delco?

19   Q.        No.  The press release that AT&T issued.

20   A.        Yeah.  I read it.

21   Q.        All right.  Do you remember when you first saw that

22   document?

23   A.        I don't remember the date, no.

24   Q.        Do you know if it was before or after the complaint

25   was filed?

1    A.         Probably after.

2    Q.         And --

3    A.         And I -- here again I turn that kind of stuff over to

4    Victoria.

5    Q.         Okay.  Do you remember that your name was referenced

6    in the press release?

7    A.         Yes.  The article has been read here today, and it's

8    basically what it says.

9    Q.         Let me ask you to turn to --

10   A.         It uses my name and some of the activities that I was

11   involved with.

12   Q.         Let me ask you to turn to exhibit --

13   A.         Also he mentioned -- he mentioned Scott Crossfield

14   going MACH 1.  That was a false statement.

15   Q.         MACH 2?

16   A.         Or MACH 2 rather.

17   Q.         Why was that, sir?

18   A.         Cause, he was not -- you know, he was not the first

19   guy to go Mach 1 or Mach 2, but that was what was testified.

20   Q.         Let me show you Exhibit 49, which is on the screen in

21   front of you, General Yeager.  It's pretty small.  Can we blow

22   up the date?

23              THE COURT:  And this is not published yet?

24              MR. ZARIAN:  It is not.

25              MR. KOHUT:  Your Honor, it may save some time.  We

1    have reviewed this document.  This is not the original press

2    release and does not contain all the information from that

3    press release.

4            THE COURT:  You're objecting to even asking

5    questions?

6            MR. KOHUT:  We do, Your Honor, given what General

7    Yeager's already stated about the press release and his lack of

8    general familiarity with the document.

9            THE COURT:  Overruled.  You can ask questions about

10   49.  I'm not determining admissibility.

11           MR. ZARIAN:  There is no dispute as to the date, Your

12   Honor.

13   Q.        BY MR. ZARIAN:  General Yeager, do you see the date

14   on this document?  It's been blown up on the screen in front of

15   you.

16   A.        What's the significance of the date?

17   Q.        Well, I represent that's the date -- that's on the

18   press release.  But do you see that date on the screen?

19   A.        I see the date.  What's your question?

20   Q.        My question is, at any time before that date did you

21   give AT&T permission to use your name?

22   A.        I never did give AT&T permission to use my name.  It

23   was all illegal.

24   Q.        And have you ever entered into an agreement with any

25   cell phone company to let them use your name?

1        A.        That's right.

2        Q.        Have you ever done that?

3        A.        No.

4                  MR. ZARIAN:  No further questions at this time, Your

5        Honor.

6                  THE COURT:  All right.  Why don't we take our

7        mid-afternoon break slightly early rather than have the

8        cross-examination started for just a few minutes.  So if you

9        just wait right there, General, for a moment.

10                 During the break, ladies and gentlemen of the jury,

11       please remember the admonition I gave you earlier.  That is,

12       don't discuss the case amongst yourselves, don't do any

13       research of any kind using a handheld device or otherwise.  If

14       anyone approaches you during the break to talk with you about

15       the case, please let me know immediately.  Continue to keep an

16       open mind and not thinking about the ultimate resolution in the

17       case.  Let's take a 15-minute break, and then we'll be back for

18       cross-examination.  Have a good break.

19                 (Jury out.)

20                 THE COURT:  Just so I'm clear, is there -- are the

21       parties trying -- you may be seated.

22                 I have a question about -- well, two things.  Just so

23       I'm clear on references made during opening, am I correct in

24       understanding that the law firm of Quinn Emanuel was not one of

25       the attorneys in the string of attorneys on this lawsuit?

 1                    MR. KOHUT:  That's correct, Your Honor.

 2                    MR. ZARIAN:  No, Your Honor.  They were pre-suit.

 3     The attorneys that were handling this very claim.

 4                    THE COURT:  All right.

 5                    MR. KOHUT:  They weren't involved in litigation, Your

 6     Honor.  They pre-date the litigation by a year-and-a-half, and

 7     they were terminated before the litigation began.

 8                    MR. ZARIAN:  That's why I objected, Your Honor.

 9                    THE COURT:  But they were in the line.  I had thought

10     there was a separate track, a parallel track being pursued, and

11     that was your point.  To the extent that they were representing

12     the plaintiff in pre-litigation related to this case, then no

13     further references to Quinn Emanuel.

14                    MR. KOHUT:  Your Honor, may I be heard on that?

15                    THE COURT:  Well, the Court made a ruling prior to

16     trial, and I'm not revisiting that ruling.

17                    MR. KOHUT:  I'm not asking you to.  However, that

18     particular motion, as we understood it, was with respect to

19     attorneys who had in fact represented the General in this

20     litigation.  And the motion in limine itself was directed

21     towards our not being able to show that he had used four or

22     five different lawyers as a way of suggesting that the case did

23     not have merit.

24                    THE COURT:  But you're not disputing that Quinn

25     Emanuel's letter laid groundwork for this litigation.

1          MR. KOHUT:  I don't think it had anything to do with

2     this litigation.  The Quinn Emanuel letter was a cease and

3     desist letter that was written to Cingular, and Cingular talked

4     to the lawyer and responded and said, yes, we agree that we

5     will not do that.

6          THE COURT:  Well, no further references to Quinn

7     Emanuel unless I see the correspondence, understand how it fits

8     in the chronology and am persuaded that it's not part the chain

9     of lawyers who worked on this case.

10         MR. KOHUT:  Well, Your Honor, this is a very

11    important issue.

12         THE COURT:  Well, you just heard my ruling.  I'm

13    willing to be persuaded, but at this point I'm not.  So I'm

14    just alerting you before you attempt to elicit any evidence

15    that goes to that question, I need to see exhibits and to

16    understand the chronology.  The same question about the

17    reference to an attorney for Victoria Yeager.

18         MR. KOHUT:  It's the same law firm, Quinn Emanuel,

19    Your Honor.

20         THE COURT:  All right.

21         MR. ZARIAN:  And it's also the subject of a 408

22    motion, Your Honor, because what he was describing was

23    settlement communications that I thought the Court had reserved

24    ruling on, and he launched into it in opening and described the

25    back and forth discussions on settlement.

1          THE COURT:  Well, I couldn't tell.  It sounded to me

2    as if there was a suggestion that there were parallel tracks

3    going to this ownership issue.  I'm willing to consider a

4    curative instruction if you think one is needed.

5          MR. ZARIAN:  Well --

6          THE COURT:  It's opening statement.  The jury has

7    been told how to think about opening statement.

8          I'm just alerting the parties so that no evidence is

9    elicited before those issues are clarified.

10         The Court, of course, has not turned to closing

11   instructions yet.  I note that the defense has proposed an

12   instruction related to ownership, but relying on a statute that

13   I believe applies only to deceased celebrities.  Is ownership

14   an issue here?

15         MR. KOHUT:  We believe so, Your Honor.

16         THE COURT:  So what's your authority?  What authority

17   are you relying on?

18         MS. HOOPIS:  Your Honor, the statute that we cite to,

19   the 3344.1, I think it's (b), what it does is it does refer to

20   deceased celebrities.  But what it does is it allows living

21   celebrities to transfer their ownership rights and their name

22   to trusts or other owners during their lifetime in anticipation

23   of their passing.  So it makes -- it makes the right of

24   publicity freely transferable.

25         THE COURT:  And that's a plain reading of the

1      statute, or is there authority that you're also relying on?

2              MS. HOOPIS:  If you look at the first sentence of

3      subheading (b), and I think it's the last sentence of that same

4      section, it says that.

5              And it's my understanding that that statute was

6      enacted in response to a Lugosi decision which held that those

7      rights were not transferable.

8              THE COURT:  That's all I need to understand.

9      Anything briefly you want to say on that point?

10             MR. ZARIAN:  Your Honor, there is absolutely no issue

11     -- no evidence of any transfer.  And this is exactly the issues

12     that we briefed on two motions in limine.  Because I think they

13     are bootstrapping this, trying to raise an issue about

14     ownership to talk about other lawyers and other lawsuits.  And

15     there is a clear 403 issue that we objected to there.

16             THE COURT:  Are there exhibits you're relying on in

17     suggesting that there has been a transfer away of the rights

18     that would provide a basis for this suit?  Assuming that

19     that's --

20             MR. KOHUT:  Yes, Your Honor.  And the documents which

21     you have not seen -- and it really is subject to two motions in

22     limine.  One was a motion in limine where the other side

23     attempted to preclude these documents on the basis that they

24     were settlement discussions.  Our response to that was they

25     were not settlement discussions.  They were cease and desist

1     letters.  In addition to which they are not between the parties

2     to this case.

3             The letter from Quinn Emanuel is on behalf of the

4     Foundation, which is not a party to this case.  Consequently,

5     it cannot be a settlement.  And consequently, if you want to

6     follow your logic on whether or not it's within the line of

7     attorneys, it's also not within the line of attorneys because

8     they don't represent General Yeager.

9             The two letters, which I will hand to the Court, if I

10    may --

11            THE COURT:  Are they identified by an exhibit?

12            MR. KOHUT:  G and H, Your Honor.

13            THE COURT:  I have those then.

14            MR. KOHUT:  So exhibits G and H.

15            THE COURT:  Are those the only exhibits you're

16    relying on for ownership?

17            MR. KOHUT:  Yes.  And some testimony of the various

18    parties.

19            But G is the cease and desist letter on behalf of the

20    Foundation.  H is the response.  And it would be helpful to

21    have your thoughts on that before I begin the cross-examination

22    of General Yeager because I was hoping to include both of those

23    documents in the cross-examination.

24            MR. ZARIAN:  Your Honor, we'd be willing to

25    stipulate.  There is a sentence in Exhibit G that says that the

1      Quinn Emanuel firm is writing on behalf of the General Chuck

2      Yeager Foundation.

3             THE COURT:  I want to look at the exhibits before I

4      hear more.  I'll look at the them and be back in about five

5      minutes.

6             (Break taken.)

7             THE COURT:  You may be seated.

8             Just briefly on G and H, having looked at those more

9      carefully, the Court's decision is I'm not making a decision

10     about admissibility.  I'm not going to preclude the defense on

11     cross-examination asking -- using information in the letter, in

12     particular the first paragraph of the Exhibit G and the third

13     paragraph for impeachment purposes.

14            I mean, that is, the defense can ask questions about

15     whether or not someone else owns the rights.  If the defense

16     wants to ask General Yeager if he can identify the letters,

17     they can also ask that.

18            I'm not at this point, again, deciding admissibility

19     ultimately.  But any reference would be without reference to

20     the law firm name or any characterization about what the

21     letters are about.

22            MR. ZARIAN:  There will be no foundation as to

23     General Yeager.  He has never seen this letter.

24            THE COURT:  Well, they can ask a question, though.  I

25     mean, if you really want to ask the question.

1           MR. KOHUT:  Really, the only question I'll ask

2     General Yeager is whether he has ever seen these letters, and

3     he's going to tell me no, and I'm going to use the letters with

4     other witnesses.

5           THE COURT:  Again, I'm not making any decision about

6     admissibility, and I'm not precluding the asking of a question

7     about assignment of rights.

8           MR. ZARIAN:  Your Honor, just one other point I have

9     to make is because Mr. Kohut during his opening pointed to

10    Mrs. Yeager and referred to Quinn Emanuel as her lawyers.  Her

11    solely.  I think that was improper.  And I have to object for

12    the record, Your Honor, to that conduct.

13          THE COURT:  The objection is noted.  If you think I

14    should consider a curative instruction, you can provide that.

15          MR. ZARIAN:  Well, I've never had to object to

16    misconduct like that in a trial, Your Honor, but I do at this

17    time.  I object.

18              THE COURT:  The objection is --

19          MR. KOHUT:  Your Honor, I need to --

20          THE COURT:  The objection is noted.

21          MR. KOHUT:  I really need to respond to that, which

22    is, number one, these are letters on behalf of the foundation.

23    Victoria Yeager is in fact a member of the foundation.  She's

24    the one in charge the foundation.  It was absolutely a proper

25    reference.

```
 1              THE COURT:  The objection is noted.  The response is

 2     noted.  I'm not doing anything with it at this point.  All

 3     right.  Can we call the jury back in?

 4              MR. ZARIAN:  Thank you, Your Honor, yes.

 5              THE COURT:  Ms. Schultz.  Let's put the General back

 6     in the witness box.

 7              General Yeager, could we have you back in the box,

 8     please.

 9              THE WITNESS:  Yes, ma'am.

10              THE COURT:  All right.

11              (Jury in.)

12              THE COURT:  You may be seated.  Welcome back, ladies

13     and gentlemen of jury.  We are now going to continue with the

14     presentation of evidence.  And specifically I'm going to

15     recognize the defense for cross-examination of General Yeager.

16     Mr. Kohut.

17              MR. KOHUT:  Thank you very much, Your Honor.

18                         CROSS-EXAMINATION

19     BY MR. KOHUT:

20     Q.       Good afternoon, General Yeager.

21     A.       Yeah, don't get so close.

22     Q.       Is that setting your ears abuzz?

23     A.       Are you getting static?

24              THE COURT:  I heard it until you turned this way.

25              THE WITNESS:  Okay.  It's coming out of that mic.
```

```
 1                    MR. KOHUT:  You tell me when we're working together,
 2       General.
 3                    (Pause in proceedings.)
 4                    THE COURT:  We did some testing before trial to try
 5       to save time, but we're just fine tuning, obviously.  Let's try
 6       that.
 7       Q.        BY MR. KOHUT:  General, how can you hear me now?
 8       A.        Try it again.
 9       Q.        Can you hear me now, sir?
10       A.        Just a second.  Let it go a little better.
11       Q.        Take your time, sir.
12       A.        Okay.  Try that one.
13       Q.        How are we doing now?
14       A.        Yes.
15       Q.        Can we say testing one, two, three?
16       A.        We got static again.  Keep talking.
17       Q.        Are you ready now, sir?
18       A.        Yeah.
19       Q.        Sir, would you agree with me that you are a legendary
20       test pilot?
21       A.        It's a matter of opinion.
22       Q.        Is it an opinion that you hold?
23       A.        I don't quite understand your question.  Are you
24       saying do I agree that I'm a legendary test pilot?
25       Q.        That was my question, sir?
```

```
 1    A.        That's your opinion.

 2    Q.        Is it an opinion that you share, sir?

 3    A.        You're not coming through.

 4    Q.        Is it an opinion that you share?

 5    A.        What do you mean "share"?

 6    Q.        Do you believe that you are a legendary test pilot?

 7    A.        No.  I don't believe in nothing.  I just live my

 8    life.  And if it just turns out that some people think that I'm

 9    a legendary test pilot, I don't argue with them.

10    Q.        So you wouldn't argue with somebody calling you a

11    legendary test pilot?

12    A.        That's what I just said.

13    Q.        Thank you, sir.  Did you break the sound barrier?

14    A.        Yes.  The X-1 broke the sound barrier October

15    the 14th, 1947.

16    Q.        And did you achieve Mach 1?

17    A.        That is the sound barrier.

18    Q.        And you did that in October of 1947, is that right?

19    A.        That's correct.

20    Q.        And would you agree with me, sir, that that was a

21    historic achievement in aviation?

22    A.        Well, that ended the first era and opened up space to

23    us.

24    Q.        So you would agree that it's a historical event in

25    aviation?
```

1    A.        Well, anybody has their opinion.  I don't think it

2    was a historic occasion because I was involved in it, and that

3    was part of a research program that we were doing -- using with

4    the X-1 and the X-1A, X2, -3, -4 and -5.

5    Q.        Sir, you understand that one of the issues in this

6    case is a press release that was issued by Cingular Wireless?

7    A.        It is, I suppose.

8    Q.        Have you ever personally contacted anyone at Cingular

9    Wireless to talk about the press release with them?

10   A.        No.

11   Q.        So you've never telephoned them, is that right?

12   A.        Yeah.  The first time that I saw the press release

13   when I read it.  That was the first time that I knew that it

14   existed.

15   Q.        Was that after your lawsuit was filed?

16   A.        No.  I think it was before.

17   Q.        Do you recall whether --

18   A.        I don't recall.

19   Q.        So you don't know whether it was before or after?

20   A.        That's right.

21   Q.        Fair enough.  Do you remember how you found out about

22   the press release?

23   A.        I don't recall.

24   Q.        Do you remember when you found out about the press

25   release?

1    A.        I don't recall.

2    Q.        Now, I want to be absolutely fair to you with respect

3    to the complaint that was filed in this case.  You're not

4    familiar with that complaint, are you?

5    A.        No.

6    Q.        And you really have no understanding of the lawsuit

7    that's been filed on your behalf, is that correct?

8    A.        That's -- like I say, I'm not a lawyer.  I can only

9    read through the release, and it's obvious in the release that

10   you are using my name without my permission.

11   Q.        Okay.  So let me see if I have your claim, and I want

12   to be as fair to you, sir, as I possibly can.

13            Your claim is that in a press release issued by

14   Cingular Wireless that they stated "legendary test pilot Chuck

15   Yeager," and they did so without your consent, is that right?

16            MR. ZARIAN:  Objection, Your Honor.

17            THE COURT:  Overruled.  You may answer to the extent

18   you're able.

19            THE WITNESS:  Ask the question again?

20   Q.        BY MR. KOHUT:  Sure.  You're objecting, sir, to the

21   fact that Cingular in a press release used the term "legendary

22   test pilot Chuck Yeager," is that right?

23   A.        That's right.

24   Q.        Okay.  And they did so without first consulting you,

25   is that right?

1    A.        That's right.

2    Q.        And they did so without first consulting you and

3    offering to pay you a fee for using your name in the press

4    release, is that right?

5    A.        It was covered.  It's just you released your press

6    release without my permission.

7    Q.        Have you ever personally asked Cingular to pay you a

8    fee for that?

9    A.        No.

10   Q.        Now, I believe this was covered --

11   A.        Cingular never said a word to them.

12   Q.        Sorry, sir.  Well, you knew that they had used your

13   name in a press release at some point, is that right?

14   A.        After I read it.

15   Q.        Fair enough.  Okay.  Now, sir, is it true that you,

16   in fact, allow companies to use your name and your likeness so

17   long as they pay you a fee?

18   A.        That's right.

19   Q.        All right.  And I believe that you talked a little

20   bit on your direct examination about Rolex.  I would like to

21   show you a four-page document, which we've previously marked

22   for identification as Exhibit L.

23             Do you have that in a notebook in front of you, or

24   can we display it on the screen?

25   A.        It's not on the screen.

1            THE COURT:  There is a notebook behind you.  If it is

2    displayed, it needs to be without publication.

3    Q.        BY MR. KOHUT:  Now, sir, could you take a few moments

4    and review those four pages, and then could you tell me when

5    you've completed your review.

6            And I apologize.  I believe I said four pages.  In my

7    copy it shows three pages.

8    A.        (Witness reviewing document.)  Yeah.  I've read it,

9    and it's basically --

10   Q.        Could you tell us what it is, sir?

11   A.        -- a letter of agreement.

12   Q.        I'm sorry?

13   A.        It is, as you say, a letter of agreement between me

14   and Rolex.

15   Q.        Now, there is actually two parts of this exhibit.

16   The first page is a letter dated September 22nd, 2008 on the

17   letterhead of Rolex to Victoria Yeager, do you see that?  That

18   would be the first page, sir.

19   A.        Yes.

20   Q.        Okay.  And on the bottom left-hand corner it

21   indicates the letter is approved and gives a date of -- it

22   looks to be October 1st, 2008, do you see that?

23   A.        Yes.

24   Q.        Okay.  And is the signature --

25   A.        In the ink written by Victoria.

```
1    Q.        That's what I was going to ask you, sir.  Is the

2    signature which appears on that document Victoria Yeager's

3    signature?

4    A.        It looks like it.

5    Q.        Is that a signature with which you have some

6    familiarity?

7    A.        It looks like it.

8    Q.        Now, before we go further on that letter, I would

9    like you to look at the two pages that follow.  And that's a

10   letter agreement, is that right?

11   A.        Yes.

12   Q.        And that's your letter agreement with Rolex?

13   A.        I assume so.

14   Q.        And if we look at the second page of that letter

15   agreement, sir, on the bottom right-hand corner, is that your

16   signature?

17   A.        Yes.

18   Q.        Okay.  And did you place it on this document on or

19   about the date it bears, June 29, 2006?

20   A.        The 29th or September 22nd?

21   Q.        Looks to me to be the 29th.  Sorry, sir?

22   A.        It you're looking on the date on the letter,

23   September 22nd, 2008.

24   Q.        I wasn't.  Let's go back to your signature on the

25   back of the letter of agreement, and that indicates that it's
```

1    made in duplicate in Geneva, which would be in Switzerland, on

2    29 June 2006, is that right?

3    A.        Yes.

4    Q.        Okay.  Now, so what we have here is we have two

5    documents, we have the letter of agreement between yourself and

6    Rolex, and then we have an amendment to that agreement in 2008,

7    is that right?

8                 MR. ZARIAN:  Objection.  Foundation, Your Honor.

9                 THE COURT:  Sustained.

10                MR. KOHUT:  Your Honor, we'll offer the letter of

11   agreement and the September 22nd, 2008 letter as Exhibit L.

12                THE COURT:  Any objection?

13                MR. ZARIAN:  No objection.  But they should be two

14   different exhibits.  It's two different documents, Your Honor.

15                THE COURT:  The record clarifies that, I believe.

16   The Court's copy does have two copies of the September 22nd

17   letter.  So with the understanding that it is a three-page

18   exhibit with one copy of the September 22nd, 2008 letter, that

19   exhibit is admitted.

20                MR. KOHUT:  Thank you, Your Honor.

21                MR. ZARIAN:  No objection, Your Honor.

22                THE COURT:  And may be published.

23                (Defendant's Exhibit L, Letter to Victoria Yeager

24   from Rolex dated September 22, 2008, admitted into evidence.)

25   Q.        BY MR. KOHUT:  Well, let's publish first the second

1      page.

2              Sir, looking at the second page, that's a letter of

3      agreement, that's your agreement with Rolex to endorse their

4      product, is that right?

5      A.      I don't see my signature on it.

6      Q.      It's on the second page of that.

7      A.      I have it, yes --

8      Q.      Okay.

9      A.      -- second.  I signed it.

10     Q.      So this is your agreement with Rolex, is that right?

11     A.      It's a letter of agreement.  I haven't read it yet.

12     Q.      Would you like to take the time to read it?

13     A.      I would.

14     Q.      Please.

15     A.      (Witness reviewing document.)  I read it, and

16     basically I've read it before and signed it.

17     Q.      And basically this is just your agreement with Rolex

18     for an endorsement, is that right?

19     A.      Yes.

20     Q.      And you understand that they pay you $70,000 a year

21     and then they also give you a $20,000 watch every other year,

22     is that right, sir?

23     A.      Yes.

24     Q.      And in exchange for that amount of money, they have

25     the rights that are set forth in this letter agreement to use

1      your name and likeness, is that right?

2      A.      Yes.

3      Q.      And you have in fact appeared in advertisements on

4      behalf of Rolex, is that right?

5      A.      Yes.

6      Q.      And is it also true that you appear on their website,

7      their Rolex website as well?

8      A.      I never -- I can't confirm that I appeared on the

9      website because I haven't seen it.

10     Q.      Fair enough, sir.  Let me just finish this up then.

11     The first page of Exhibit L, do you recognize that as an

12     amendment to the agreement?

13     A.      What is Exhibit L?

14     Q.      I'm sorry, sir.  I've handed you three pages.  Let's

15     go to the first page.

16     A.      Well, thanks a lot.

17             THE COURT:  Can you display the first page?

18             MR. KOHUT:  Sure.

19     Q.      BY MR. KOHUT:  Does that help, sir?

20     A.      No.

21     Q.      Could you look at the screen, sir?

22     A.      Well --

23             MR. KOHUT:  May I approach the witness, Your Honor?

24             THE WITNESS:  Letter of agreement.  That's all I can

25     find.

```
 1                THE COURT:  General Yeager, can you see the screen

 2    now?

 3                THE WITNESS:  Yes.

 4                THE COURT:  There is another letter on the screen.

 5                THE WITNESS:  Okay.  I'll try to find it.

 6    Q.        BY MR. KOHUT:  General Yeager, if you can read the

 7    screen, we'll rely on the screen.

 8    A.        Okay.

 9    Q.        And your recognize that as an amendment to the Rolex

10    agreement that you entered into in 2006?

11                MR. ZARIAN:  Foundation, Your Honor.

12                THE COURT:  It's already admitted.  It's a question,

13    does he recognize.  You can answer that question.

14                THE WITNESS:  It's signed by and approved by

15    Victoria.

16    Q.        BY MR. KOHUT:  That's what you can tell me, isn't it,

17    sir?

18    A.        I'm sorry?  It's a letter from -- Peter Nicholson,

19    Vice-President Director of Communications for Rolex, and it's

20    to Victoria.  And what's your question?

21    Q.        Sir, you've given me enough.  It's to Victoria Yeager

22    of the General Chuck Yeager Foundation, is that right?

23    A.        Yes.

24    Q.        And there is a General Chuck Yeager Foundation, isn't

25    there?
```

```
1    A.         Obviously.

2    Q.         And it was formed by you and Victoria Yeager?

3    A.         Yes.

4    Q.         And are you the president of the foundation, sir?

5    A.         Yes.

6    Q.         And do you given endorsements to companies in the

7    name of the foundation?

8    A.         Yes.

9               MR. ZARIAN:  Objection.  Vague.

10              THE COURT:  Overruled.

11              MR. KOHUT:  The answer will stand, Your Honor?  Thank

12   you.

13   Q.         BY MR. KOHUT:  And the endorsement monies from those

14   contracts actually go to the foundation, is that right?

15   A.         I don't know that it does.

16   Q.         Okay.

17   A.         Victoria handles.

18   Q.         Let me ask you that because I want to give you an

19   opportunity to talk about that.

20              Victoria Yeager is your wife, is that right?

21   A.         Yes.

22   Q.         And you've been married for roughly ten years?

23   A.         Yes.

24   Q.         And since becoming your wife has she taken control of

25   your finances?
```

1    A.        No.  She pretty well runs it.  Control is a bad word.

2    Q.        Does she run the foundation?

3    A.        She runs the foundation in conjunction with my

4    knowledge.

5    Q.        Okay.  And is she in fact the one that deposits and

6    writes all checks to all checking accounts?

7    A.        Yes, but we discuss it before she does it.

8    Q.        But in answer to my question, she receives all

9    deposits and writes all check?

10   A.        She's what?

11   Q.        She receives deposits of all monies, and she writes

12   all checks?

13   A.        She personally does?  Yes.  We do.

14   Q.        Does she write all the checks, sir?

15   A.        Yes, she does.

16   Q.        Do you write any yourself?

17   A.        That's not my job.

18             MR. KOHUT:  I didn't say it was, sir.  I have nothing

19   further.  Thank you.

20             THE WITNESS:  Let me answer the question before you

21   butt in on me.

22   Q.        BY MR. KOHUT:  I'm sorry, sir.  I was trying to be

23   very polite and respectful of you.  What would you like to say?

24   A.        Like I can say is, she manages most all of our

25   business but we discuss it before she does.

 1     Q.        I understand your response.  Thank you very much,

 2     sir.  I have nothing further.

 3                THE COURT:  Mr. Zarian, any redirect?

 4                MR. ZARIAN:  Nothing further, Your Honor.

 5                THE COURT:  All right.  General Yeager, you may step

 6     down.

 7                THE WITNESS:  Ma'am?

 8                THE COURT:  You may step down.  And you should take

 9     your headset with you.

10                THE WITNESS:  Thank you very much.

11                THE COURT:  Take the headset to the table.  Very

12     good.  All right.  Mr. Zarian, your next witness.

13                MR. ZARIAN:  I would like to call Victoria Yeager to

14     the stand, Your Honor.

15                THE COURT:  All right.  Mrs. Yeager, please come

16     forward.

17                (The witness was sworn by the Clerk.)

18                THE WITNESS:  I do.

19                THE CLERK:  Please state your full name and spell

20     your last name for the record.

21                THE WITNESS:  Victoria Yeager, V-i-c-t-o-r-i-a,

22     Yeager, Y-e-a-g-e-r.

23                            VICTORIA YEAGER,

24     a witness called by the Plaintiff, having been first duly sworn

25     by the Clerk to tell the truth, the whole truth, and nothing

1          but the truth, testified as follows:

2                          DIRECT EXAMINATION

3      BY MR. ZARIAN:

4      Q.          Thank you, Your Honor.  Good afternoon, Victoria.

5      A.          Good afternoon.

6      Q.          Would you please introduce yourself briefly to the

7      judge and to the jury?

8      A.          My name is Victoria Yeager, and I'm married to

9      General Chuck Yeager.  I'm from Philadelphia, Pennsylvania, and

10     have been married to General Yeager since August 22, 2003.

11     Q.          If I may, ma'am, can I ask how old are you?

12     A.          53 years and 364 days.  My birthday is tomorrow.

13     I'll be 54.

14     Q.          Where do you currently live, ma'am?

15     A.          Live in Penn Valley next to Grass Valley, California.

16     Q.          You have been married how long to General Yeager?

17     A.          August 22nd of this year will be ten years -- excuse

18     me -- will be nine years.  Sorry.

19     Q.          Let me go back and ask you, if you were just to

20     briefly summarize your educational background?

21     A.          I have a BA from University of Virginia.  I spent my

22     junior year in Paris, went to the Political Science Institute,

23     the Sorbonne and the Sorbonne Nouvelle during that time.

24     Nouvelle which means New Sorbonne.

25                 And then I spent a year in acting school.  And I have

1    an MBA in finance from Columbia University, and I have a

2    pilot's license.

3    Q.        When did you get your pilot's license?

4    A.        2008.

5    Q.        Who was your instructor?

6    A.        General Yeager is my unofficial instructor, but he

7    doesn't have a civilian certified flight instructor license, so

8    he and I went and got someone who was rated and we taught him

9    how to teach me, frankly.

10   Q.        Tell me a little bit about your employment

11   background.  What did you do out of school, ma'am?

12   A.        Out of school I -- well, first I was in acting

13   school.  I was an actress for a couple years and a producer.  I

14   always did volunteer work.  And then when I went to business

15   school, I got into investment banking and really migrated back

16   to non-profits.  I was always a consultant for non-profits.

17            My mother was a world-renowned authority on

18   alcoholism and drug abuse.  She got Betty Ford to go public

19   with her alcoholism, opening up that.  And so as far back as I

20   can remember, it's volunteer work and non-profits.

21   Q.        Did you spend any time working for non-profits?

22   A.        Yes.  Well, not for them directly.  I was a

23   consultant, so I was always an outside contractor.

24   Q.        And where did you do that?

25   A.        I did that all over the world, frankly.  Namibia,

1    South Africa, Botswana, Indonesia, Australia, New Hampshire,

2    Georgia.

3    Q.        Those last two stand out.  How did you first meet

4    General Yeager?

5    A.         I was going up a trail near where we live, and he was

6    coming down the trail.  And it was a beautiful -- it was March

7    25th.  The flowers were just starting out.  And I said it's a

8    beautiful day.  And he said I just got back from Australia.

9    And I said, well, I just got back from Africa.  What were you

10   doing in Australia?  And he said teaching software guys.  And I

11   said, oh, I can do that.  I need to fill up my coffers again

12   because I was volunteering.  Can I get a job with you?  And he

13   said no, no, no.  I'm not a software guy.  I'm a fighter pilot.

14   I'm Chuck Yeager.

15          And I thought, oh, is that a common name in the

16   military?  Is he the Chuck Yeager?  Who was Chuck Yeager?  And

17   I said, okay, can you take me up in a fighter jet?  He said no,

18   no.  That costs tens of thousands of taxpayer dollars.  I said,

19   I pay taxes.  And ultimately he kind of explained who he was,

20   and the penny dropped, and I remembered The Right Stuff movie.

21   And we decided to go hiking the next day together.

22   Q.        And did you start dating then?

23   A.        About a week later.

24   Q.        How long until you got married?

25   A.        We got -- so that was March 25th, 2000.  We got

1   August 22nd, 2003.  So three years and a few months.

2   Q.        Thank you.  So let me ask you, Victoria, in your

3   marriage who is generally responsible for handling business and

4   financial matters?

5   A.        I handle the details and the day-to-day stuff.  And

6   if there's a decision that needs to be made that's substantial,

7   I gather up all the information I can and bring it to General

8   Yeager.  We make a decision together.

9   Q.        So could you tell us how are decisions generally made

10  with respect to business and financial matters?

11  A.        Well, as I said, I -- if it relates to licensing his

12  name, I gather -- I do a lot of research on the company.  I

13  research the -- what their customer service, how -- whether

14  they're well thought of or not.  And I try to get the ballpark

15  of where they're thinking and what they want to do.  And I

16  bring that to General Yeager.  And then he decides whether he

17  wants to be involved and asks my opinion.  And we sort of

18  discuss it.  And we make the decision together.

19  Q.        With respect to the licensing of his name or any

20  pictures of him in particular, does General Yeager generally

21  delegate the day-to-day matters to you?

22  A.        The day-to-day, absolutely, yes.

23  Q.        As a result of your experience in your marriage, are

24  you generally familiar with General Yeager's past and present

25  contractual arrangements?

1     A.        I am.

2     Q.        Are you generally familiar with activities relating

3     to the licensing of his name or his image?

4     A.        Yes, I am.

5     Q.        Are you generally familiar with instances, either in

6     the past or in the present, in which he has given others

7     permission to use his name or his image?

8     A.        Yes.

9     Q.        All right.  Do those include any instances in which

10    he has allowed others to use his name or his image for free?

11    A.        Yes.

12    Q.        I want to ask you about some of those matters in

13    particular.

14              Let me ask you first about civic events to which

15    General Yeager lends his name and/or his time.  He has recently

16    served as a grand marshall, is that correct?

17    A.        Last Monday.  So a week ago he was the grand marshall

18    for the National Memorial Day Parade in Washington D.C.

19    Q.        And do you know who asked him to do that?

20    A.        There is a veteran's group, and they call themselves

21    the National Memorial Parade Organization.  They asked him to

22    do that.

23    Q.        Did he or you, on his behalf, to your knowledge ask

24    for any compensation for that?

25    A.        Absolutely not.

1    Q.        Has he served as the grand marshall of other --

2    A.        In fact --

3    Q.        Go ahead.

4    A.        In fact, when we were talking about them paying his

5    expenses, we asked them to include in the VIP section a couple

6    of friends a guy that's like a son to him.  And in the end he

7    paid a lot of the expenses as a donation, essentially.  So they

8    really won't have much in the way of expenses at all.  So we

9    try to do that as well.  We try to help them out.

10   Q.        Has he served as a grand marshall of any other

11   parades or similar events?

12   A.        He served as grand marshall -- what most comes to

13   mind most recently was he was the grand marshall for the

14   Sacramento Veteran's Day Parade last November.  And he is going

15   to be the grand marshall of the Veteran's Day Parade in San

16   Diego.  This is the 65th anniversary of breaking the sound

17   barrier and of the formation of the Air Force.

18   Q.        Okay.  General Yeager mentioned travel to

19   Afghanistan.  Did you hear him talk about that?

20   A.        Yes, I did.  And we traveled in April to Afghanistan,

21   Kuwait and Qatar.  And at 89, he spent 36 hours without any

22   sleep, took a nap for an hour, and still said, yes, I'll go

23   talk to the pilots.  That's why I'm here.

24   Q.        Did he, to your knowledge, or you on his behalf ask

25   for any money for that?

```
1    A.          Absolutely not.  Also, we went off to Pakistan, as he

2    said.  And we made sure that we spent a night in Kuwait again

3    because the maintenance guys were busy because, of course,

4    they're working 24/7 over there, so they couldn't hear him

5    speak.  So we made a point of going there again and making sure

6    we met with the maintenance guys.

7    Q.          Has General Yeager, to your knowledge, or have you,

8    on his behalf, asked for any money for acting as grand marshall

9    of any Veteran's Day parade?

10   A.          No.

11   Q.          Let me ask about charitable causes.  Has General

12   Yeager lent his name or his time to any charitable causes that

13   you know of?

14   A.          Yes, he has.

15   Q.          Can you tell me about some of them?

16   A.          Well, the one that is the biggest -- that I feel is

17   the biggest -- was Disability Resources, Inc.  And that is a

18   group that has eight -- has five group homes for Autistic and

19   Down Syndrome folks.  And he has been doing that for 24 years,

20   going to fundraisers for them.

21            But most recently they sent out one letter that he

22   signed.  They made 401 copies.  And they raised $3.2 million in

23   just the space of just over a year.

24   Q.          Has General Yeager, to your knowledge, or have you,

25   on his behalf, demanded or received any money for that?
```

1        A.          No.

2        Q.          What is the Dallas Safari Club?

3        A.          Dallas Safari Club is a group of people that come.

4    They go on safaris, and they do some hunting.  They also do a

5    lot of education for kids.  And General Yeager has lent his

6    name and done things for them to raise money for the kids.

7        Q.          Has General Yeager, to your knowledge, or have you,

8    on his behalf, demanded or received any compensation for that?

9        A.          No.

10       Q.          What about the Aerospace Museum of California, is he

11   involved in that organization?

12       A.          General Yeager gives FAA safety talks.  And he gives

13   about one a year.  About one a year.  And he does it at the

14   Aerospace Museum of California.  So it's kind of a win/win.

15   The museum gets some visibility.  They get a little bit of

16   money because people do pay for that.  It goes to the museum.

17              And the FAA safety people, they have a program called

18   FAST.  And if you're a pilot, or anyone, really, you can go and

19   get some instruction and learn how to be perhaps a better

20   pilot.

21              He also does a couple others like Wings of Hope,

22   which go -- they go into foreign countries and home.  They're

23   medical flight people, and they go and help people medically.

24              He also does the Pacific Aviation Museum.  They have

25   his name on their -- not board of directors but something like

1    the honorary board of directors.  And on behalf of him, people

2    have given millions of dollars just in the last couple years.

3    Same with the San Diego Air and Space Museum.

4    Q.        Has General Yeager, to your knowledge, or you, on his

5    behalf, demanded or received any money for helping those

6    museums?

7    A.        No.

8    Q.        I want to turn with you to certain educational

9    efforts and educational programs that he may have been involved

10   in.

11            MR. KOHUT:  Your Honor, I want to -- I'm sorry.  Let

12   him finish the question.

13   Q.        BY MR. ZARIAN:  What are the Marshall University

14   Yeager Scholars?

15            MR. KOHUT:  Objection, Your Honor.  Rule 403 as to

16   this line of questioning and this particular question.

17            THE COURT:  Overruled.  You may answer.

18            THE WITNESS:  Marshall University Yeager Scholars was

19   started by Glennis and General Chuck Yeager in the late '80s.

20   And it's a four-year, full scholarship program, semester --

21   opportunity for a semester abroad, summer at Oxford.  It's a

22   leadership program.  It's in Huntington, West Virginia, which

23   is the closest school to where General Yeager was born.

24   Q.        And have you been personally involved in helping

25   provide support to the Marshall University Yeager Scholars?

1      A.        Yes, we have.  We go back about once a year and meet

2      with the Yeager scholars and some of the board, and we -- of

3      course, General Yeager lends his name to fundraising.  They

4      have eleven students.  They're trying to get up to 20.

5      Q.        Has General Yeager, to your knowledge, or have you,

6      on his behalf, ever demanded or received compensation for the

7      work he has done with the Marshall University Yeager Scholars?

8      A.        No.  In fact, I forgot, but Glennis in the '80s gave

9      much of General Yeager's historic memorabilia to Marshall

10     University Yeager Scholars for display, of course, and some of

11     it to the Smithsonian.

12              In fact, some of that money from the Free Spirit

13     Award, which he could have taken and put in his pocket, it went

14     through the General Chuck Yeager Foundation, but he gave a

15     $50,000 endowment fund.

16     Q.        What are the Young Eagles?

17     A.        Young Eagles was a program started in the '90s to get

18     a million kids flying by December 17th, 2003, the 100th

19     anniversary of the Wright Brothers.

20              And it was not really to make a million pilots,

21     necessarily, but just to open up their horizons and be

22     supportive of aviation.  And it's really changed lives because

23     we actually have sent two kids to the camp that they have in

24     the summer.

25              But anyway, General Yeager was the chairman of that

```
 1    program.  And as usual he got -- they went way beyond a

 2    million, a million-twenty-thousand, and probably another

 3    500,000 that hadn't been registered in the very beginning.

 4              And that program -- General Yeager, when he

 5    accomplished the mission, he stepped aside for the next people

 6    to come on.  He became Chairman Emeritus.  And because he is

 7    still attached and because people still honor him, that program

 8    is still going on today.

 9    Q.        Has General Yeager, to your knowledge, or have you,

10    on his behalf, demanded or received any money for assisting the

11    Your Eagles?

12    A.        No.

13              MR. KOHUT:  Objection.  Rule 403.

14              THE COURT:  Overruled.

15              THE WITNESS:  No.

16    Q.        BY MR. ZARIAN:  Ask you about one other.  The Civil

17    Air Patrol, what is that organization, ma'am?

18              MR. KOHUT:  Same objection, Your Honor.

19              THE COURT:  Overruled.

20              THE WITNESS:  It's really -- it's hard to describe.

21    I probably should have looked online.

22              But basically, for instance, when Steve Fossett went

23    missing in Nevada in an airplane, the Civil Air Patrol was the

24    first to muster and go try to look for him.  That's what they

25    do.  They also have a children's program, and in that program
```

1    they have a Chuck Yeager Award.

2    Q.       To your knowledge, has General Yeager or have you, on

3    his behalf, demanded or received any compensation for the

4    assistance he has provided the Civil Air Patrol?

5    A.       No.

6    Q.       Now, Victoria, when a profit corporation, a

7    for-profit corporation seeks to use General Yeager's name or

8    image to promote itself, does he usually require a fee for

9    that?

10   A.       He usually does, but there have been instances where

11   he hasn't.

12   Q.       All right.  Tell me about some of the instances where

13   he has not.

14   A.       We've had some people that we know very well, and

15   they've done some start-up businesses.  One was to -- it was

16   for-profit, but it was still to get the names of female

17   aviators that have made a difference out to especially young

18   girls.

19            And so they were selling T-shirts, and they had

20   General Yeager's name on the side.  She asked permission, and I

21   investigated -- that's a bigger word.  I researched her

22   business and what she was doing.  And I said, fine, when you

23   start making over a 100,000 or 200,000 dollars a year, come

24   back and talk to us for the permission.  And she was so

25   grateful.  She's not there yet, but we hope the best for her.

```
 1              And then there was another one, Di Freeze was a
 2    journalist, and she was having a little bit of trouble making
 3    ends meet, and she wanted to do a children's E-book on General
 4    Yeager.  So she asked her permission, and that's on Amazon.
 5    And she started giving us 50 percent of profits.  And I said
 6    you wait until after you make $10,000.  Come back to me, and
 7    we'll talk.
 8    Q.       Now when large for-profit corporations seek to use
 9    General Yeager's name or his image to promote themselves, does
10    he usually require a fee for that?
11    A.       Yes, he does.
12    Q.       And from time to time does he in fact license others
13    to use his name or a picture of himself for promotion --
14    A.       Yes, he does.
15    Q.       -- or publicity services?
16    A.       Yes, he does.
17    Q.       All right.  Does General Yeager have any guidelines
18    for deciding whether to enter into a license or similar
19    agreement with a company?
20    A.       Yes.
21    Q.       What are those guidelines?
22    A.       Well, he wants to make sure the company doesn't cheat
23    its customers or clients.  He wants to make sure that they have
24    good customer service and that they have a good reputation.  He
25    wants to have somebody that he doesn't lower his name.
```

1    Q.        Can you think of any instances where he has turned

2    down companies that wanted to enter into an agreement with him?

3    A.        Yes.

4    Q.        Can you give us an example?

5    A.        Well, Massey Coal from -- well, they are not based in

6    West Virginia, but they had operations in West Virginia.  They

7    wanted to use General Yeager's name, and they were talking in

8    the 7, 8 figures.

9              MR. KOHUT:  Objection, Your Honor.  Hearsay.

10   Additionally, relevance and 403.

11             THE COURT:  Sustained as to the hearsay.  The jury

12   shall disregard the reference to the dollar figures.

13             MR. ZARIAN:  May the witness continue, Your Honor?

14             THE COURT:  Ask the next question.

15   Q.        BY MR. ZARIAN:  Thank you, Your Honor.  Without

16   reference to the dollar amount that was discussed, what

17   happened with respect to the negotiations with Massey Coal?

18   A.        Well, I e-mailed, frankly, Homer Hickam, who's the

19   guy who wrote October Sky.  It's about him.  His father was a

20   coal miner, and he wanted to go into the NASA, astronaut in

21   space.  And I said do you know anything about Massey Coal

22   because it's, of course, his background.  And he said, oh,

23   they've rehabilitated --

24             MR. KOHUT:  Objection, Your Honor.  Move to strike.

25             THE COURT:  Sustained.

```
1                    THE WITNESS:  Sorry.

2       Q.      BY MR. ZARIAN:  Then what happened?

3       A.      Ultimately, we decided not to.

4       Q.      Why was that?

5       A.      Because Homer said that the home boys --

6               MR. KOHUT:  Objection.  Move to strike.  Hearsay.

7               THE WITNESS:  Sorry.

8               MR. ZARIAN:  It's not for the truth of the matter,

9       Your Honor.

10              THE COURT:  Sustained as to -- it's not for the truth

11      of the matter?

12              MR. ZARIAN:  It's not.

13              MR. KOHUT:  Then relevance.

14              MR. ZARIAN:  Simply to establish that there's been

15      instances where they have not in fact made agreements because

16      of the nature of the company involved.

17              THE COURT:  The objection is overruled.  I'll allow a

18      response to this one question.  The jury is instructed that the

19      response is not being offered for the truth of what this other

20      individual said but rather to give a sense of how the witness

21      makes decisions.

22              MR. ZARIAN:  Thank you, Your Honor.

23              THE WITNESS:  So I guess I can just say because of

24      what we understood, we decided not to -- General Yeager decided

25      and we decided that it wouldn't be a good idea to lend his name
```

1     to them.

2     Q.       BY MR. ZARIAN:  Fair enough.  Thank you.  Does

3     General Yeager receive compensation from time to time for any

4     speaking appearances?

5     A.       Yes.

6     Q.       And could you give the jury any examples of such

7     instances?

8     A.       We went to Europe to speak to Airbus and EADS.  And

9     because it was all condensed into one week, we basically did a

10    three-for instead of charging them for each talk.

11    Q.       So were there three speaking appearances?

12    A.       There were.  Excuse me.  There were.

13    Q.       And was there anything else?

14    A.       It might have been three or four.  He flew the A380,

15    which is the largest commercial plane in the world.

16    Q.       What year was this?

17    A.       It would have been -- wait just a moment -- it would

18    have been 2008, I think.

19    Q.       What was the compensation paid by Airbus for that?

20    A.       They gave $100,000.  I think it was more than that.

21    Wait a minute.

22             I think before I had said $100,000.  But as I think

23    about it, I think it was more like 130,000 or more.  In fact,

24    it was 150,000 because they also gave us some money for our

25    documentary that we're doing, and they continued to give that

1    because of our coming over.

2    Q.       Can you think of any other examples where General

3    Yeager received compensation for a speaking engagement for a

4    corporation?

5    A.       He spoke in Pittsburgh to a healthcare organization,

6    and it was a non-profit.  We suggested they just keep the money

7    and give it to their hospital, but they really, really wanted

8    to give him some money and have him come, so we charged them a

9    lot less than unusual.  It was 42-5.

10   Q.       42,500?

11   A.       Yes.

12   Q.       When was that, ma'am?

13   A.       That was -- I think that was in 2010 but -- 2009 at

14   the very earliest.  Maybe 2009.

15   Q.       All right.  Let me turn to a different type of

16   agreement.  Does General Yeager from time to time receive any

17   compensation in a cash or lump sum for licensing his name or

18   similar agreements with corporations?

19   A.       Yes.

20   Q.       What are some of the companies that, to your

21   knowledge, he has agreed to license his name or image to for a

22   fee over the years?

23   A.       GMP Diecast, America Remembers, Rolex.  He mentioned,

24   AC Delco.  Born Aviation.  I'm sure there's somebody else.  Oh,

25   Silvergate.

1    Q.        I want to ask you first about the companies that paid

2    a lump sum instead of a royalty.

3    A.        I'm sorry?

4    Q.        Let me inquire first as to AC Delco.  Are you

5    personally familiar with the terms of that arrangement?

6    A.        I'm not familiar with the terms.  I'm familiar with

7    the numbers -- I'm somewhat familiar with the numbers, not the

8    terms.

9    Q.        Can you tell us what you know about the numbers?

10        MR. KOHUT:  Objection.  Foundation.

11        THE COURT:  Overruled.  Rephrase the question,

12    actually, to make clear that her basis for being able to answer

13    any follow-up questions.

14    Q.        BY MR. ZARIAN:  Yes.  In connection with your

15    handling of General Yeager's business and legal fairs, have you

16    had occasion to learn some of the terms of the AC Delco

17    contracts?

18    A.        Yes.

19    Q.        And how did you learn those?

20    A.        We were given financial documents from the -- a

21    family corporation that was getting the monies.

22    Q.        And did you personally review those documents?

23    A.        I reviewed them a long time ago.  I did.

24    Q.        And from time to time did you have occasion to

25    discuss the AC Delco as background to negotiating an

1    arrangement on General Yeager's behalf?

2    A.        Yes.

3    Q.        Based on that personal background, can you tell us

4    what your understanding is of the financial arrangement that

5    attended the AC Delco agreement?

6              MR. KOHUT:  Objection.  Foundation.

7              THE COURT:  Overruled.

8              THE WITNESS:  It was my understanding that he was

9    getting somewhere between -- in the '80s somewhere between half

10   a million to three-quarters of a million a year.

11   Q.        BY MR. ZARIAN:  Was that renewed for a period of

12   time?

13   A.        He said it went for ten years.  And I found evidence

14   that it went for five.  It doesn't mean it didn't go for ten,

15   but that's my recollection.  It went for five -- five to seven,

16   sorry.

17             MR. KOHUT:  Move to strike the testimony.  Again

18   foundation.

19             THE COURT:  Granted in part.  The jury will disregard

20   what the General, himself, reportedly said but otherwise may

21   consider the response.

22   Q.        BY MR. ZARIAN:  Let me ask you about the Rolex

23   transaction.  Would you turn to Exhibit L.  It should be in the

24   binder there in front of you.

25             THE COURT:  This is Defendant's Exhibit L?

```
 1                    MR. ZARIAN:  Yes, it is.  And it is in evidence, Your

 2      Honor.

 3                    THE COURT:  It is.  It may be published if you wish.

 4                    MR. ZARIAN:  Thank you, Your Honor.

 5                    THE WITNESS:  Okay.

 6      Q.       BY MR. ZARIAN:  Do you have that in front of you?

 7      A.       Yes.

 8      Q.       Are you familiar with the terms of either of these

 9      two arrangements, either the first page or the second and third

10      pages?

11      A.       General Yeager gets ten percent of sales.

12      Q.       All right.  Is that your understanding of the Rolex

13      arrangements?

14      A.       I'm sorry.  I'm on the wrong one.  I'm sorry.

15      Q.       We're looking at Exhibit L.

16      A.       Sorry.  I was on M.

17      Q.       And it may be on your screen.

18      A.       There you go.  Sorry.  Okay.

19      Q.       It's hard to read there but whichever you prefer.

20               Are you familiar with the terms of General Yeager's

21      relationship with Rolex?

22      A.       Yes.

23      Q.       Does he have an agreement with Rolex now?

24      A.       Actually, we're in negotiations right now.

25      Q.       Are you assisting with those negotiations?
```

1    A.          Yes, I am.

2    Q.          To your understanding, does General Yeager in fact

3    own all of the rights to his own name at this time?

4    A.          Yes.

5               MR. KOHUT:  Foundation.  Move to strike.

6               THE COURT:  Granted.  That objection is sustained.

7    The jury shall disregard the answer.  You may lay a foundation

8    if you can.

9    Q.          BY MR. ZARIAN:  Is it in fact true that you handle

10   substantially all of General Yeager's legal and financial

11   affairs at this time?

12   A.          Yes.

13   Q.          And do you specifically handle substantially all of

14   his legal and financial affairs with respect to any licensing

15   of his name or image?

16   A.          Yes.

17   Q.          And based on that experience, which, by the way, how

18   long have you been doing that?

19   A.          Well, since March of -- since April of 2000 I've been

20   doing a little bit of it, and I think it was probably about

21   March of 2002 when I've been doing 99.9 percent of it.

22   Q.          Do you continue to do that to this time?

23   A.          Yes.

24   Q.          You help him in the administration of any contractual

25   agreements that he has involving licensing of his name?

1    A.        Yes.

2    Q.        You help negotiate the renewal or any new agreements

3    involving the licensing of his name?

4    A.        Yes.

5    Q.        And you continue to do that to the present date?

6    A.        Yes.

7    Q.        Based on that experience and that background, can you

8    tell me does General Yeager currently own all of the rights to

9    his own name?

10             MR. KOHUT:  Objection.  Foundation.  Calls for legal

11   conclusion.

12             THE COURT:  Overruled.  You may answer to the extent

13   you're able.  Just so the jury understands, this is not a legal

14   response.  It's what the witness knows.

15             THE WITNESS:  Yes.

16   Q.        BY MR. ZARIAN:  So the record is clear, is it your

17   testimony that, yes, in your opinion he does own all of those

18   rights?

19   A.        General Yeager owns all of the rights to his name.

20   Q.        All right.  Let's take a look at Exhibits 44 and 45

21   and 46.  Do you have those in front of you?

22   A.        Yes.

23   Q.        Are you familiar with these documents?

24   A.        I'm somewhat familiar.

25   Q.        And I believe these perhaps are being published.

1          They are not in evidence.  Are they being published?

2                    THE COURT:  They should not be published.  Can the

3          jury see the document?

4                    MR. ZARIAN:  Thank you.  I want to confirm that.

5          Q.        BY MR. ZARIAN:  Do you recognize Exhibit 44?

6          A.        Yes.

7          Q.        What is Exhibit 44?

8          A.        It's a contract with Electronic Arts for its Air

9          Combat with Yeager.  I think that's what that was.

10         Q.        Do you know where this contract came from, this copy

11         of this contract?

12         A.        I think it came from Electronic Arts, but I guess I'm

13         guessing, frankly.

14         Q.        Are you familiar with the Electronic Arts contract

15         between them and General Yeager?

16         A.        I'm somewhat familiar.

17         Q.        Do you recognize Exhibit 45?

18         A.        I do.

19         Q.        What is Exhibit 45?

20         A.        That's an amendment to the Electronic Arts Celebrity

21         Sponsorship and Development Agreement.

22         Q.        What's the date of that document?

23         A.        July 2nd, '91.

24         Q.        What about Exhibit 46, are you familiar with that

25         document?

```
 1        A.        Yes.

 2        Q.        What is that document?

 3        A.        That's a second amendment to the Celebrity -- to the

 4   Air Combat with General Yeager, which is a computer game.

 5        Q.        Do you have -- in the course of assisting General

 6   Yeager with his business and financial matters as his wife, do

 7   the two of you keep copies of these Electronic Arts agreements

 8   on file anywhere?

 9        A.        Actually, yes.

10        Q.        Are you generally familiar with the terms of these

11   agreements?

12        A.        Generally, yes.

13             MR. ZARIAN:  Your Honor, I would move these into

14   evidence.

15             MR. KOHUT:  Objection, Your Honor.  Foundation.

16   Additionally with respect to Exhibit 46 it's an unsigned

17   document.

18             THE COURT:  Objection is sustained without prejudice.

19             MR. ZARIAN:  As to 46 or all three, Your Honor?

20             MR. KOHUT:  No foundation laid.

21             THE COURT:  All three.

22        Q.   BY MR. ZARIAN:  What's your understanding of the

23   Electronic Arts agreement with General Yeager?

24             MR. KOHUT:  Objection, Your Honor.  She's testifying

25   about the content of a document that has not been received into
```

1    evidence.

2          THE COURT:  Overruled.  Answer the question.  What's

3    your understanding?

4          THE WITNESS:  This is a contract to license General

5    Yeager's name.  And the names -- well, his name.  And it's for

6    the Air Combat computer game.

7    Q.      BY MR. ZARIAN:  And what is your understanding the

8    amount that General Yeager received under the terms of the

9    agreement?

10         MR. KOHUT:  Objection, Your Honor.  Foundation.

11         Your Honor, her understanding is simply not relevant.

12   She doesn't have the foundation for these documents that's been

13   established.  She's now trying to put into evidence the content

14   of documents which she neither understands and she doesn't have

15   a basis for, and there is no foundation.  And her understanding

16   itself is irrelevant.

17         THE COURT:  Well, overruled.  The question is about

18   revenues received.

19         MR. ZARIAN:  That's right.

20         MR. KOHUT:  That's right, Your Honor, but --

21         THE COURT:  To the extent Ms. Yeager can answer that

22   question, she may answer.

23         MR. ZARIAN:  Thank you, Your Honor.

24         MR. KOHUT:  That's revenues received as opposed to

25   revenues provided for in the agreement, Your Honor?

1           MR. ZARIAN:  Your Honor, if there's excessive

2      argument, perhaps --

3           THE COURT:  You ask the question, and you'll be able

4      to cross-examine.  Clarify the question.

5      Q.      BY MR. ZARIAN:  Thank you, Your Honor.

6           What is your understanding, Mrs. Yeager, of the

7      revenues actually received by General Yeager under the terms of

8      the Electronic Arts agreements?

9           MR. KOHUT:  Objection.  Foundation.

10          THE COURT:  Overruled.

11          THE WITNESS:  He received well over a million

12     dollars.  Well over if not actually.  I guess I'll stay with

13     well over.  I thought it was somewhere around two, but I'll

14     stay it was well over a million.

15     Q.      BY MR. ZARIAN:  Let me turn with you to Exhibit 53 in

16     the binder before you, ma'am.

17     A.      Yes.

18     Q.      Do you recognize Exhibit 53?

19     A.      Yes, I do.

20     Q.      What is Exhibit 53?

21     A.      It's an agreement -- am I supposed to say the name?

22     It's an agreement between General Yeager and UBS.

23     Q.      Can you tell me what the date of the document is?

24     A.      August 5th, 2010.

25     Q.      Were you personally involved in helping negotiate

1      this agreement?

2      A.          Yes, I was very involved.

3      Q.          And do you recognize this as a true and correct copy

4      of that agreement, that is, the final agreement?

5      A.          Yes.  It looks like it.

6                  MR. ZARIAN:  Your Honor, plaintiff would move

7      Exhibit 53 into evidence.

8                  MR. KOHUT:  Objection, Your Honor.  Relevance.  Four

9      years after the date.

10                 MR. ZARIAN:  Goes to the weight, Your Honor.

11                 THE COURT:  Overruled.

12                 MR. ZARIAN:  Thank you, Your Honor.

13                 THE COURT:  Exhibit 53 is admitted and may be

14     published.

15                 (Plaintiff's Exhibit 53, Brand Marketing Contract,

16     admitted into evidence.)

17     Q.          BY MR. ZARIAN:  Could you please summarize for the

18     jury the terms of the agreement that's in evidence as

19     Exhibit 53?

20     A.          General Yeager would receive $101,000, and it was

21     only for use in print, only print outside of the United States.

22     And it was only one particular ad.  And the ad, frankly, even

23     wearing these glasses I could barely see his name.

24                 They were not allowed in any way, shape or form to

25     put it on the internet or to put it in any publication that

1     would reach the United States.  They cannot put it on anything

2     but printed material, so newspapers and magazines.

3                 MR. KOHUT:  Your Honor, may I make an inquiry?  The

4     exhibit that I have does not include the advertisement at the

5     end of the contract.  May I inquire if the Court's copy does?

6                 THE WITNESS:  That's true.

7                 THE COURT:  The Court's copy is only a contract.

8     What's on the screen?

9                 THE WITNESS:  That's the ad I was talking about, Your

10    Honor.

11                MR. KOHUT:  There is an ad, Your Honor, which is

12    attached to and is an exhibit to this contract.  And either

13    that should be included or the contract should be excluded as

14    only a partial document.

15                MR. ZARIAN:  Your Honor --

16                THE COURT:  Is this being published?

17                THE CLERK:  Yes, it is.

18                MR. ZARIAN:  It is.  It is in evidence.

19                THE COURT:  Your point is it should be a part of the

20    exhibit, you just don't have a copy in your binder, Mr. Kohut?

21                MR. KOHUT:  My point, Your Honor, is that this

22    particular contract incorporates the actual advertisement that

23    is the subject of the contract.  And at least the copy I have,

24    and I believe the copy the Court has, does not include that

25    advertisement which Ms. Yeager has just spoken of.

1              MR. ZARIAN:  Your Honor, this was taken up at a prior

2      hearing.

3              MR. KOHUT:  This particular --

4              MR. ZARIAN:  If I may finish, counsel?

5              THE COURT:  Is this the exhibit to the contract?

6              MR. ZARIAN:  It is part, yes.  It is a part of the

7      exhibit of the contract and of the Exhibit 53.  And it was

8      produced once the Court received a protective order that it was

9      an issue that precluded the production of an unredacted version

10     of this document, and so it was previously produced in a

11     redacted version that did not identify the contracting parties.

12     Once that --

13             THE COURT:  Where is the defense's copy or the

14     Court's copy of the full exhibit?

15             MR. ZARIAN:  The defense received it over the

16     weekend.

17             THE COURT:  Where is the Court's copy?

18             MR. ZARIAN:  I don't know.

19             MR. KOHUT:  May I simply inquire, Your Honor, whether

20     the Court has as a last page the actual advertisement?

21             THE COURT:  No, I do not.  That's why I'm asking

22     Mr. Zarian for that.  So there is really no dispute here but

23     that the exhibit should include all of the attachment.

24             MR. KOHUT:  That's correct, Your Honor.

25             THE COURT:  All right.  Just so it's clear, and it

1      appears it's not disputed, this is part of the attachment.  All

2      right.  So that it's properly published to the jury, the Court

3      just needs the balance of the exhibit, and the defense needs

4      the balance of the exhibit so it's complete.

5               MR. ZARIAN:  Thank you, Your Honor.  And the defense

6      has it.  We'll ensure that the Court has one, too.  Thank you,

7      Your Honor.

8               THE COURT:  And just as a reminder, prior protective

9      orders don't apply here in trial unless the Court has

10     confirmed.  And so the redactions are not accepted.

11              MR. ZARIAN:  There's other issues involved as to when

12     it could be produced and probably beyond the scope of this

13     discussion, Your Honor.  But happy to discuss those with the

14     Court.  Thank you, Your Honor.

15              THE COURT:  At this point, the exhibit is coming in

16     unredacted with the exhibit.

17              (Plaintiff's Exhibit 53, Brand Marketing Contract,

18     admitted into evidence.)

19              MR. ZARIAN:  Thank you, Your Honor.  So we may

20     publish it again then?

21              THE COURT:  You may.

22     Q.       BY MR. ZARIAN:  Let me direct your attention,

23     Mrs. Yeager, to the page that's on the screen in front of you.

24     What is that, by the way?  What are we looking at?

25     A.       We're looking at the ad to which we agreed could be

1    in only newspapers or magazines outside the United States.

2    Q.        Were certain countries specified?

3    A.        The way the -- the way the marketing business works

4    is that they say "worldwide rights exclusive of the United

5    States."  So it was anywhere outside the U.S.

6    Q.        And was it just this one ad?

7    A.        Just this one ad.

8    Q.        Does General Yeager's name appear anywhere on this

9    ad?

10   A.        It does.  It appears up in the left corner.

11   Q.        Okay.  We see that now on the screen.  Is that the

12   only reference to General Yeager's name in this ad?

13   A.        Yes.

14   Q.        What was the compensation that was paid under the

15   terms of the USB (sic) agreement for this use of General

16   Yeager's -- sorry -- UBS agreement for this use of General

17   Yeager's name?

18   A.        For the UBS agreement for worldwide rights exclusive

19   of the United States, just in print material, newspapers and

20   magazines, no internet, no TV, no nothing else, it was

21   $101,000.

22   Q.        For what term?

23   A.        For one year.  And there were -- he was one of 240

24   celebrities in that year.  They were rolling out 60 celebrities

25   every three months.

1           And also the $101,000 was most-favored nations,

2    meaning nobody else for the same usage would get anymore.  And

3    in fact it's my understanding that the next person of those

4    other 239 celebrities got -- the most that the next person got

5    was about a third.

6    Q.        Thank you.  Let me turn with you to some of the other

7    instances in which General Yeager received a royalty, that is,

8    a percentage or a per-article, per-item fee.  Is the Born

9    Aviation one of those instances?

10   A.        Yes.

11   Q.        Are you familiar with the terms of the Born Aviation

12   agreement?

13   A.        Yes.

14   Q.        And can you summarize the terms as you understand

15   them?

16   A.        For the use of General Chuck Yeager's name he got ten

17   percent.

18   Q.        Ten percent of what, Mrs. Yeager?  What is the

19   business of Born Aviation?

20   A.        They are a wholesaler.  And so they were selling a

21   Chuck Yeager shirt.  In fact, I might wear one tomorrow, but it

22   has a P51 on it and a copy of his autograph, and hats with his

23   P51, Glamorous Glenn III, named after his wife, and a copy of

24   his autograph.

25   Q.        Were there any other similar agreements that you're

1      familiar with?

2      A.          Yes.

3      Q.          Involving a percentage royalty?

4      A.          Yes.  GMP Diecast.

5      Q.          Tell about the GMP Diecast.  What does GMP stand for?

6      A.          Georgia Marketing -- not sure -- Promotions maybe --

7      Productions.

8               And they wanted to make and sell a die cast model,

9      very high-end die cast model of Glamorous Glenn III, the same

10     name of the plane that General Yeager flew in World War II,

11     shot down -- credited with eleven-and-a-half -- actually shot

12     down more -- airplanes, so he is a fighter ace.  And -- I'm

13     sorry.  What was the question?

14     Q.          Could you summarize just the terms of that agreement?

15     A.          So for permission to use his name, and Glamorous

16     Glenn III, and his image, they were paying $8 for a model,

17     which really came out to about 15 percent total of the sales

18     price, wholesale price, and we also got some product.  And

19     there is a book out that -- for lawyers, really, or

20     negotiators, and if you look at that --

21     Q.          Let me stop you there.

22     A.          Sorry.

23     Q.          Were there any other similar agreements involving a

24     royalty payment, percentage?

25     A.          Yes.  There was one for Silvergate.

1    Q.        What is Silvergate?  What kind of a company?

2    A.          There is a lot of modelers out there.  It's a very,

3    very, very small market.  And modelers, what they do is they

4    take -- they're sold pieces of an airplane, and they take them

5    off, and they glue them together.  And this was a very low-end

6    sort of plane, so it was a P51, Glamorous Glenn II, and they

7    were paying 15 percent.

8    Q.        Are you personally familiar with the terms of that

9    agreement?

10   A.        Sorry.  Yes, I am.

11   Q.        And are they paying 15 percent, is that correct?

12   A.        Yes.

13   Q.        Any others that you recall involving a percentage

14   royalty?  I think you mentioned America Remembers?

15   A.        America Remembers, yes.  America Remembers.  That's

16   from the '80s, and that's ten percent.

17   Q.        All right.  Let me turn to a different area.

18             Your Honor, by the way, I would go ahead and move

19   Exhibits J, K, M and N into evidence?

20             THE COURT:  Any objection?

21             MR. KOHUT:  I have to look at them first, Your Honor.

22             MR. ZARIAN:  They are actually defendant's exhibits.

23             THE COURT:  Still I'll give Mr. Kohut a chance to

24   make certain he knows.

25             MR. ZARIAN:  I can come back to this.  Perhaps

1          counsel can consider that, Your Honor.

2                    THE COURT:  All right.

3          Q.        BY MR. ZARIAN:  To your knowledge, Mrs. Yeager, let's

4          just be clear, does General Yeager currently own all of the

5          rights to his own name to your understanding?

6                    MR. KOHUT:  Objection.  Foundation.  Asked and

7          answered.

8                    THE COURT:  Overruled.

9                    THE WITNESS:  Yes.  He owns all of the rights.

10         Q.        BY MR. ZARIAN:  Let me ask you, what is The General

11         Chuck Yeager Foundation?

12         A.        It's 501(c)(3) non-profit.  It started, as General

13         Yeager said, when he got the Free Spirit Award.  He didn't want

14         to waste any of that money on taxes, so we started a

15         foundation.

16         Q.        Does The Chuck Yeager Foundation currently own any of

17         the rights to General Yeager's name?

18         A.        No.

19         Q.        What is General Chuck Yeager, Inc.?

20         A.        That's an S Corporation formed for -- we were -- it

21         was recommended by an accountant to form it for tax purposes.

22         Q.        All right.  Does that corporation still exist?

23         A.        It does.  Barely.

24         Q.        Has it been dissolved?

25         A.        Not yet.  No.

1      Q.        Does that corporation currently own any of the rights

2      to General Yeager's name?

3      A.        No.

4      Q.        Let me turn with you to Exhibit 49 in the binder in

5      front of you.  What is this document, do you recognize it?

6      A.        This is a document that I found online.

7      Q.        Did you personally retrieve this document?

8      A.        Yes.

9      Q.        When did you personally retrieve this document?

10     A.        I don't recall really.

11     Q.        Do you remember the year?

12     A.        It might have just been last year, frankly.  But it

13     might have also been in 2006.  Sorry.  I just don't remember

14     right now.

15     Q.        All right.  But you recall personally retrieving this

16     document?

17     A.        Yes.

18     Q.        What is the title of the document?

19     A.        "Cingular Enhances Emergency Preparedness for 2006

20     Hurricane Season."

21     Q.        Can you tell me the date that appears on this

22     document?

23     A.        May 17th, 2006.

24               MR. ZARIAN:  Your Honor, plaintiff would move

25     Exhibit 49 into evidence.

1              MR. KOHUT:  Objection.  Hearsay.  Relevance.

2    Incomplete.

3              MR. ZARIAN:  This is the press release at issue.

4              MR. KOHUT:  It is not, Your Honor.  Additionally, the

5    press release is actually Exhibit 1.  This document is not

6    complete.  It's missing a paragraph.

7              MR. ZARIAN:  Counsel is mistaken.  Exhibit 1 is cut

8    off on the entire right-hand margin.

9              THE COURT:  No argument.  I'll allow you to lay a

10   further foundation to clarify the nature of this document.

11   Q.        BY MR. ZARIAN:  Okay.  Again, Mrs. Yeager, did you

12   personally access this document online?

13   A.        Yes.

14   Q.        Did you do that on a computer that you or General

15   Yeager owned?

16   A.        Yes.

17   Q.        Do you know where you were when you did that?

18   A.        I was in the home office with my computer.

19   Q.        And when you accessed this document, do you remember

20   what particular website or destination online you went to?

21   A.        Well, there were three.  That's why I'm a little

22   confused.

23   Q.        Tell me about the three?

24   A.        One was the freelibrary.com, one was phonedog.com.

25   Actually, I think there's more like four or five, but I just

1     can't remember their names right now.  Sorry.

2     Q.        Did you print all of them, or did you choose to print

3     this one?

4     A.        I chose to print this one, and the others I

5     downloaded, and I e-mailed them.

6     Q.        But this is the one that you printed, is that

7     correct?

8     A.        Yes.

9     Q.        And did you do that on your own personal printer?

10    A.        Yes.

11    Q.        Do you understand this to be a true and correct copy

12    of the document that you printed?

13    A.        Yes.

14              MR. ZARIAN:  Your Honor, I would move Exhibit 49 into

15    evidence.

16              MR. KOHUT:  Objection, Your Honor.  Foundation.  The

17    witness doesn't know whether she downloaded this in 2006 or

18    recently.  It's an incomplete document.  Additionally, she

19    can't source the document.  It appears on the second page --

20              THE COURT:  What are the legal objections?

21              MR. KOHUT:  Foundation, Your Honor.

22              THE COURT:  Overruled.

23              MR. KOHUT:  Foundation.  Hear --

24              THE COURT:  The objections are overruled.  Exhibit 49

25    is admitted.

1              (Plaintiff's Exhibit 49, Cingular Press Release on

2      Wireless IQ-Technology Market Research, admitted into

3      evidence.)

4      Q.       BY MR. ZARIAN:  Thank you, Your Honor.  May it be

5      published?

6              THE COURT:  It may.

7      Q.       BY MR. ZARIAN:  When did you first see this press

8      release from AT&T, or Cingular, it's predecessor?

9              MR. KOHUT:  Objection, Your Honor.  Assumes it's from

10     AT&T or Cingular, and there's been no foundation.

11             THE COURT:  Sustained.

12     Q.       BY MR. ZARIAN:  Who do you understand issued this

13     press release?

14     A.       Cingular.

15             MR. KOHUT:  Objection.  Foundation.

16             THE COURT:  Overruled.

17             MR. ZARIAN:  It's her understanding, Your Honor.

18             THE COURT:  Overruled.

19     Q.       BY MR. ZARIAN:  When did you first see this press

20     release that you understand is from Cingular, now AT&T?

21     A.       Shortly after this date, May 17, 2006.

22     Q.       Do you recall where you were when you first saw this

23     press release from Cingular?

24     A.       I was at my computer.

25     Q.       At home?

1          A.          At home.

2          Q.          And is that how you found out about the press

3     release?

4          A.          Someone e-mailed us the information, and so I went

5     online and looked.

6          Q.          Someone brought it to your attention, is that right?

7          A.          Yes.

8          Q.          Do you see General Yeager's name referenced in this

9     press release?

10         A.          Yes.

11         Q.          And I think that's been highlighted on the screen in

12    front of you, is that correct?

13         A.          Yes.

14         Q.          And is that the reference you were just identifying

15    to General Yeager's name?

16         A.          Yes.

17         Q.          Now at any time prior to May 17, 2006, did you give

18    AT&T, or Cingular, on General Yeager's behalf permission to use

19    his name in this press release?

20         A.          No.

21         Q.          To your knowledge, at any time prior to May 17, 2006,

22    did General Yeager himself give AT&T any permission to use his

23    name in this promotional release?

24         A.          No.

25                    MR. KOHUT:  Objection, Your Honor.  Argumentative

1    with respect to the word "promotional."

2              MR. ZARIAN:  I'll withdraw it.  Let me restate it.

3              MR. KOHUT:  Additionally --

4              THE COURT:  The question is withdrawn.

5              MR. KOHUT:  Okay.

6    Q.        BY MR. ZARIAN:  At any time prior to May 17, 2006,

7    did General Yeager, to your knowledge, give AT&T permission to

8    use his name in this press release?

9              MR. KOHUT:  Objection, Your Honor.  Assumes this

10   press release came from AT&T.  The only information we have on

11   that --

12             THE COURT:  Sustained.

13   Q.        BY MR. ZARIAN:  Cingular.  To your knowledge, at any

14   time prior to May 17th, 2006, did General Yeager give Cingular

15   permission to use his name in this press release?

16             MR. KOHUT:  Same objection.  There is no evidence it

17   came from Cingular.

18             THE COURT:  Overruled.

19             THE WITNESS:  He did not give any permission at all

20   to use his name.  Cingular -- he did not give Cingular any

21   permission to use his name at all.

22   Q.        BY MR. ZARIAN:  To your knowledge, has General Yeager

23   ever entered into any agreement with a cell phone company to

24   allow them to use his name or his image?

25   A.        He has not.

1    Q.        To your knowledge, has General Yeager ever entered

2    into an agreement with any phone or telephone or

3    telecommunications company to let it use his name or his image?

4    A.        He has not.

5    Q.        You continue to currently assist General Yeager in

6    the negotiation of agreements with corporations, is that

7    correct?

8    A.        Yes.

9    Q.        In those negotiations, what are some of the factors

10   that you take into consideration in deciding what the final

11   terms of the agreement will be?

12             MR. KOHUT:  Objection.  Foundation.  Relevance.

13             THE COURT:  Overruled.  But this will be the last

14   answer.  You may briefly answer this question, and then we're

15   going to adjourn for today.

16             MR. ZARIAN:  Thank you, Your Honor.

17             THE WITNESS:  What we take into consideration first

18   -- literally first is the company's reputation and whether they

19   are well thought of, whether they treat their customers well or

20   their clients well.  And we look to see if there's complaints

21   on the internet and what the character of the complaints are.

22             And so General Yeager pretty much decides that first,

23   and then we talk about the money and the usage.  He always or

24   -- never say always, never say never.  He does retain the right

25   to -- if -- to ok or not ok what the actual usage is in the

1          form of the usage.

2                  For instance, that UBS, they had to show us that

3          before they put it out.

4                  MR. ZARIAN:  Thank you.

5                  THE COURT:  All right.  That would bring us to 4:30,

6          and I made a promise to the jury to adjourn today at 4:30, so

7          we're going to do that.

8                  As we adjourn for the evening, please remember my

9          admonition to not discuss the case with anyone.  At most you

10         may tell family members and employers that you're on a jury

11         here.

12                 Do not do any research of any kind, don't go on the

13         internet, go to the library, don't use a handheld device.  If

14         you hear any news reports about the case, turn them off,

15         disregard them entirely.  If anyone approaches you overnight,

16         please let me know first thing in the morning.  And do not

17         discuss the case with anyone.  Tell them you are ordered not to

18         discuss the case.  Continue to keep an open mind until the case

19         is sent to you for deliberations.

20                 So have a good evening.  If you could be back ready

21         to go at 8:30 tomorrow morning.  Reminder, our schedule

22         tomorrow is 8:30 to 1:30 with two short breaks.  So bring

23         snacks if you will need those to survive until a late lunch at

24         1:30.  We will see you tomorrow.  Thank you very much.

25                 (Jury out.)

1          THE COURT:  You may be seated.  At this point,

2    Mr. Kohut do you know is the defense planning to put on a case

3    in defense?  I'm just trying to look at our schedule for the

4    rest of the week.

5          MR. KOHUT:  Yes, of course, Your Honor.

6          THE COURT:  Can you outline that for me in terms of

7    how long?  I'm trying to decide when we should have our first

8    final jury instruction session.

9          MR. KOHUT:  You know, assuming that I'm permitted to

10   fully examine Ms. Brown and Mr. Siegel when they are called,

11   which I assume is going to be tomorrow, then we would call our

12   expert, David Drews, and then intend to complete our case

13   subject to any rights of rebuttal that we may have as a result

14   of things that may or may not come up through the presentation

15   of plaintiff's case.  And Mr. Drews I would expect to get on

16   and off in less than 40 minutes.

17          I do have one additional issue I would like to raise.

18          THE COURT:  Any objection to Mr. Kohut conducting his

19   direct and cross of Ms. Brown at the same time?

20          MR. ZARIAN:  No objection, Your Honor.

21          THE COURT:  All right.  So that will be the procedure

22   to save time.

23          I do believe we have a draft of the proposed final

24   instructions for you, so before you leave the courtroom wait

25   for those.  And then the Court's practice is to have you meet

1    first with the law clerk and narrow down the disputed issues

2    that I really need to discuss with you.  And so you'll do that

3    at some point tomorrow.  It appears that presentation of

4    evidence will take until the end of -- probably until 1:30 p.m.

5    tomorrow.

6            MR. ZARIAN:  For our case-in-chief or generally?

7            THE COURT:  Both.  I don't think both cases will be

8    done by 1:30 tomorrow.

9            MR. ZARIAN:  Personally, I think it will spill over

10   somewhat into Wednesday, Your Honor.  I agree.

11           THE COURT:  Or at least it will take until 1:30 p.m.,

12   so I would propose a working session on jury instructions at

13   1:30.

14           MR. KOHUT:  That's fine, Your Honor.

15           THE COURT:  All right.  Mr. Kohut, you had something

16   additionally?

17           MR. KOHUT:  Thank you very much, Your Honor.

18           I'm concerned about the existing line of examination.

19   As you may recall, we had a motion in limine where we asked the

20   Court to essentially preclude the plaintiffs from -- well, let

21   me just say it in a rough sentence -- from trashing AT&T.

22           And it appears as though that's where we're going

23   with this latest line of questioning.  The questions have not

24   yet been asked.  But the questions with respect to the

25   company's reputation certainly would suggest that.

1                    And we would ask that that be precluded on the basis

2          that it's not relevant in this particular case.  What the

3          General is requesting, essentially, is an endorsement value for

4          the use of his name.  His name was used before he had an

5          opportunity to make a decision as to whether he would or would

6          not allow the company to use his name, which, of course, we

7          believe we had a legal right to use his name.

8                    And, consequently, any feelings that he may or may

9          not have had about the company prior to the use here are

10         irrelevant and really self-serving at this point now that we're

11         involved in this lawsuit, so --

12                   THE COURT:  All that's been elicited so far is the

13         criteria.

14                   MR. KOHUT:  I understand that.  I assume that we're

15         going into a particular direction that's why I'm raising it

16         now.

17                   MR. ZARIAN:  We're not heading off in any direction.

18         I could head that off at the pass.  It was one question.  It's

19         not a line.  And, frankly, I intend to turn to what other

20         factors they consider.  That's really where I thought the

21         question was going in any event, so --

22                   THE COURT:  So you don't plan to ask a hypothetical:

23         If you would have had the opportunity to say yes or no to AT&T?

24                   MR. ZARIAN:  No.

25                   MR. KOHUT:  Your Honor, in that case what is the

1     relevance of the factors that he considers?

2             THE COURT:  Well, it was one of several factors.  So

3     I'm accepting the representation that there is no plan to

4     elicit a response to a hypothetical.

5             MR. ZARIAN:  Thank you, Your Honor.

6             MR. KOHUT:  Thank you, Your Honor.

7             THE COURT:  Anything else we need to discuss this

8     evening?

9             MR. KOHUT:  Not on our side, Your Honor.

10            MR. ZARIAN:  Not for us, Your Honor.

11            THE COURT:  The Court will be available at 8:15 in

12    the morning but ready to go at 8:30.

13

14                          CERTIFICATION

15

16            I, Diane J. Shepard, certify that the foregoing is a

17    correct transcript from the record of proceedings in the

18    above-entitled matter.

19

20

21                          /s/ DIANE J. SHEPARD
                            DIANE J. SHEPARD, CSR #6331, RPR
22                          Official Court Reporter
                            United States District Court
23

24

25